TODD KIM, Assistant Attorney General
SETH M. BARSKY, Section Chief
MEREDITH L. FLAX, Assistant Section Chief
MICHAEL R. EITEL, Senior Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, South Terrace 370
Denver, Colorado 80202
Phone: (303) 844-1479 / Fax: (303) 844-1375
Email: Michael.Eitel@usdoj.gov

*Attorneys for Federal Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEFENDERS OF WILDLIFE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. FISH AND WILDLIFE SERVICE, et al.,<br><br>Defendants. | Case No. 4:21-cv-00344-JSW<br><br>4:21-cv-00349-JSW<br><br>4:21-cv-00561-JSW |
| WILDEARTH GUARDIANS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DEBRA HAALAND, U.S. SECRETARY OF THE INTERIOR, et al.,<br><br>Defendants. | **FEDERAL DEFENDANTS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT; OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| NATURAL RESOURCES DEFENSE COUNCIL, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,<br><br>Defendants. | Date:  November 12, 2021<br>Time: 9:00 AM<br>Courtroom: 5<br>Judge: Hon. Jeffrey S. White |

# NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on November 12, 2021, at 9:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 5 of the above-entitled Court, located at 1301 Clay Street, Oakland, California, or by video teleconference, Federal Defendants the U.S. Fish and Wildlife Service, et al., by and through undersigned counsel, will move for summary judgment for the reasons more fully set forth in the accompanying memorandum of points and authorities.

DATED: August 20, 2021

TODD KIM, Assistant Attorney General
SETH M. BARSKY, Section Chief
MEREDITH L. FLAX, Assistant Section Chief

*/s/ Michael R. Eitel*
MICHAEL R. EITEL, Senior Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, South Terrace 370
Denver, Colorado 80202
Phone: (303) 844-1479 / Fax: (303) 844-1375
Email: Michael.Eitel@usdoj.gov

OF COUNSEL:

KRISTEN BYRNES FLOOM
U.S. Department of the Interior
Office of the Solicitor

# TABLE OF CONTENTS

**PAGE**

I.   INTRODUCTION……………………………………………… 1

II.  BACKGROUND…………………………………………....... 3

　　A.   Statutory background—the Endangered Species Act (ESA)……………. 3

　　B.   Factual and Regulatory Background………………………………… 4

　　　　1.   Gray wolf biology………………………………… 4

　　　　2.   Gray wolf status and distribution in the United States……………. 5

　　　　3.   Recent regulatory processes ………………………………… 7

　　　　　　a.   The 1978 Listing Rule………………………………….. 7

　　　　　　b.   Recovery of NRM and Great Lakes metapopulations…….. 8

　　　　　　c.   The Service's recent regulatory actions addressing gray
　　　　　　　　wolves in the lower 48 United States……………………… 9

　　　　　　　　i.    The 2019 Proposed Rule…………………………... 9

　　　　　　　　ii.   Public Comment and Peer Review………………… 10

　　　　　　　　iii.  The 2020 Final Rule………………………………… 12

III. STANDARD OF REVIEW……………………………………… 14

IV.  ARGUMENT……………………………………………… 15

　　A.   The Service properly removed ESA protections for the gray wolves
　　　　previously listed as threatened or endangered in the lower 48 States……… 16

　　　　1.   The ESA requires the Service to first identify a valid "species"
　　　　　　capable of being protected as threatened or endangered…………. 16

　　　　2.   The Service properly determined that the Minnesota and 44-State
　　　　　　entities are not protectable "species" under the ESA…………….. 18

　　　　　　a.   The Service's review of the *status* of gray wolf entities is
　　　　　　　　not legally relevant to the regulatory action taken………… 20

　　　　　　b.   Plaintiffs' focus on whether the Service should list other
　　　　　　　　"species" does not undermine the 2020 Rule……………… 24

　　B.   The Service rationally concluded that gray wolves are recovered………... 27

　　　　1.   The Service properly analyzed all wolves in the lower 48 States… 28

　　　　2.   The Service rationally analyzed the status of and threats to wolves
　　　　　　in significant portions of their range in the United States………….. 32

　　C.   The Service's five-factor inquiry considering threats to gray wolves is
　　　　reasoned……………………………………………… 38

　　　　1.   The Service reasonably determined that gray wolves are not an

endangered species or a threatened species because of human-caused mortality.......................................................... 39

2.    The Service reasonably determined that gray wolves are not an endangered species or a threatened species because of the inadequacy of existing regulatory mechanisms......................... 42

a.    Plaintiffs misstate the Service's obligations in reviewing State regulatory mechanisms..................................... 42

b.    The Service reasonably determined that gray wolves are not endangered or threatened because of inadequate regulatory mechanisms in the Great Lakes..................... 43

c.    The Service reasonably determined that gray wolves are not endangered or threatened because of inadequate regulatory mechanisms outside of the Great Lakes............ 47

V.    CONCLUSION................................................................................. 49

# TABLE OF AUTHORITIES

**CASES**                                                                     **PAGE**

*Alaska v. U.S. Dep't of Agric.*, 772 F.3d 899, 900 (D.C. Cir. 2014)........................ 27

*Alsea Valley Alliance v. Evans*, 161 F. Supp. 2d 1154, 1162 (D. Or. 2001)............... 18, 25

*Center for Biological Diversity v. Morgenweck*, 351 F. Supp. 2d 1137 (D. Colo. 2004) .................................................................................................... 25

*Center for Biological Diversity v. Jewell*, 12-cv2296, 2014 WL 5703029 (D. Ariz. Nov. 5, 2014)......................................................................................... 21

*Center for Biological Diversity v. Zinke*, 868 F.3d 1054, 1060 (9th Cir. 2017)............ 18,22,35

*Center for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018)............ 41

*Chevron USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1984)............. 17

*City of Arlington, Tex. v. FCC*, 569 U.S. 290, 301 (2013)..................................... 27

*City of Los Angeles v. U.S. Dep't of Com.*, 307 F.3d 859, 877 (9th Cir. 2002) ........... 26

*Coos Cty Bd of Cty. Comm'rs v. Kemthorne*, 531 F.3d 792, 804 (9th Cir. 2008) ......... 20

*Crickon v. Thomas*, 579 F.3d 978, 988 (9th Cir. 2009)....................................... 27

*Crow Indian Tribe v. United States*, 965 F.3d 662 (9th Cir. 2020).......................... 23

*Defenders of Wildlife v. Dep't of Interior*, 354 F. Supp. 2d 1156 (D. Or. 2005)............ 22-23

*Defenders of Wildlife v. Norton*, 258 F.3d 1136 (9th Cir. 2001)............................. 20, 32

*Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207 (D. Mont. 2010)................... 18

*Defenders of Wildlife v. Zinke*, 849 F.3d 1077 (D.C. Cir. 2017) ............................. passim

*Defenders of Wildlife v. Zinke*, 856 F.3d 1248, 1263 (9th Cir. 2017) ...................... 29

*Desert Survivors v. U.S. Dep't of Interior*, 321 F. Supp. 3d 1011 (N.D. Cal. 2018)....... 33

*E. & J. Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1039 (9th Cir. 2007) ............. 21

*Friends of Animals v. Haaland*, 997 F.3d 1010, 1015 (9th Cir. 2021)...................... 33

*Friends of Blackwater v. Salazar*, 691 F.3d 428, 436 (D.C. Cir. 2012)..................... 44

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009)......................... 15

*Greater Yellowstone Coalition, Inc. v. Servheen*, 665 F.3d 1015, 1019 (9th Cir. 2011)........................................................................................ 15, 43

*Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994)....................................... 16

*Humane Society of the United States v. Locke*, 626 F.3d 1040, 1051 (9th Cir. 2010)..... 30

*Humane Society of the United States v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017) ........... passim

*Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)............................................. 15

*Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008)................................ 15

*Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)..................................................... 35

*Mobil Oil Exploration & Producing, Inc. v. United Distrib. Cos.*, 498 U.S. 211 (1991)……………………………………………………………..……… 21

*Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co*, 463 U.S. 29, 43 (1983)……………………………………………………………… 19

*Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005) ……................. 22-23

*Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 951 (D.C. Cir. 2004)…………...... 27

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007)……………………………………………………… 10, 17

*Oceana, Inc. v. Bryson*, 940 F.Supp.2d 1029, 1045-46 (N.D. Cal. 2013)…………......... 27

*Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 487 (D.D.C. 2014) ……………………….. 33

*River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) …………... 38

*Rybachek v. EPA*, 904 F.2d 1276, 1287–88 (9th Cir. 1990) …………………................ 26

*SEC v. Chenery Corp.*, 332 U.S. 194, 201 (1947) …………….................................... 24

*Strahan v. Coxe*, 127 F.3d 155, 167–68 (1st Cir. 1997) …………………....................... 20

*Trout Unlimited v. Lohn*, 559 F.3d 946 (9th Cir. 2009)……………………….................... Passim

*United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 715 (1963)………………............... 28

*Wyoming v. U.S. Dep't of Interior*, 2010 WL 4814950 (D. Wyo. Nov. 18, 2010)……….... 18-19

*Weyerhaeuser Co. v. FWS*, 139 S.Ct. 361 (2018)………………………………………… 35

**STATUTES & REGULATIONS**                                                                   **PAGE**

5 U.S.C. § 706(2)(A)………………………………………………………………………... 14

5 U.S.C. § 706(2)(C) ……………………………………………………………..……… 3, 20

16 U.S.C. § 1531(b) ……………………………………………………………..……… 16

16 U.S.C. § 1532(3) …………………………………………………………….……4, 31

16 U.S.C. § 1532(6) …………………………………………………………… Passim

16 U.S.C. § 1532(16) …………………………………………………………….……4, 32

16 U.S.C. § 1532(20) …………………………………………………………..……4, 16, 22

16 U.S.C. § 1533(a)(1)(A)-(E) …………………………………………………..……… Passim

16 U.S.C. § 1533(b)(1)(A) …………………………………………………………….……4

16 U.S.C. § 1533(b)(2) …………………………………………………………..……… 35

16 U.S.C. § 1533(b)(7) ………………………………………………………..……… 4

16 U.S.C. § 1533(c)(2) ……………………………………………………..……… 38

16 U.S.C. § 1533(f)(1) ................................................................................ 16

16 U.S.C. § 1533(g) ..................................................................................... 4

16 U.S.C. § 1536(a) .................................................................................... 16

16 U.S.C. § 1538.......................................................................................... 16

16 U.S.C. § 1539(j) ....................................................................................... 6

50 C.F.R. § 17.11.................................................................................... 3, 16

50 C.F.R. § 17.12 ........................................................................................... 3

50 C.F.R. § 424.11(a) .................................................................................. 17

50 C.F.R. § 424.11(e) .................................................................................... 4

50 C.F.R. § 424.11(e)(2) .......................................................................... 4, 38

50 C.F.R. § 424.11(e)(3) .............................................................................. 18

50 C.F.R. § 424.11(d)(3) .............................................................................. 18

50 C.F.R. § 424.14(h)(1)(iii) ....................................................................... 25


43 Fed. Reg. 9607 (Mar. 9, 1978) ...................................................... 6, 7, 18

59 Fed. Reg. 60252 (Nov. 22, 1994) ............................................................. 6

59 Fed. Reg. 60266 (Nov. 22, 1994) ............................................................. 6

61 Fed. Reg. 4725 (Feb. 7, 1996) ....................................................... Passim

74 Fed. Reg. 15123 (Apr. 2, 2009) .................................................. 8, 29, 43

76 Fed. Reg. 25590 (May 5, 2011) ............................................................... 8

76 Fed. Reg. 81666 (Dec. 28, 2011) ............................................................. 9

77 Fed. Reg. 55530 (Sept. 10, 2012) ............................................................ 9

78 Fed. Reg. 35664 (June 13, 2013) ........................................................... 10

79 Fed. Reg. 37,578 (July 1, 2014) .................................................. 33,36,41

80 Fed. Reg. 2511 (Jan. 16, 2015) ........................................................ 10, 23

82 Fed. Reg. 20284 (May 1, 2017) ............................................................... 9

**ACRONYMS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| AR_ | Administrative Record (ECF 58 in 4:21-cv-344-JSW) |
| DPS | Distinct Population Segment |
| ECF | Docket entries in 21-cv-344-JSW |
| ESA | Endangered Species Act |
| FWS | U.S. Fish and Wildlife Service |
| NMFS | National Marine Fisheries Service |
| NRM | Northern Rocky Mountain |
| Pls. Br. | Plaintiffs' Joint Motion for Summary Judgment, in 21-cv-344-JSW |
| Service | U.S. Fish and Wildlife Service |
| SPR | Significant portion of its range |

I.      **INTRODUCTION**

From European settlement through the mid-1900s, humans tried to eradicate the gray wolf (*Canis lupus*) from the lower 48 United States. Gray wolves were eliminated in the lower 48 States, except in northern Minnesota, but the concerted campaign to eradicate the gray wolf failed. Beginning in the 1960s, the Federal government aggressively worked to protect, re-establish, and recover gray wolves in the lower 48 States. By the 1970s, the U.S. Fish and Wildlife Service protected the gray wolf under the Endangered Species Act (ESA) throughout the lower 48 States. Under the ESA authority, the Service also reintroduced gray wolves to central Idaho and Yellowstone National Park. Since that time, domestic gray wolves have achieved recovery. By the early 2000s, ESA protections and reintroductions led to the expansion of gray wolves in the lower 48 States, resulting in abundant, widely distributed, and genetically connected populations.

Gray wolves occur today in two metapopulations,[1] one in the Western United States and one in the Great Lakes region. In the Western United States, over 2,400 gray wolves occur across Idaho, Montana, Wyoming, Washington, Oregon, and California. And wolves continue to expand their range in the Western United States, with recent documentation of wolves in Colorado. The Great Lakes wolves are even more robust, with over 4,200 wolves occupying Minnesota, Wisconsin, and Michigan. Both the Western United States and Great Lakes metapopulations are connected to nearly 30,000 wolves in Canada, meaning wolves in the United States no longer exist in isolated populations. They are stable populations within a vast, interconnected network of gray wolves inhabiting North America.

With ESA protections and the cooperative efforts of States, Tribes, non-governmental organizations, and many others, the gray wolf expanded to the point of recovery. Congress

---

[1] A metapopulation is "a population that exists as partially isolated sets of subpopulations that 'interact' when individuals move from one subpopulation to another. A metapopulation is widely recognized as being more secure over the long term than are several isolated populations that contain the same total number of individuals … because adverse effects experienced by one of its subpopulations resulting from genetic drift, demographic shifts, and local environmental fluctuations can be countered by occasional influxes of individuals and their genetic diversity from the other components of the metapopulation." AR_43.

mandated that success under the ESA results in species management being returned to the States and Tribes—the sovereigns with primary responsibility over resident wildlife species. Here, because the gray wolf entities delineated on the ESA's list of endangered and threatened species before 2020 were not entities that Congress allowed the Service to protect, delisting was warranted for that reason alone. Before taking that step, however, the Service undertook a conservative analysis of the gray wolf's status throughout the lower 48 States to "eliminate the possibility of removing protections for any gray wolves that might meet the Act's definition of a 'species' and might be endangered or threatened." AR_44. The Service possesses substantial expertise on gray wolves and ESA implementation, and it made a reasoned determination that the best scientific and commercial data available in 2020 established that gray wolves no longer met the definition of a threatened or endangered species. The Service thus removed ESA protections in the 2020 Rule for the two previously listed wolf entities—the Minnesota and 44-State entities. AR_38, 153-54.

Several plaintiff groups and amici now challenge the 2020 Rule. The bases for these challenges vary, but they share a central theme: the Service should not permit States to manage gray wolves until wolf populations become more widely distributed and secure throughout their historical range in the lower 48 States. The Service shares the desire for broader wolf distribution and recolonization in the lower 48 States. But the ESA—the statute the Service must follow— does not allow the Service to withhold regulatory action on gray wolves once it determines that the species has recovered. Policy preferences for the Service to protect wolves beyond recovery do not provide a legal basis for setting aside the Service's expertise. The Service properly set aside these policy questions over how many gray wolves beyond biological recovery might be desirable and conformed its rulemaking to the ESA, as written, informed by the best scientific evidence available to it.[2]

---

[2] The Service does not dispute the significant Tribal interests in gray wolves, as expressed in their amicus filings. *See* ECF 87-1; ECF 86-1. Nor, as Michigan and Oregon argue, is the Service deciding "where a species may be allowed to live." ECF 83-2 at 4. Rather, the Service is applying the ESA as Congress intended. The statute does not authorize the Service to preempt State and Tribal management of wildlife because of the policy considerations expressed by Plaintiffs, various amici, and some of the peer reviewers.

1    The Service's 2020 Rule and its administrative record reflect that the Service achieved

2    these objectives. The Court should decline Plaintiffs' invitation to usurp the Service's authority

3    by dictating how the Service should administer the ESA for gray wolves in the lower 48 States.

4    Judicial restraint is particularly appropriate here because Plaintiffs focus much of their argument

5    on whether the Service should protect *new* gray wolf entities, not the Minnesota and 44-State

6    entities that the Service addressed in the 2020 Rule. Plaintiffs have already petitioned the Service

7    to list Northern Rocky Mountain (NRM) and Western North American gray wolf populations

8    (the NRM population, except Wyoming, was congressionally delisted in 2011, and the Service

9    later delisted the Wyoming wolves).[3] The Service is considering those petitions under currently

10   available scientific information and regulatory conditions. The ESA's petition process, not

11   judicial review, is the proper mechanism for Plaintiffs to request that the Service consider the

12   protected status of gray wolves based on the facts and evidence that exist today.

13   The Service's 2020 Rule follows the law and is supported by the administrative record.

14   The Court should uphold the rule under the deferential standard of review that applies in this

15   case and grant the Service's motion for summary judgment.

16   **II.     BACKGROUND**

17   **A.     Statutory background—the Endangered Species Act (ESA)**

18   Congress enacted the ESA in 1973 to, in part, "provide a program for the conservation of

19   [] endangered species and threatened species." 16 U.S.C. § 1531(b). Such species are "listed," or

20   added to the Lists of Endangered and Threatened Wildlife and Plants, 50 C.F.R. §§ 17.11, 17.12.

21   "The cornerstone of effective implementation of the [ESA] is the process to determine which

22   species should be listed as endangered or threatened and which listed species should be

23   reclassified or removed from the lists (delisted)." S. Rep. No. 97-418, at 10 (May 26, 1982).

24   Under the statutory process, the Service first identifies the "species" at issue, which Congress

25   defined as a species, subspecies, or "distinct population segment of any species of vertebrate fish

26   or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16).

27
     _____

28   [3] *See* AR_21766; *see also* May 26, 2021 Petition, https://ecos.fws.gov/docs/tess/petition/992.pdf;
     July 29, 2021 Petition, https://ecos.fws.gov/docs/tess/petition/3352.pdf.

The Service next considers five statutory factors as applied to the "species," to determine whether it meets the definition of an "endangered species" or a "threatened species." 16 U.S.C. § 1533(a)(1)(A)-(E). An endangered species is a species that is "in danger of extinction throughout all or a significant portion of its range," *id*. § 1532(6), while a threatened species is a species that is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," *id*. § 1532(20). The Service must base any final listing or delisting determination on the best scientific and commercial data available, after considering any State and foreign efforts to protect the species. *Id*. § 1533(b)(1)(A).

After listing a species, the Service works to bring the species to the point at which the ESA's protections are no longer necessary. 16 U.S.C. § 1532(3) (defining "conserve"). The ESA imposes a duty on the Service to review the list of endangered and threatened species and determine whether any species should be removed from the list ("delisted"). *Id*. § 1533(c)(2); 50 C.F.R. § 424.11(e). Congress required that, for any determination to remove ESA protections for a species, the Service must apply the same statutory criteria it uses to add species to the list. 16 U.S.C. § 1533(c)(2) (delisting decisions made "in accordance with the provisions of subsections (a) and (b)" of this section; 50 C.F.R. § 424.11(e)(2). That is, the same statutory standards and process apply when the Service either "lists" or "delists" a species. *Id*.

When the Service removes ESA protections for a recovered species, it must monitor the species for at least five years. 16 U.S.C. § 1533(g). If the monitoring reveals a significant risk to the species, the ESA permits the Service to relist the species using the ESA's emergency listing procedures. *Id*.; *see also id*. § 1533(b)(7).

**B.     Factual and Regulatory Background**

**1.     Gray wolf biology**

Gray wolves are one of the most adaptable and resilient land mammals on earth. AR_403-405, 426. They thrive under nearly every environmental condition, and they have high birth and growth rates that allow populations to increase in size even when faced with human-caused mortality rates ranging from 17 to 48% annually. AR_57; AR_405. From 1999 to 2008,

for example, humans killed on average 16% of the NRM wolves annually,[4] but the population grew at an average annual rate of 24% during this time. AR_57. From 2009 to 2015, human-caused mortality rates increased to 29% annually, primarily from regulated hunts, and the NRM wolves continued to grow by an average of 1% annually. *Id.*

Wolf populations also can rapidly recover from events that cause population declines. Regulated hunting in Wisconsin resulted in 374 wolf mortalities over two years and reduced the population from an estimated 809 wolves in 2012 to 660 wolves in 2014. AR_419-420. The State then reduced harvest quotas, which led to an increased population of 746 wolves the next year, and reinstated ESA protections in 2015 led to over 900 wolves by 2019. *Id.*; AR_92; *see also* AR_38285, 38293.

Pack structure is adaptable and resilient. Wolves normally live in packs ranging from an average of 7 wolves to more than 20 wolves. AR_403. Packs typically consist of a breeding pair, pups, offspring from previous years, and occasionally an unrelated wolf. *Id.* The top-ranking male and female in each pack typically reproduce, but breeding members can be quickly replaced and pups reared by other pack members. AR_403-04; AR_46-47. And wolves are prolific dispersers. Dispersal is hard-wired into their basic biology and, by the age of three, most wolves will have dispersed from their birth pack. AR_404. Because wolves have a remarkable ability to disperse, detect social openings, and find mates, they readily form widespread and well-distributed populations. AR_404; *see also* AR_25325 (Jimenez et al., 2017).

## 2. Gray wolf status and distribution in the United States

Except for targeted eradication programs that use a combination of poison, unregulated trapping and shooting, and other species-extermination actions, the adaptability of gray wolves allows them to respond and recover from nearly any threat. AR_407-408; AR_48. Government-sponsored eradication programs in the late 1800s and early 1900s decimated gray wolf

---

[4] The NRM wolves are part of the Western United States metapopulation, which consists of core populations occupying vast areas of suitable wolf habitat in Montana, Idaho, and Wyoming, as well as peripheral habitats in Washington and Oregon.  AR_425. Individuals from the NRM population have begun to recolonize California and have dispersed into Colorado and Utah. AR_115, 416.

populations in the United States. Gray wolves were essentially eliminated from the western

United States by the 1930s and persisted only in remote northeastern Minnesota through the

1960s. AR_407-409.

Beginning in the late 1960s, the Service began protecting gray wolves under the

predecessor statute to the ESA, and then under the ESA following its passage in 1973. *See*

*generally* AR_40-41 (Table 1). In 1978, the Service revised the gray wolf listing from multiple

subspecies entities to two entities: threatened in Minnesota and endangered throughout the

remaining 48 coterminous United States and Mexico. *See* Final Rule, 43 Fed. Reg. 9,607 (Mar.

9, 1978).[5] The two entities included large areas where wolves were extirpated and areas outside

the species' historical range. AR_42.

With ESA protections, gray wolf populations rapidly expanded in the lower 48 States. In

the NRM, the Service reintroduced gray wolves into central Idaho and Yellowstone National

Park in the mid-1990s, AR_412,[6] and the populations flourished, soon achieving the objectives

in the NRM recovery plans, AR_44339 (1980 recovery plan); AR_44038 (1987 recovery plan).

From 101 wolves in 1995, the NRM population grew to a conservative minimum population

estimate of 663 wolves distributed throughout Idaho, Montana, and Wyoming by the end of

2002. AR_412. By the end of 2015, the final year of a combined NRM population estimate that

was part of the post-delisting monitoring for Idaho and Montana, the population reached a

minimum estimated size of 1,704 wolves. *Id.* Idaho, Montana, and Wyoming have since

transitioned to using different estimation techniques, but they estimated well over 2,000 wolves

in the three States by the end of 2019. AR_413. This increase occurred despite the delisting of

the NRM wolves in 2011 and resulting increase in human-caused mortality. Wolves also

expanded outward from the NRM. The Service estimates that Oregon and Washington contained

---

[5] The 1978 rule predated the November 1978 amendments to the Act revising the definition of "species" to include DPSs of vertebrate fish or wildlife. AR_42.

[6] With the reintroductions, the Service designated two nonessential experimental populations under Section 10(j) of the ESA, 16 U.S.C. § 1539(j). The 10(j) rules provided for increased management flexibility to address potential human-wolf conflicts in these areas. *See* 59 Fed. Reg. 60,252 (Nov. 22, 1994) (Greater Yellowstone ecosystem recovery area); 59 Fed. Reg. 60,266 (Nov. 22, 1994) (central Idaho recovery area).

over 300 wolves by the end of 2019 and, by 2020, wolves had dispersed to and formed packs in California and Colorado. AR_414-416.

In the Great Lakes region,[7] researchers estimated about 1,000 to 1,200 wolves in northern Minnesota by the mid-1970s. AR_417. As in the NRM, the Great Lakes wolves expanded with ESA protections. In Minnesota, the wolf population expanded its range by nearly 300% and population numbers have ranged between 2,000 and over 3,000 wolves since the early 2000s. *Id.* Wolves naturally reoccupied Wisconsin in the mid-1970s and Michigan in the late 1980s. AR_418-420. In Wisconsin, five packs in 1979 ballooned to over 800 wolves by 2013 and remained at over 900 wolves by 2019. AR_419-420. In Michigan, three wolves in 1988 expanded to 116 wolves in 1996, 557 wolves in 2010, and over 690 wolves by 2020. AR_420-421. Minnesota, Wisconsin, and Michigan now regularly contain over 4,000 wolves. AR_424.

Today, the gray wolf exists within the lower 48 States in two stable or growing metapopulations in the NRM and Great Lakes regions, as well as a separate Mexican wolf subspecies listed in the southwest. AR_424; AR_45 (identifying separate listing of the Mexican wolf subspecies). And wolves have continued to disperse widely, which "suggests that gray wolves could eventually recolonize most large patches of suitable habitat [in the lower 48 States] as long as healthy core wolf populations are maintained" in the NRM and Great Lakes regions. AR_425. These large metapopulations represent the southern extension of vast gray wolf populations in North America. The Great Lakes wolves are connected to 12,000 to 14,000 wolves in Canada, AR_424, and the NRM wolves are connected to over 15,000 wolves in Canada, AR_425. Combined, gray wolves constitute a resilient, adaptable, and robust species that exists in large and healthy numbers throughout North America.

### 3. Recent regulatory processes

#### a. The 1978 Listing Rule

In 1978, the Service listed gray wolves in two areas: in Minnesota (threatened), and in the remaining lower 48 States and Mexico (endangered). 43 Fed. Reg. 9,607. At the time, the

---

[7] The Great Lakes region consists of core wolf populations and suitable habitat in Minnesota, Wisconsin, and Michigan. AR_423.

1   Service gave the "firmest assurance" that it did not list the species throughout the entire lower 48

2   States and Mexico in order to reestablish wolves in all of these geographic areas. *Id*. at 9607,

3   9610. The Service stated the opposite: it would continue to manage and focus recovery actions

4   on extant populations inhabiting specific geographic areas like the NRM. *Id*.

### b.   Recovery of NRM and Great Lakes metapopulations

6   After 1978, the Service thus developed plans to recover wolves in specific geographic

7   areas: the NRM region, the Eastern United States (including the Great Lakes region), and the

8   southwestern United States (Mexican wolves). AR_39-40. In the southwestern United States, the

9   Service designated an endangered Mexican wolf subspecies in 2015 and now manages this

10  subspecies separately from other gray wolves in the lower 48 States. AR_410.

11  For the other two geographic areas, the Service's recovery approach worked as intended.

12  By the mid-2000s, gray wolf populations greatly exceeded established recovery goals and

13  criteria in both the NRM and Great Lakes regions. AR_412-21. The Service therefore began

14  regulatory efforts to remove ESA protections for these two distinct population segments (DPS)[8]

15  and return management to the States. The Service's regulatory actions were controversial. States,

16  non-governmental organizations, and individuals repeatedly filed lawsuits arguing that the

17  Service's regulatory actions were unlawful, either for removing ESA protections or for retaining

18  them. *See* AR_40-41 (Table 1, listing regulatory actions and litigation history since 1967). By

19  2019, decades of regulatory, judicial, and congressional actions resulted in a patchwork of legal

20  protections applied to gray wolves in the lower 48 States. *Id*.

21  In the NRM, the Service designated a DPS, determined that gray wolves in the NRM,

22  except in Wyoming, were recovered, and removed ESA protections for the recovered wolves. 74

23  Fed. Reg. 15,123 (Apr. 2, 2009).[9] A court vacated the rule but, in 2011, Congress mandated that

24  the Service republish the 2009 delisting rule. 76 Fed. Reg. 25,590 (May 5, 2011) (reinstating the

25  ───────────────────

26  [8] The ESA defines "species" as a species, a subspecies, or a "distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16).

27  [9] In 2008, the Service issued a rule delisting the NRM DPS in its entirety, including Wyoming. 73 Fed. Reg. 10514 (Feb. 27, 2008). The rule was enjoined and later vacated and, on December

28  11, 2008, the Service issued a rule reinstating ESA protections for the NRM DPS. AR_41.

2009 Rule as directed by Congress in the 2011 Continuing Appropriations Act, P.L. 112-10). In 2012, the Service removed ESA protections for wolves in Wyoming. 77 Fed. Reg. 55,530 (Sept. 10, 2012). A lower court vacated that delisting rule, but the D.C. Circuit reversed. *Defenders of Wildlife v. Zinke*, 849 F.3d 1077 (D.C. Cir. 2017); 82 Fed. Reg. 20,284 (May 1, 2017) (reinstating the 2012 Rule).

In the Great Lakes region, the Service identified a western Great Lakes DPS of wolves and determined that they were recovered. 76 Fed. Reg. 81,666 (Dec. 28, 2011). A lower court vacated the 2011 Rule and the D.C. Circuit upheld the lower court's ruling. *Humane Soc'y of the United States v. Zinke*, 865 F.3d 585, 601-03 (D.C. Cir. 2017) (holding that the Service cannot restrict its analysis to the DPS, but must also consider the status and legal protections of listed wolves throughout the lower 48 States).

### c.     The Service's recent regulatory actions addressing gray wolves in the lower 48 States

By 2019, several regulatory, judicial, and congressional actions had permanently altered the "lower 48 listing" contained in the Service's 1978 Rule. First, the Service's 2009 Rule and Congress' reinstatement of it in 2011 removed NRM DPS wolves, except in Wyoming, from the scope of the 1978 Rule. Second, the Service's 2012 Rule removing ESA protections for Wyoming wolves, upheld on appeal, removed those wolves from the scope of the 1978 Rule. Third, the Service's 2015 Rule designating a Mexican wolf subspecies removed wolves in the southwestern United States and Mexico from the scope of the 1978 Rule. Thus, by 2019, the ESA's lists designated wolves as threatened in Minnesota and endangered in the 44-State entity—those portions of the lower 48 States outside of: (a) the delisted NRM DPS; and (b) the range of the Mexican wolf subspecies. AR_40.

### i.     *The 2019 Proposed Rule*

Because Congress did not intend the ESA to haphazardly provide a patchwork of protections to pockets of gray wolves in portions of the lower 48 States, the Service proposed to delist the two gray wolf "entities" that remained listed in 2019—the Minnesota wolves

(threatened) and the 44-State entity (endangered). *See* AR_20097.[10] The Service's proposed rule considered the two listed entities as a single "gray wolf entity" because neither the Minnesota entity nor the 44-State entity constituted a separately protectable "species." AR_20102.[11]

The Service noted that the extant population in the combined entity—primarily wolves in the Great Lakes region—occupies a fraction of the gray wolf's historically occupied range in the lower 48 States. AR_20131. But the extant population exists in a metapopulation (a series of semi-connected subpopulations) comprised of large numbers of wolves well-distributed throughout vast areas of suitable habitat. AR_20131-32. The Service found that State regulation of human-caused mortality—the primary factor affecting the long-term survival of gray wolves—was sufficiently protective and adaptable to maintain large, robust, distributed gray wolf populations into the foreseeable future. AR_20132-33. The Service proposed to remove ESA protections for the gray wolves in the lower 48 States, outside the range of the NRM DPS and Mexican wolf subspecies, because the combined entity was recovered. AR_20135.

### ii.    *Public Comment and Peer Review*

The Service provided 120 days of public comment and conducted a public hearing in Brainerd, Minnesota. AR_40; *see also* AR_20097; AR_10936, AR_19674. The Service also subjected the 2019 Proposed Rule to rigorous peer review. AR_11201; AR_10956.

Several reviewers concluded that the Service's technical and scientific analysis was sound. AR_11068 (the Service provided "adequate review and analysis of the factors relating to

---

[10] The Service proposed to remove ESA protections throughout the lower 48 States in 2013. 78 Fed. Reg. 35,664 (June 13, 2013). The Service issued the proposed rule after it delisted wolves in the NRM and western Great Lakes, and the proposed rule thus addressed only wolves outside the DPSs' boundaries. *Id*. The Service also proposed to designate a Mexican wolf subspecies in the southwestern United States as endangered. *Id*. The Service finalized the proposed rule for the Mexican wolf subspecies, designating it as an endangered species. 80 Fed. Reg. 2,488 (Jan. 16, 2015). The Service superseded the rest of the 2013 proposed rule with the 2019 Proposed Rule.

[11] A DPS must be discrete from other population segments of, and significant to, the species to which it belongs. 61 Fed. Reg. 4,725 (Feb. 7, 1996) (DPS Policy); *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (granting *Chevron* deference to the Service's DPS Policy). Because Minnesota wolves were not discrete from wolves in the rest of the lower 44 States, the Service determined that neither entity constituted a separate DPS, and so it combined the entities for its analysis. AR_20102.

the persistence of gray wolves in the lower 48 states"); AR_11076 (the Service's biological analysis was "generally accurate," with some topics that required further input); AR_11120 (in the Great Lakes "habitat is fairly secure, and not likely to drastically change in the foreseeable future, and have [*sic*] been demonstrated to support viable wolf populations" and "there is no reason to assume genetic, interconnectedness, ecological functioning or viability will be altered" for Great Lakes wolves after delisting); AR_11120-21 ("Although delisting has resulted in some decline and stabilizing of wolf populations in the [NRM] …, the original introduced wolf population continues to serve as a source for wolves spreading throughout the region. This population will likely continue to spread and expand as long as large blocks of suitable habitat exists within range of dispersing wolves"); AR_11195 ("it is reasonable for the Service to conclude that the approach of Michigan, Wisconsin, and Minnesota to wolf management is likely to maintain a viable wolf population in the Western Great Lakes area into the future").

Some peer reviewers, however, concluded that the Service did not adequately show that future threats would not arise, for example, by rebutting theories about how State management or genetics could become threats to wolf populations at some point in the future. AR_11151, 11154 (arguing the Service should not assume responsible State management); AR_11144 (arguing the Service's burden is to prove that no threats will arise, rather than identify evidence of existing threats); AR_14656 (the Service's burden is to rebut theories of possible future genetic threats, rather than identify evidence showing genetic threats exist). And peer reviewers expressed generalized concerns with the impacts of delisting on wolves located outside the NRM and Great Lakes metapopulations, like wolves in the West Coast States and in unoccupied areas of their historical range. AR_11082-83, 11090-91.[12]

In finalizing the proposed rule in 2020, the Service addressed and responded to peer reviewers' comments by revising the final rule and biological report as appropriate and responding to specific comments. *See generally* AR_104-123.

---

[12] Two peer reviewers also commented extensively on their policy and legal views on ESA implementation—for example, commenting that the Service should discourage management actions that kill wolves "regardless if it has no effect on the viability of wolf populations." AR_11148; *see also, e.g.*, AR_11082-83 (commenting with legal interpretations and opinions).

1

### iii.     The 2020 Final Rule

2      On November 3, 2020, the Service issued a Final Rule that removed regulatory

3 protections for the two prior listed entities—the Minnesota entity and the 44-State entity. AR_38.

4 The Service first concluded that neither entity constitutes an entire protectable "species" as

5 Congress defined the term and that the Service could not lawfully protect these entities

6 prospectively as separate endangered or threatened species. AR_43-44. The Service also decided

7 to review the "status of gray wolves in several configurations . . . to eliminate the possibility of

8 removing protections for any gray wolves that might meet the Act's definition of a species and

9 might be endangered or threatened." AR_44. The Service thus considered the status of and

10 threats to wolves in three configurations comprising four entities: "(1) Each of the two currently

11 listed gray wolf entities separately; (2) the two currently listed entities combined into a single

12 entity (the approach in our proposed rule); and (3) a single gray wolf entity that includes all gray

13 wolves in the lower 48 [United States] and Mexico except for the Mexican wolf." *Id*.

14      To begin, the Service properly framed the inquiry as addressing whether wolf populations

15 in the lower 48 States can sustain themselves over time, which necessitates a sufficient number

16 and distribution of healthy populations to withstand annual variations in the environment,

17 catastrophes, and novel changes in biological and physical environments. AR_50-52. A species

18 with a sufficient number and distribution of healthy populations is more able to tolerate stresses

19 and adapt to environmental changes. AR_140. And metapopulations "are widely recognized as

20 being more secure over the long term than are several isolated populations that contain the same

21 total number of packs and individuals." *Id*. Applying these biological principles, the Service

22 found that gray wolves in the lower 48 States are anchored by two large metapopulations in the

23 NRM and Great Lakes regions. AR_150. While these metapopulations occupy a fraction of their

24 historical range, AR_47-48, the Service concluded they are capable of sustaining viable wolf

25 populations in the lower 48 States over time, AR_124, 140-153. Several lines of evidence

26 support the Service's findings.

27

28

First, the metapopulations contain abundant numbers of gray wolves. Combined, the two metapopulations contain over 6,000 wolves that are part of connected wolf populations totaling over 30,000 animals. *Id*.

Second, the metapopulations contain populations broadly distributed across six States that are expanding outward. *Id*. As noted, metapopulations are much more secure than a series of isolated populations because adverse effects experienced by one subpopulation can be countered by influxes of individuals from other subpopulations. AR_43.

Third, the metapopulations occupy high-quality habitats that support—and, based on ample evidence, will continue to support—abundant prey resources into the future. AR_75-78. States have incentives to manage deer, elk, and other game animals in abundant, harvestable quantities, providing prey security into the future. *See, e.g.*, AR_75-76, *Defenders of Wildlife*, 849 F.3d at 1084 (upholding the Service's analysis of State management actions when also considering the "strength of the State's incentives").

Fourth, the metapopulations have high genetic fitness and, through remarkable dispersal propensity and ability, readily can maintain that fitness across variable environmental conditions. AR_102-03, 140, 146. And gray wolves are genetically connected to many thousands of wolves in Canada, further guarding against future deleterious genetic impacts. AR_146, 150.

Fifth, individual States manage mortality and prey species as if they were isolated populations; they do not rely on other States to sustain either wolf or prey resources into the future. AR_102-03. Multiple States agreeing to and managing above minimum recovery levels provides management redundancy. If one State's wolf population periodically falls for whatever reason—disease, State management changes, and so on—management by other States to sustain populations above minimum levels provides a buffer and continued healthy populations of wolves to recolonize vacant habitats. AR_140, 142, 149.

Sixth, management within individual States provided assurances that wolf populations are maintained above minimum thresholds. The evidence shows that only high levels of sustained human-caused mortality can threaten to reduce wolf populations. AR_57; AR_405, 419-20. Thus, it is not crucial to maintain human-caused mortality at defined thresholds because,

even if hunting or other events cause declines, wolf populations rapidly recover when the human-caused mortality levels drop. *Id*. Thus, regulatory systems must regulate and manage human-caused mortality, but need not precisely control individual wolf mortality, particularly when they contain robust monitoring requirements and provide for adaptive management. AR_54-55.[13] Through post-delisting monitoring, the Service will evaluate population numbers and other data to verify that gray wolves remain secure under State management. AR_154. At the time of the 2020 Rule, the Service concluded, based on the best available science, that existing regulatory mechanisms were sufficient to maintain gray wolf recovery within the various wolf entities that it evaluated. AR_102-03.

In short, the Service concluded that gray wolves in the United States exist in robust, well-distributed, and expanding metapopulations occupying core habitats in the NRM and Great Lakes regions. The Service arrived at this conclusion in part because gray wolves continue to recolonize vacant, suitable habitat in the West Coast States, Colorado, and elsewhere. The active and ongoing recolonization is evidence of recovery. Despite delisting in the NRM States resulting in fewer protections than the ESA—often much less, as in Wyoming's shoot-on-sight predator zone, AR_63—robust gray wolf populations continue to grow and recolonize adjacent habitats in the West Coast States and southern Rocky Mountains. AR_72-73, 133-34, 152-53. The Service removed ESA protections for the Minnesota and the 44-State entities in part because, based on regulatory mechanisms that existed in 2020, gray wolves in the lower 48 States are biologically capable of sustaining robust, connected populations. AR_38, 153-54.

## III.   STANDARD OF REVIEW

Judicial review of agency determinations under the ESA is governed by the "arbitrary or capricious" standard in the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A). *See Trout Unlimited v. Lohn*, 559 F.3d 946, 955 (9th Cir. 2009). Under the APA, the "narrow" role

---

[13] Michigan, for example, admits that it has the tools and capabilities to manage responsibly gray wolves, reinforcing the Service's findings. ECF 83-2 at 2. In attacking management by other States, Michigan goes beyond its area of expertise and provides no evidence to support its view that the Service rationally analyzed Michigan's regulatory mechanisms, but irrationally considered other State regulatory regimes.

of a court is to ensure that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co*, 463 U.S. 29, 43 (1983). When an agency is acting within its area of expertise, the courts are at their "most deferential." *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (en banc). Expert predictive judgments are "entitled to particularly deferential review." *Trout Unlimited*, 559 F.3d at 959. As a result, a "court is not to substitute its judgment for that of the agency," and it should uphold an agency decision of "less than ideal clarity" so long as "the agency's path may reasonably be discerned." *FCC v. Fox Television Stations*, 556 U.S. 502, 513-14 (2009) (citations omitted).

## IV.    ARGUMENT

When the Service acts to delist an "iconic" species, it "raises a host of scientific, political, and philosophical questions regarding the complex relationship between" the species and humans. *Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1019 (9th Cir. 2011). The Court's role, however, is not to "grapple with" those questions or to "resolve scientific uncertainties or ascertain policy preferences." *Id.* The Court instead must "address only those issues [it is] expressly called upon to decide pertaining to the legality of the Service's delisting decision." *Id.* In considering those issues, the Court should assume that the agency's decision is lawful unless the plaintiff proves otherwise. "Absent a showing of arbitrary action, we must assume that the agencies have exercised this discretion appropriately." *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

Here, gray wolves listed before 2020 did not meet the statutory definition of a "species," which precludes their protection as a "threatened species" or "endangered species" under the ESA. The Service's regulatory action is proper on this basis alone. The Service, however, proceeded cautiously in the 2020 Rule and further "consider[ed] whether any populations of gray wolves covered by the listed entities meet the definition of a threatened species or an endangered species." AR_44. The Service did so by grounding its comprehensive review in the best available scientific data, as informed by the Service's decades of experience and expertise gained in managing and recovering wolves. The Service's determinations comply with the law.

### A. The Service properly removed ESA protections for the gray wolves previously listed as threatened or endangered in the lower 48 States.

Plaintiffs devote much of their brief to criticizing how the Service reviewed the biological or recovered status of gray wolves in the lower 48 States. Pls. Br. at 10-41 (ECF 74 in 21-cv-344-JSW). Based on these arguments, they want the Court to order the Service to relist the previously listed gray wolf entities—the Minnesota and the 44-State entities. *Id*. at 47-49. But Plaintiffs (and amici) leap over the first question the Service must answer in every listing or delisting inquiry:

> Did the ESA-listed gray wolf entities the Service reviewed in the 2020 Rule constitute protectable "species" under the ESA?

Each complaint acknowledges this threshold question, even if in conflicting ways.[14] Plaintiffs now avoid the question, waiving any claim that the Service's decision is unreasonable. For good reason. The ESA's plain language, the Service's binding policies, and Ninth Circuit precedent compelled the Service to conclude that the Minnesota and 44-State entities are not separate protectable "species" under the ESA. Without a valid protectable "species," the Service had no choice: through rulemaking, it could not legally maintain endangered or threatened species' protections for them.

### 1. The ESA requires the Service to first identify a valid "species" capable of being protected as threatened or endangered.

The ESA has a singular focus—the conservation of "species." Congress defined "species," 16 U.S.C. § 1532(16), provided the Service with regulatory authority to designate a "species" as threatened or endangered, *id*. § 1533(a)(1), and structured the remaining portions of the ESA to serve the goal of conserving such threatened or endangered "species." *See, e.g.*, 16 U.S.C. § 1531(b); *see also, e.g.*, 16 U.S.C. §§ 1533(f)(1), 1536(a), 1538, 1539. Proper

---

[14] Defenders of Wildlife and WildEarth Guardians, for example, alleged that the Minnesota and 44-State entities constitute "species" as defined under the ESA. ECF 54 ¶¶ 38, 42 (21-cv-344); ECF 79 ¶¶ 128-149 (21-cv-349). NRDC contradictorily admitted that neither entity constitutes a "species." ECF 51 ¶ 110 (21-cv-561). While telling, these inconsistencies are not relevant because Plaintiffs waived the claims by not presenting them on summary judgment. *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) ("We review only issues which are argued specifically and distinctly in a party's opening brief.") (citation omitted).

administration of the ESA thus depends on the Service appropriately undertaking the first step in every listing or delisting inquiry—the "'neutral' task of defining a species." *Trout Unlimited*, 559 F.3d at 955.

"Species" is a term of art. It includes taxonomic species and subspecies, as well as "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16). The Service relies on standard taxonomic distinctions to identify species and subspecies. 50 C.F.R. § 424.11(a). Congress did not define the term DPS, and so the Service and the National Marine Fisheries Service (NMFS) promulgated a joint DPS Policy in 1996. 61 Fed. Reg. 4,722. Under the DPS Policy, the Service defines a population segment as a DPS based on considerations of the population's discreteness from other populations and its significance to the taxon to which it belongs. *Id*. The DPS Policy constitutes a reasoned interpretation of the ESA. *Nw. Ecosystem All.,* 475 F.3d at 1150 (DPS Policy entitled to deference under *Chevron USA, v. Nat. Res. Def. Council,* 467 U.S. 837, 865 (1984)).

The ESA's definition of "species" allows the Service to list or delist only *entire* "species"; it prohibits the Service from classifying something other than a "species" as threatened or endangered.[15] In Senate Report No. 96-151 (May 15, 1979), discussed in the DPS Policy, 61 Fed. Reg. at 4,725, the Senate Committee rejected pleas to remove the Service's authority to designate DPSs because that authority could lead to the listing of "squirrels in a specific city park" even though an abundance of squirrels lived in "other parts in the same city, or elsewhere." *Id*. at 6-7. The Committee equated protecting squirrels in a city park with an abuse of the DPS concept, not a proper application of it. *Id*. at 7. That is, Congress did not intend for the Service to protect a haphazard grouping of animals as threatened or endangered. *Id*.

Ninth Circuit precedent recognizes the same limitations. In *Trout Unlimited*, the court held that the Service cannot use extraneous considerations—like differences between hatchery and wild fish of the same species—to justify listing an entity that does not comprise an entire

---

[15] Although not applicable to this case, the Service may list a taxon of higher rank than a species. 50 C.F.R. § 424.11(a). This distinction is one of convenience, not substance, because the Service can list a higher taxon only if "all included species are individually found to be endangered or threatened." *Id*.

species, subspecies, or DPS. 559 F.3d at 955-56; *see also Alsea Valley All. v. Evans*, 161 F. Supp. 2d 1154, 1162 (D. Or. 2001) (agency not permitted to split a single species into two entities for listing purposes). In *Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207 (D. Mont. 2010), the Court similarly rejected the Service's efforts to protect as threatened or endangered only part of a broader "species," like Wyoming wolves. *Id*. at 1216-17.

The courts held that, rather than manipulate the ESA's definition of "species" to serve policy ends, the Service must identify the "species" as it is—a "neutral" task—and *then* conduct an endangerment analysis for the entire species. *Trout Unlimited*, 559 F.3d 955; *Ctr. for Biological Diversity v. Zinke*, 868 F.3d 1054, 1058 (9th Cir. 2017) ("If a population is found to be a DPS, the inquiry proceeds to whether it is endangered or threatened"); *see also* 61 Fed. Reg. at 4,725 (if the Service identifies a DPS, it *then* conducts a status review).[16]

### 2. The Service properly determined that the Minnesota and 44-State entities are not protectable "species" under the ESA.

In 1978, the Service designated gray wolves as a threatened species in Minnesota and as an endangered species in the remaining portions of the lower 48 States and Mexico. 43 Fed. Reg. at 9,607, 9,610. This 1978 listing pre-dated amendments to the ESA allowing the Service to list and protect DPSs, and so the 1978 listing did not conform to the ESA as written today. The Service recognized this disconnect and made several attempts over the years to address wolves consistent with the statutory structure. AR_40-41 (rulemaking to designate DPSs and remove ESA protections for these DPSs because gray wolves recovered in the NRM and Great Lakes by the early-to-mid 2000s). The courts overturned and vacated many of the prior rules, AR_40-41, often leading to a "confused state of affairs," *Wyoming v. U.S. Dep't of Interior*, No. 09-CV-

---

[16] The Service revised the listing regulations in 2019 to include 50 C.F.R. § 424.11(e)(3), which recognizes the same concept: the Service cannot maintain protections for an entity that does "not meet the statutory definition of a species." The 2019 regulation did not substantively depart from prior regulations. 50 C.F.R. § 424.11(d)(3) (1986) (providing for revisions to listings when the data justifying an original listing—such as its composition as a species—was erroneous). Plaintiffs' complaints challenge the Service's reliance on the 2019 Regulation, *see, e.g.*, ECF 79 ¶ 149 (21-cv-349), but they waived the claims by not raising them on summary judgment, *supra* n.14. Even if Plaintiffs had pursued the argument, it would fail because the regulation applies the ESA's plain language: the Service lacks authority to protect something other than a "species."

118J, 2010 WL 4814950, at *38 (D. Wyo. Nov. 18, 2010).[17] Moreover, for more than a decade, the 1978 entities themselves have not existed as they originally appeared on the ESA's list. In response to one of the adverse court decisions, Congress itself extracted the NRM population segment, except for Wyoming, from the 1978 listing, and the Service later carved out Wyoming and the Mexican wolf subspecies from the prior 1978 listed entities. *See* AR_40-41; *see also* AR_4211 (Plaintiffs admitting prior regulatory actions "carved" up the 1978 listing). By 2020, ESA-listed wolves thus existed in two entities: Minnesota and the 44-State entity. *Id*. In the 2020 Rule, the Service appropriately evaluated whether these remaining entities constitute protectable "species" within the meaning of the ESA. The answer was no.

First, neither entity constitutes an entire taxonomic species because gray wolves are widely distributed across the globe. AR_43. Nor does either entity constitute an entire taxonomic subspecies, unlike the Mexican wolves. *Id*. Finally, neither entity constitutes a DPS. Under the Service's DPS Policy, a DPS must be both discrete from other populations of the species and significant to the taxon to which it belongs. 61 Fed. Reg. at 4,725. To be discrete, the population segment must be markedly separate from other members of the species because of "physical, physiological, ecological, or behavioral factors." *Id*. Minnesota wolves are spatially, biologically, and genetically connected to wolves in Wisconsin, Michigan, and surrounding States and are thus not distinct from the 44-State entity. AR_43. Likewise, the 44-State entity is not a DPS because it includes wolves connected to other wolves in both Minnesota and the NRM region. AR_43-44. The Service may consider whether any DPSs of gray wolves may warrant listing under the DPS Policy's criteria, but neither the 44-State entity nor the Minnesota entity meet those criteria.

Plaintiffs agree that the ESA's inquiry depends on the upfront, proper identification of the "species." Pls. Br. at 10 (arguing the Service must properly determine whether any "species"

---

[17] As *Wyoming* observed: "Given the past history of the wolf project, both the state of Wyoming and the FWS have been facing conflicting rulings and determinations, based on substantially the same scientific and commercial data—a Catch–22 for all. The courts have done little to facilitate resolution of the issues and an understanding as to what is necessary to satisfy the requirements of the ESA's delisting provisions in the unique facts of this case." 2010 WL 4814950, at *38.

exists and prohibits "artificially" creating "species" for listing or delisting purposes). Despite raising claims in the complaints over whether the Minnesota and 44-State entities constitute a protectable "species," Plaintiffs abandoned those claims. *See* n.14, *supra*. Plaintiffs therefore do not contest the Service's determination that neither listed entity constitutes a protectable species under the ESA.

Considering the law and the Service's uncontested finding, the Court confronts a straightforward situation. The Service engaged in rulemaking to address the status of gray wolves in the lower 48 States. *Coos Cnty. Bd. of Cnty. Comm'rs v. Kemthorne*, 531 F.3d 792, 804 (9th Cir. 2008) (the Service may start rulemaking in response to a petition or on its own initiative). When completing a rulemaking, the Service must conform its decision to the ESA's requirements. 5 U.S.C. § 706(2)(C) (an agency's final actions must not be "in excess of statutory jurisdiction, authority, or limitation, or short of statutory right"); *Defs. of Wildlife v. Norton*, 258 F.3d 1136, 1146 (9th Cir. 2001) (even decisions to withdraw proposed rules are final and must comply with the ESA). The ESA precludes the Service from recognizing something other than a "species" as threatened or endangered—an important factor because an ESA listing preempts States and Tribes from exercising their sovereign rights over resident wildlife species. *Strahan v. Coxe*, 127 F.3d 155, 167–68 (1st Cir. 1997) (ESA preempts inconsistent State regulatory schemes).[18] And here, neither listed entity constitutes a separate "species." The Service therefore could not maintain ESA protections for the two entities and properly delisted them. AR_153-54.

Rather than address the plain language and import of the ESA, Plaintiffs deflect by questioning the Service's discretionary consideration of the *status* of gray wolves and arguing that it should have listed *other* wolf entities. Neither argument undercuts the 2020 Rule.

### a.    The Service's review of the *status* of gray wolf entities is not legally relevant to the regulatory action taken.

Plaintiffs' main complaint about the 2020 Rule focuses on the Service's review of the status of wolves in the lower 48 States. *See* Pls. Br. at 18-41. As noted, the Service concluded

---

[18] *See* ECF 83-2 ("All gray wolves found within Michigan are 'the property' of the People of the State of Michigan. Mich. Comp. Laws § 324.40105.").

that the Minnesota and the 44-State entities are not protectable "species" within the meaning of the ESA and should be removed from the ESA's lists. The Service could have stopped its analysis there and considered in a separate, later action, either on its own initiative or in response to a petition, whether to list or protect other gray wolf "species," like any regional DPSs. An "agency need not solve every problem before it in the same proceeding." *Mobil Oil Expl. & Producing Se. v. United Distrib. Cos*., 498 U.S. 211, 230-31 (1991) (agency "enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of [both] procedures and priorities") (citations omitted); *see also E. & J. Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1039 (9th Cir. 2007) (agency has "wide latitude to determine the most effective way to carry out its charge from Congress"). Yet the Service took a precautionary approach to administering the ESA and also considered whether other populations or configurations of gray wolves covered by the previously listed Minnesota and 44-State entities met the definition of a threatened species or an endangered species. AR_44 ("in recognition of the unique listing history of the gray wolf, our many prior actions to designate and delist DPSs (table 1), and related court opinions, we have adopted a conservative approach to delisting in this rule").

In the 2020 Rule, the Service analyzed the status of gray wolves in four configurations: (1) Minnesota; (2) the 44-State entity; (3) Minnesota and the 44-State entity combined; and (4) wolves in the lower 48 States, excluding Mexican wolves. AR_44-45. The Service reasonably examined the consequences of the delisting to ensure that other potential configurations of wolves that might qualify as listable "species" within the meaning of the ESA do not require protection when it removed protections for the Minnesota and 44-State entities. *Id*. But that analysis is legally irrelevant to whether the then-existing listed entities were consistent with the ESA. The Service could not maintain protections for the Minnesota or 44-State wolves based on the status of other gray wolf configurations, and so its discretionary status review of alternative wolf entities does not undermine its delisting decision.

*Center for Biological Diversity v. Jewell*, 12-cv-2296, 2014 WL 5703029 (D. Ariz. Nov. 5, 2014), highlights this principle. The court there affirmed the Service's finding that the desert eagle population under review did not constitute a "species"—there, a DPS. *Id*. at *13. Even

1   though the Service also analyzed threats to the desert eagle population, the court found the

2   threats analysis irrelevant. The Service could not designate the desert eagle as an endangered or

3   threatened species because of a threats analysis alone. *Id.* (without a DPS, "the Court need not

4   reach the question of whether [the Service] acted arbitrarily and capriciously in finding the desert

5   eagle not threatened or endangered"). Both in the district court and on appeal, the question thus

6   centered on whether the entity the Service reviewed constituted a DPS and not on the *status* of

7   that entity. *Id.*; *Ctr. for Biological Diversity*, 868 F.3d 1054.

8         The ESA's plain language confirms that a status review is legally irrelevant without a

9   protectable "species." Under the ESA, every part of the statutory listing or delisting inquiry

10   depends on the proper identification and existence of a protectable "species." Section 4(a)(1), for

11   example, requires the Service to "determine whether any species," not unscientific wildlife

12   groupings, constitute endangered species or threatened species. 16 U.S.C. § 1533(a)(1). The ESA

13   requires the Service to consider five statutory factors to gauge the level of threats to a "species."

14   *Id.* § 1533(a)(1)(A) (the Service must consider threats to "*its* habitat or range"—i.e., the

15   "species" habitat or range) (emphasis added). Likewise, in conducting a status review, the

16   Service must consider threats in "a significant portion of *its* range"—i.e., the "species" range. *Id.*

17   § 1532(6) (definition of "endangered species") (emphasis added). In performing this review, the

18   Service must consider State or foreign nation efforts "to protect such species." *Id.* 1533(b)(1)(A).

19   These examples reinforce the ESA's two-step inquiry, where the second step—a status review—

20   has relevance only if it addresses a "protectable" species. *Trout Unlimited*, 559 F.3d at 955. By

21   focusing on the second step and ignoring the first, Plaintiffs address the wrong question and thus

22   do not call into question the Service's decision that delisting is required under the first step of the

23   listing inquiry—the lack of a protectable species.

24         Plaintiffs' reliance on cases evaluating prior wolf listing and delisting actions does not

25   salvage their flawed framing of the case. Plaintiffs, for example, emphasize two district court

26   cases addressing the Service's 2003 Rule that reclassified the 1978 wolf listing into three

27   DPSs—an Eastern, a Western, and a Southwestern DPS. Pls. Br. at 12 (citing and discussing

28   *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005), and *Defenders of Wildlife v.*

*Dep't of Interior*, 354 F. Supp. 2d 1156 (D. Or. 2005)). Those courts rejected the DPS classifications because the Service lumped large swaths of historical habitat into the range of extant populations, thus designating DPSs "based upon geography, not biology." *Nat'l Wildlife Fed'n*, 386 F. Supp. 2d at 564; *Defenders of Wildlife*, 354 F. Supp. 2d at 1170-71. The cases that Plaintiffs cite support the Service's decision in the 2020 Rule. The listed Minnesota and 44-State entities include areas of unoccupied habitat—New Jersey, Oklahoma, West Virginia—and represent geographic areas, not biological delineations of "species." The Service therefore correctly concluded that the prior entities do not constitute "species" as defined by the ESA.

Plaintiffs' discussion of *Humane Society*, 865 F.3d 585, and *Crow Indian Tribe v. United States*, 965 F.3d 662 (9th Cir. 2020), misses the mark for similar reasons. Pls. Br. at 11; *see also* ECF 83-2 at 8-9. In both cases, the Service carved out a DPS from a prior listed entity and examined only the DPS. *Humane Society*, 865 F.3d at 601-02. Both courts rejected this approach and held the Service must examine the effects of delisting a DPS on the entire listed entity. *Id.*; *Crow Indian Tribe*, 965 F.3d at 677-78. In sharp contrast, the Service here examined the entire listed entities and, even more, analyzed the status of wolves throughout the entire lower 48 States to ensure that no other wolf configurations should be protected as a threatened or endangered species concurrent with the delisting.[19] In the 2020 Rule, the Service did not *create* a remnant entity that was not a protectable "species," thereby opening a "backdoor route" to a future regulatory action—the concern addressed by *Humane Society*, 865 F.3d at 601-03. The remnant entities already existed because of prior regulatory and congressional actions, as well as actions advocated by some Plaintiffs (the 2015 Mexican wolf subspecies listing). AR_41-42.[20] It is one thing to find that the Service cannot *create* a statutory problem by carving up a listed entity to

---

[19] Some amici point to the court's instruction in *Humane Society* to evaluate the entire listed entity, yet they argue the Service erred in analyzing the listed wolf entities (like the 44-State entity). ECF 86-1 at 18. This confusion over the proper unit of analysis identifies no flaw in the Service's 2020 Rule.

[20] Some Plaintiffs petitioned the Service to extract the Mexican wolf subspecies from the 1978 listing and separately protect them. 80 Fed. Reg. at 2489 (discussing Center for Biological Diversity and WildEarth Guardians petitions). The Service agreed and, in 2015, designated the Mexican gray wolf subspecies as an endangered species. *Id.* at 2,511. This regulatory action modified the 1978 Rule by extracting the Mexican wolf subspecies from the 1978 listing. *Id.*

delist a DPS, as the courts concluded in *Humane Society* and *Crow Indian Tribe*. It is another thing to prohibit the Service from addressing a statutory problem that already exists—here, the lack of a "species" as Congress defined the term. *Cf. SEC v. Chenery Corp.*, 332 U.S. 194, 201 (1947) (when confronted with prior illegal action, the agency was "bound to deal with the problem afresh, performing the function delegated to it by Congress").

Plaintiffs' disagreement with how the Service considered the status of the wolf entities cannot paper over their failure to challenge the Service's threshold determination that neither listed entity constitutes a valid "species" capable of being protected under the ESA.

> **b.** **Plaintiffs' focus on whether the Service should list other "species" does not undermine the 2020 Rule.**

Plaintiffs' secondary critique alleges the Service erred in failing to identify and protect *other* species, like a Pacific Coast DPS (Pls. Br. at 13-18), or perhaps up to five separate DPSs identified in Plaintiffs' petition (Pls. Br. at 43-46).[21] Plaintiffs also contest the Service's optional reviews of other wolf configurations, like wolves in the lower 48 States (Pls. Br. at 41-43). These arguments admit the relevant question is whether some *other* species exists in the lower 48 States, not whether the Service erred in the 2020 Rule by removing ESA protections for the Minnesota and 44-State entities.

First, Plaintiffs argue that the Service should have treated West Coast wolves as "discrete" from NRM wolves under the DPS Policy because, while geographically connected, the wolves are genetically distinct. Pls. Br. at 16-17 & n.13. Plaintiffs mischaracterize the Service's analysis of West Coast wolves, as discussed below.[22] And their focus on a separate

---

[21] Plaintiffs refer to wolves in Washington, Oregon, and California as "Pacific Coast" wolves. The Service referred to those States as "West Coast States," and so we use "West Coast wolves."

[22] Plaintiffs' new petition asking the Service to list new "species" contradicts their litigation arguments. Plaintiffs argue here that West Coast wolves are biologically distinct and separate from NRM wolves. Pls. Br. at 13-18. The Center for Biological Diversity, Humane Society, and Sierra Club, however, recently petitioned the Service to list a DPS that includes both NRM and West Coast wolves. Petition at 2, 10-14, https://ecos.fws.gov/docs/tess/petition/992.pdf. WildEarth Guardians and others similarly argue in a new petition that the Service should list a Western DPS that includes NRM and West Coast wolves. Petition at 6, 14-16, https://ecos.fws.gov/docs/tess/petition/3352.pdf. These incompatible theories are unexplained, unconvincing, and arguably improper. *Cf.* 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4477, p. 782 (1981) ("Absent any good explanation, a party should not

DPS of West Coast wolves is problematic because the Service could not simultaneously protect both a 44-State DPS and a Pacific Coast DPS as endangered or threatened. *See* 61 Fed. Reg. at 4,724-25 (a DPS must be discrete from—not part of—other populations); *Alsea Valley All.*, 161 F. Supp. 2d at 1162 ("Listing distinctions below that of … a DPS of a species are not allowed under the ESA."). Plaintiffs' focus on a Pacific Coast DPS thus, in essence, acknowledges that a 44-State entity does not constitute a protectable DPS under the law.

Second, Plaintiffs have petitioned—and continue to petition—the Service to list *other* DPSs, implicitly conceding that the listed Minnesota and 44-State entities are not protectable "species." In Plaintiffs' 2018 petition, for example, they contended that up to five DPSs exist in the lower 48 States. Pls. Br at 44 (discussing AR_21766). Except for international borders, DPSs are based on biology, 61 Fed. Reg. at 4,725, and so multiple overlapping DPSs cannot be listed simultaneously, even if each individual DPS theoretically could be "scientifically supported," Pls. Br. at 44. This foundational defect highlights why the Service rationally denied the 2018 petition, and the Court should reject the claim raised by the *Defenders* plaintiffs challenging that decision. Pls. Br. at 43-46.[23] But regardless of the basis for Plaintiffs' arguments for multiple DPSs, they are *not* arguing that the Minnesota or 44-State entities are DPSs. *Id*. Plaintiffs in fact

---

be allowed to gain an advantage by litigating on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory").

[23] While Plaintiffs argue the Service found the "petition presented substantial information on threats," Pls. Br. at 45, the Service concluded the opposite. First, the petition did not present substantial information showing that their alternative proposing a set of five gray wolf DPSs was a valid option for revising the listed entities. AR_326-29. Second, the Service found that Plaintiffs failed to provide substantial information that listing may be warranted for: (1) a lower 48 States DPS or (2) Western and Eastern United States DPSs. AR_331-47. The Service was not required to defer to Plaintiffs' information, Pls. Br. at 45-46, where that would have required the Service to ignore information readily available in its files and its own past resolution of scientific evidence. *See* 50 C.F.R. § 424.14(h)(1)(iii) (like motions to reconsider judicial orders, the Service's petitions findings "must be applied in light of any prior reviews or findings the Service has made on the listing status of the species that is the subject of the petition"); *see also Ctr. for Biological Diversity v. Morgenweck*, 351 F. Supp. 2d 1137, 1142 (D. Colo. 2004) ("Of course FWS can rely on what is within its own expertise and records to reject petitions consistent with ESA standards."). The Service thus properly denied the petition based on findings that Plaintiffs' information was either not credible or already resolved by the Service in prior rules. AR_331-46.

concede that "legacy problems" preclude the Service from protecting the Minnesota and 44-State entities as DPSs. Pls. Br. at 44.

Third, Plaintiffs allege the Service procedurally erred by failing to provide the public with notice that it would be analyzing a "48 United States, minus Mexican wolf" entity. Pls. Br. at 41-43. The Service, however, apprised the public of the precise regulatory action taken: the proposed rule sought comment on removing ESA protections for two entities (the Minnesota and 44-State entities), AR_20135, and the final 2020 Rule implemented *that* regulatory action, AR_153-54. The additional analysis in the final rule either expanded upon issues that were already discussed in the proposed rule (e.g., that neither of the listed entities constitute a "species"), or responded to comments on the proposal (e.g., evaluating the status of the NRM wolves). AR_103-04; *see also Rybachek v. EPA*, 904 F.2d 1276, 1287–88 (9th Cir. 1990) ("fact that a final rule varies from a proposal, even substantially, does not automatically void the regulations. Rather, we must determine whether the … final rule was in character with the original proposal and a logical outgrowth of the notice and comments received").[24]

Beyond that, Plaintiffs' own position during the rulemaking was that the Service's analysis of anything besides the Minnesota and 44-State entities was legally irrelevant. *See, e.g.*, AR_4206; AR_10142. And so it was. The Service's analysis of new entities or wolf configurations did not have any bearing on its threshold determination that the Minnesota and 44-State entities are not protectable "species" under the ESA, and the rule should be upheld on that independent basis. Plaintiffs' complaints with the adequacy of procedural notice on a different issue—the status of different lower 48 States wolf entities—cannot show either harm to

---

[24] While not legally relevant, the Service's proposed rule fully apprised the public that it was considering the status of NRM wolves. Pls. Br. at 41-43 (expressing concern with whether the Service gave notice it would consider NRM wolves). The Service's proposed rule provided notice that it was considering the Biological Report, which analyzed all lower 48 States wolves. *See, e.g.*, AR_20103. And the proposed rule itself analyzed NRM wolves. *Id*. at 20102, 20135 (addressing connection of West Coast wolves to NRM wolves); *id*. at 20110 (discussing effects of State management of NRM wolves). Nor did the Service err in developing its analysis in response to public comments. *See, e.g.*, AR_5972. "Agencies, are free—indeed they are encouraged—to modify proposed rules as a result of the comments they receive." *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 951 (D.C. Cir. 2004) (per curiam).

1   them or a defect in the Service's regulatory action. *City of Los Angeles v. U.S. Dep't of Com.*,

2   307 F.3d 859, 877 (9th Cir. 2002) (any procedural irregularities are harmless when "we know

3   that the result would have been exactly the same").

4         At bottom, Plaintiffs challenge the Service's decision to remove regulatory protections

5   for two entities—the Minnesota and the 44-State wolves. And Plaintiffs ask the Court to reinstate

6   protections for those two entities. Pls. Br. at 47-49. Rather than focusing on the Service's

7   regulatory action, Plaintiffs' litigation arguments are concerned with the Service's failure to

8   protect something new, like West Coast wolves or various DPS configurations. Even if Plaintiffs

9   were correct that the Service erred in failing to protect something new in the 2020 Rule (and they

10  are not), the remedy would be a remand for the Service to reconsider alternative wolf

11  configurations—an issue already pending before the agency given Plaintiffs' recent petitions.

12  The remedy would *not* be to reinstate the past unlawful regulatory regime, *Crickon v. Thomas*,

13  579 F.3d 978, 988 (9th Cir. 2009), particularly when action to reinstate prior rules could be

14  immediately challenged as unlawful, *see, e.g.*, *Alaska v. U.S. Dep't of Agric.*, 772 F.3d 899, 900

15  (D.C. Cir. 2014); *Oceana, Inc. v. Bryson*, 940 F. Supp. 2d 1029, 1045-46 (N.D. Cal. 2013); *see*

16  *also* Pls. Br. at 44 (agreeing that protecting the Minnesota and 44-State entities is not among the

17  "scientifically supported ways to list and protect gray wolves across the lower-48 States").

                                    * * *

19        In summary, the "question in every case is, simply, whether the statutory text forecloses

20  the agency's assertion of authority, or not." *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 301

21  (2013). The Service removed ESA protections for two entities that the Service could not lawfully

22  protect as separate species under the ESA. Through almost 50 pages of argument, Plaintiffs do

23  not contest this point. The Court therefore should venture no further; it should reject Plaintiffs'

24  challenge to the 2020 Rule and grant the Service's motion for summary judgment.

25        **B.     The Service rationally concluded that gray wolves were recovered.**

26        The Service's threshold "species" determination cleared the legal landscape. Gray wolves

27  in the current configurations—the Minnesota and 44-State entities—are not valid "species"

28  under the ESA. The Service nonetheless continued its analysis and considered whether other

populations or configurations of gray wolves covered by the previously listed Minnesota and 44-State entities met the definition of a threatened species or an endangered species. AR_44. As noted, any asserted flaws in this precautionary analysis could not render unlawful the Service's threshold determination that the Minnesota and 44-State entities are not protectable species and should be removed from the ESA's lists. But, if the Court proceeds past this determination (which it need not do), the Service evaluated the best scientific and commercial data available and rationally concluded that gray wolves were recovered in the lower 48 States in large part because of the composition, biological status, and level of threats to core wolf metapopulations in the Great Lakes and NRM regions. AR_153.[25]

Plaintiffs disagree with the Service's expert analysis and conclusions and raise two related arguments disputing wolf recovery in the lower 48 States: (1) the Service ignored all extant wolf populations but those in the Great Lakes (Pls. Br. at 11-13); and (2) the Service failed to analyze threats in a significant portion of the range of gray wolves in the lower 48 States (Pls. Br. at 18-28). Both arguments rest on the flawed premise that two expansive wolf metapopulations cannot anchor the wolf species in the lower 48 States and establish its recovery. As the Service determined, based on the best available scientific evidence, they can; gray wolves have met criteria demonstrating their recovery in the lower 48 States.

**1.      The Service properly analyzed all wolves in the lower 48 States.**

Plaintiffs' main argument is that the Service "failed to evaluate," "failed to analyze," or just plain "ignored" all wolves outside of "one or two 'core' populations" in the lower 48 States.

---

[25] Plaintiffs have petitioned the Service to list new gray wolf entities based on new facts, including regulatory changes in Idaho and Montana. *See* n.22, *supra*. These petitions recognize that the ESA's petition process—not litigation focusing on past agency actions—represents the appropriate mechanism to address new and emerging information. And the Service will address those petitions in due course. But the 2020 Rule must be reviewed based on the evidence before the agency when it promulgated the rule, not judged in hindsight based on post-decisional developments. Plaintiffs and amici cannot reasonably claim that the Service violated the law by disregarding documents and events that occurred after the Service issued the 2020 Rule. The Court therefore should not address Plaintiffs' and amici's arguments based on post-decisional information or events (Pls, Br. at 32 n.19; *id*. at 35 n.23; ECF 71-1 and 71-2; *see also* ECF 86-1 at 2, 13-15; 87-1 at 9-16), as doing so would exceed the limited scope of judicial review under the APA, *see United States v. Carlo Bianchi & Co*., 373 U.S. 709, 715 (1963) (APA review considers "the reasonableness of what the agency did on the basis of the evidence before it").

Pls. Br. at 11-13. Plaintiffs' hyperbole of "one or two 'core' populations" and a systemic "failure to analyze" does not cast shade on the Service's 2020 Rule.

The Service's 2020 Rule analyzed—in depth—the status of and threats to wolves throughout all of the lower 48 States, including wolves in the West Coast States and Colorado. *See* AR_143 (analyzing wolves in the NRM, West Coast States, and Colorado); *see also*, *e.g.*, AR_47-49, 52, 116, 145, 151. The Service performed this analysis in the context of not just "one or two 'core' populations," as Plaintiffs state. Pls. Br. at 13. The "core" metapopulations consist of over 6,000 wolves occurring in connected populations that occupy vast areas of secure habitat throughout the NRM and Great Lakes regions—metapopulations connected genetically to nearly 30,000 wolves in Canada and that are actively recolonizing the southern Rocky Mountains, the West Coast States, and other vacant suitable habitats. AR_424-25.

The Service's analysis of West Coast wolves highlights that it fully analyzed all wolves in the lower 48 States. Plaintiffs argue that the Service should not have treated West Coast wolves as the western front of an expanding NRM wolf population. Pls. Br. at 13-18. Initially, these arguments concede the Service analyzed West Coast wolves and did not ignore wolves outside the Great Lakes region. More broadly, however, Plaintiffs' arguments mischaracterize the Service's analysis.

First, Plaintiffs argue the Service defined the boundaries of the NRM wolves differently in 2009, thereby creating an unexplained inconsistency in its definition of the NRM population's boundary in 2020. Pls. Br. at 14. A population's boundaries are based on biology, and the NRM population's distribution changed in the decade from 2009 to 2020. *See* 74 Fed. Reg. at 15126-28 (defining the NRM boundaries in 2009, in part based on then-known wolf distribution and dispersal distances); AR_48-49 & Fig. 2 (addressing the changes to the NRM population's distribution over time).[26] The Service therefore did not weigh the *same* facts differently; the facts simply changed. *See Defenders of Wildlife v. Zinke*, 856 F.3d 1248, 1263 (9th Cir. 2017)

---

[26] In 2008, two wolves occurred outside the NRM boundaries in Washington State, and genetic analysis revealed that they likely originated from British Columbia rather than the NRM population. 74 Fed. Reg. at 15,128. By 2020, the genetic data revealed that NRM wolves expanded outward into Washington, Oregon, and California. *See, e.g.*, AR_115.

1   (rejecting arguments of unexplained inconsistencies when the purportedly inconsistent findings

2   "evaluated substantially different" things); *Humane Soc'y of the United States v. Locke*, 626 F.3d

3   1040, 1051 (9th Cir. 2010) (rejecting categorical rule that an agency must explain tension

4   "between current and earlier factual determinations").

5          Plaintiffs next make an unqualified assertion that the Service considered *only* geographic

6   distance when evaluating the relationship between NRM and West Coast wolves. Pls. Br. at 16

7   (the Service placed a "singular reliance on distance" in evaluating these wolves); *id.* at 17 (the

8   Service considered "only physical separation" between NRM and West Coast wolves). Yet the

9   Service considered the genetic relationships between NRM and West Coast wolves when

10  evaluating whether they constituted part of a larger wolf population in the west. *See, e.g.*,

11  AR_44, 47, 115.

12         The Service, for example, considered Hendricks et al. (2018), which evaluated genetic

13  data and modeling for wolves in the West Coast States, AR_44, 115 (discussing AR_5499-

14  5500).[27] The authors concluded that all Oregon wolves contained genes from, and thus

15  descended from, NRM migrants. AR_5500. California wolves descended from Oregon wolves

16  and thus also descended from NRM wolves. AR_2342.[28] Washington State wolves "have more

17  complex ancestry with some individuals of [Montana] ancestry only and several other

18  individuals with admixed ancestry" from NRM and coastal British Columbia wolves. AR_5550.

19  Washington thus may represent a mixing zone between the expanding coastal British Columbia

20  and NRM populations. AR_5499-50. Even then, wolves with coastal wolf ancestry are not

21  genetically predisposed or uniquely adapted to coastal habitats. AR_5500 ("individuals with

22  coastal ancestry can occupy interior habitat as well as coastal habitat"). The Washington wolves

23  with coastal wolf ancestry in fact occupied *inland* habitats characteristic of the NRM, not coastal

24  ecotypes, AR_5499, consistent with ample data that wolves "are habitat generalists and can

25

26  [27] The Service relied on the Hendricks study, pages 142-143, which is AR_5490. *See* AR_44.
    Plaintiffs, however, dispute the Service's analysis by citing a *different* study. Pls. Br. at 16 n.13

27  (citing AR_6214). Plaintiffs' mistake identifies no flaw with the Service's analysis.

28  [28] The original breeding female of the Lassen pack in California is not closely related to Oregon
    wolves, and it is believed that she dispersed from another part of the NRM population. AR_2342.

reproduce and survive nearly anywhere," AR_110. Based on this and other evidence reviewed, the Service rationally concluded NRM wolves are expanding into the West Coast States and those colonizing wolves constitute the western expansion of the NRM population, not a separate population of wolves protectable as a DPS. *Id.*

Plaintiffs respond by arguing the Service's analysis is focused only on "distance" between wolves in the NRM and West Coast States, while also admitting the Service considered genetic relationships between wolf populations. Pls. Br. at 16 n.13. Plaintiffs also dispute the Service's analysis of genetic data by relying on a different study than the one the Service addressed. *Id.* And Plaintiffs have petitioned the Service to combine the NRM and West Coast wolves into a single distinct population, *see* AR_5978, betraying their arguments that West Coast wolves are not actually part of an expanding western metapopulation. In the end, these arguments confirm that Plaintiffs cannot generate evidence showing the Service considered Great Lakes wolves to the exclusion of all other wolves in the lower 48 States.

Nor can Plaintiffs show the Service's reliance on two metapopulations to establish wolf recovery is legally inappropriate. Plaintiffs contend that wolf recovery depends on abundant, robust wolf populations in the West Coast States, Colorado, and elsewhere. *See, e.g.*, Pls. Br. at 12-13 (arguing wolves must be recovered in geographic areas, not as a "species"). Michigan and Oregon take the argument even further, asserting that the Service must ensure recovery of individual "long-distance dispersing wolves." ECF 83-2 at 2, 6.[29] But the ESA expressly ties recovery to the "species," not geography, by defining "species" and then framing recovery in terms of the status of and threats to the species. 16 U.S.C. § 1532(3). The ESA therefore does not mechanically relate recovery to the number of individual animals present, the percent of range occupied, or even whether the species' status leaves room for improvement. *Id.*[30]

---

[29] Inconsistently, these States also argue the Service must apply the ESA by State, instead of to the "species." ECF 83-2 at 7 (arguing the Service must apply the statutory inquiry to wolves in each State, rather than to the listed entities or a valid "species"). These arguments reflect policy positions, not efforts to apply the law as written. *See* 16 U.S.C. § 1533(a)(1) (unambiguously requiring a five-factor inquiry for the "species," not animals in individual States).

[30] Various amici neglect this point by relying on a peer reviewer to argue that additional wolf populations could "contribute to metapopulation resiliency." ECF 86-1 at 20. Any species could

For these reasons, the Service has interpreted the ESA as not requiring it "to restore the gray wolf (or any other species) to its entire historical habitat, or any specific percentage of currently suitable habitat." AR_51; AR_116 ("Neither the Act nor our regulations require that a listed species be restored to any threshold amount of its historic range before it may be delisted."). The Ninth Circuit agrees, explaining that a "species with an exceptionally large historical range may continue to enjoy healthy population levels despite the loss of a substantial amount of suitable habitat. Similarly, a species with an exceptionally small historical range may quickly become endangered after the loss of even a very small percentage of suitable habitat." *Defenders of Wildlife*, 258 F.3d at 1143. So too here. The Service properly tethered recovery to the species' status, and its expert findings on the recovered status of the core wolf metapopulations in the United States are entitled to deference. *Trout Unlimited*, 559 F.3d at 959 ("It is not our role to ask whether we would have given more or less weight to different evidence, were we the agency. Assessing a species' likelihood of extinction involves a great deal of predictive judgment. Such judgments are entitled to particularly deferential review.").

### 2. The Service rationally analyzed the status of and threats to wolves in significant portions of their range in the United States.

Plaintiffs next challenge the Service's analysis of whether any entity it considered is threatened or endangered in a "significant portion of its range." Pls. Br. at 18-28. In analyzing whether gray wolves were either an endangered species or a threatened species throughout a significant portion of their range (SPR), the Service must consider whether portions of the wolf's current range where wolves may be at greater risk are "significant." *See* 16 U.S.C. § 1532(6) (a species is an endangered species if it "is in danger of extinction throughout all or a *significant portion of its range*") (emphasis added); *id*. § 1532(20) (same). Plaintiffs' arguments here largely repackage their threshold critique that the Service should have protected wolves in the lower 48 States based on threats existing in specific geographic locations, like the West Coast States or southern Rocky Mountains. These repackaged arguments fare no better.

---

become more resilient and improve its status. That theoretical inquiry, however, fails to address whether the species is threatened, endangered, or recovered for purposes of a listing analysis.

1   First, the Service properly applied the statutory inquiry to the wolf entities considered in

2   the 2020 Rule.[31] For each entity evaluated, the Service considered whether wolves in that entity

3   were in danger of extinction or likely to become so in the foreseeable future throughout all of

4   their range based on its assessment of identified threats, which are expounded on below. After

5   answering no to that question, the Service considered whether there were any significant portions

6   of each entity's range where the entity may be in danger of extinction or likely to become so in

7   the foreseeable future. *See* AR_140. The Service rationally concluded that there were no portions

8   outside of the Great Lakes States where (1) wolves face greater threats and therefore could

9   potentially be endangered or threatened, and (2) the portions may be "significant" because they

10  were not "biologically meaningful in terms of the resiliency, redundancy, or representation of the

11  entity being evaluated." AR_138.

12      The Service's approach to evaluating significance was reasonable. *Cf.* Pls. Br. at 21-22.

13  After years of litigation over the meaning of "significant portion of the range," the Service

14  collaborated with NMFS to issue a policy interpreting the phrase. 79 Fed. Reg. 37,578 (July 1,

15  2014) (SPR Policy). Among other things, the policy sets forth a definition of "significant," 79

16  Fed. Reg. 37,609, which was later challenged and vacated by several district courts.[32] Without

17  any generally applicable interpretation, the Service interpreted that statutory phrase for the 2020

18  Rule through notice and comment procedures. As explained below, the Service's interpretation is

19  properly entitled to controlling weight. *See generally Friends of Animals v. Haaland*, 997 F.3d

20  1010, 1015 (9th Cir. 2021) ("the Court also reviews agency rulemaking under the two-step

21  *Chevron* framework") (citation omitted); *Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 487

22  (D.D.C. 2014) (when the ESA "does not define how the concept is to be measured . . . the

23  agency therefore has discretion to make this determination on the basis of its own expertise").

---

[31] Plaintiffs never identify the "object" of the "significant portion of its range" inquiry. Under the ESA, a "significant portion of its range" analysis matters only when performed in relation to the Service's review of a protectable "species." 16 U.S.C. § 1532(6), (20). Neither listed entity the Service acted on in the 2020 Rule constitutes a protectable species.

[32] *See, e.g.*, *Desert Survivors v. U.S. Dep't of Interior*, 321 F. Supp. 3d 1011 (N.D. Cal. 2018). The *Desert Survivors* court later clarified that its vacatur of the policy's definition of "significant" applies nationwide. 336 F. Supp. 3d 1131 (N.D. Cal. 2018).

1    The Service explained in the final rule how it interpreted significance and how it applied

2    that interpretation. *See, e.g.*, AR_114 ("For the gray wolf entities addressed in this rule, we

3    assessed 'significance' based on whether portions of the range contribute meaningfully to the

4    resiliency, redundancy, or representation of the gray wolf entity being evaluated without

5    prescribing a specific 'threshold.'"). The Service did not create the concept of "resiliency,

6    redundancy, or representation" for this rule. It is based on peer-reviewed scientific literature and

7    the Service has routinely applied these principles in, and before, the SPR policy. *See* 79 Fed.

8    Reg. at 37,581 ("We evaluate biological significance based on the principles of conservation

9    biology using the concepts of redundancy, resiliency, and representation (the three R's).");[33] *see*

10   *also* AR_140 ("To sustain populations over time, a species must have a sufficient number and

11   distribution of healthy populations to withstand annual variation in its environment (resiliency),

12   novel changes in its biological and physical environment (representation), and catastrophes

13   (redundancy).") (citing AR_40599, 602, AR_25132); AR_51 (gray wolf recovery criteria align

14   with the "conservation biology principles of representation (conserving the adaptive diversity of

15   a taxon), resiliency (ability to withstand demographic and environmental variation), and

16   redundancy (sufficient populations to provide a margin of safety)").

17       The Service adequately explained how it applied these principles. The Service's

18   evaluation of resiliency included wolves' high reproductive capacity and genetic diversity.

19   AR_146 ("Those factors provide resiliency in the face of stochastic variability (annual

20   environmental fluctuations, periodic disturbances, and impacts of anthropogenic stressors).").

21   The Service defined "representation" as "the ability of a species to adapt to changing

22   environmental conditions over time," and explained the source of the definition and how it was

23   applied. AR_114 ("We use Smith et al.'s (2018) [AR_25132] definition of representation … by

24   asking whether the species has sufficient adaptive diversity such that it is not in danger of

25   extinction or likely to become so in the foreseeable future. Adequate representation does not

26   require preservation of all adaptive diversity to meet this standard under the Act."); *see also*

27

28

---

[33] The courts vacating the SPR Policy did not hold that the Service's use of the three R's was unlawful or arbitrary and capricious.

AR146 ("Life-history characteristics of the wolf, including high dispersal capability and adaptability, along with the high genetic diversity evident in wolves in the Great Lakes area, provides sufficient adaptive capacity such that their long-term survival is assured."). Finally, in evaluating representation, the Service considered whether the portion is "an isolated population with unique or markedly different genotypic or phenotypic traits that is evolving separate from other wolf populations," and whether it is well-represented in the rest of the entity. *See*, *e.g.*, AR_145. For each entity assessed in the rule, the Service identified portions of the entity's range where gray wolves face greater threats and therefore may be endangered or threatened and then determined that none of those portions was significant. *See, e.g*., AR_152-53.

Plaintiffs raise several alleged flaws in the analysis, none of which withstands scrutiny. First, they argue repeatedly that the Service applied a "meaningless," "standardless" inquiry. Pls. Br. at 21. The Service used a specific, defined standard—"whether portions of the range contribute meaningfully to the resiliency, redundancy, or representation of the gray wolf entity" to determine whether any portions where the entity may be endangered or threatened could be significant. AR_114. This standard does not lose meaning because Plaintiffs prefer a different, unarticulated standard that would eliminate the Service's discretion. Indeed, many standards do not impose quantitative, bright-line tests but still present "meaningful" and legally appropriate standards. In *Weyerhaeuser Co. v. FWS*, 139 S.Ct. 361 (2018), for example, the Supreme Court recently concluded that a highly discretionary standard—one requiring the Service to "tak[e] into consideration" various factors and weigh "benefits" generally—presented a "'meaningful standard against which to judge the agency's exercise of discretion.'" *Id*. at 371-72 (quoting 16 U.S.C. § 1533(b)(2), and *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)). The Ninth Circuit likewise has upheld the Service's DPS Policy, which sets forth a flexible, discretionary, and "open-ended" inquiry. *Ctr. for Biological Diversity*, 868 F.3d at 1060. These examples refute Plaintiffs' position that any standard without quantifiable, bright-line rules is meaningless and unlawful.

Second, Plaintiffs err in relying on possible "range contraction" from the loss of West Coast and central Rocky Mountain wolves. *See* Pls. Br. at 23-24 (citing findings made for other species in the context of the DPS analysis). Their "range contraction" theory is indistinguishable

from "significant gap in the range," which the Service declined to adopt as a factor in the SPR analysis. *See* 79 Fed. Reg. at 37,594 ("We deliberately chose not to use the phrase, 'significant gap in the species' range' because that is a factor in the DPS Policy, and 'significant' in the SPR phrase is not the same as 'significant' in the DPS Policy."). Plaintiffs make a similar error in arguing that the Service should have considered whether "peripheral populations" are found in a unique ecological setting or if their genetic characteristics "differ[] markedly" from other populations. *See* Pls. Br. at 24-25. Like "significant gap in the range," those concepts from the DPS policy do not directly apply to the SPR inquiry, and the Service therefore did not overlook a relevant factor. *Cf. id.* at 24.

Third, Plaintiffs' discussion of "peripheral populations," Pls. Br. at 24-27, restates Plaintiffs' flawed arguments about the genetic traits of West Coast wolves. *See* Section IV.B.1., *supra*. The 44-State entity that was previously listed as endangered encompasses: (1) a core population in the Great Lakes; and (2) wolves in the West Coast States that descended from NRM wolves. The West Coast wolves, although part of the 44-State entity, are not biologically significant to that entity because they are part of the NRM metapopulation. AR_145 (West Coast and Colorado wolves are not meaningful to redundancy or resiliency because they occur in small numbers and are part of the currently recovered and stable NRM metapopulation, and they are not meaningful to representation because they are not genetically distinct from NRM wolves).[34] Wolves at the fringes of the Great Lakes population are not significant for a different reason: they are not needed to ensure the viability of the large, stable Great Lakes metapopulation. AR_144. This is not "inconsistent reasoning." Pls. Br. at 25. It appropriately accounts for biological differences between gray wolves in the 44-State entity.[35]

---

[34] One peer reviewer stated that recovery requires "many large populations arrayed across a range of ecological settings," and that representation does not apply at the species level. *See* Pls. Br. at 25, n.16. The Service considered and responded to this comment. *See* AR_114 ("While Shaffer and Stein (2000) introduced the concept of representation in the broad context of conserving biodiversity across ecosystems, we apply their concept at the species level, consistent with Smith et al. (2018).").

[35] Plaintiffs' view that the Service conflated "the two prongs of the listing inquiry," Pls. Br. at 26, ignores the central defect in their challenge—*they* ignore the first step by failing to address whether the listed entities, or any other, constitute a "species." *See* Section IV.A., *supra*. In any

1   Fourth, there is no merit to Plaintiffs' argument that the Service must consider "all areas

2   where wolves had been sighted throughout the United States." *See* Pls. Br. at 27; *see also* ECF

3   83-2 at 5-7 (arguing that the Service must "explain why gray wolves are not endangered

4   *wherever* they currently exist") (emphasis in original); ECF 86-1 at 17 (arguing that the Service

5   erred in excluding dispersing wolves within its definition of current range). Plaintiffs concede

6   that "courts have accepted [the Service's] interpretation of 'range' for the purpose of ESA's SPR

7   policy as 'current range.'" Pls. Br. at 29. Still, they question the scope of the current range

8   identified by the Service. Plaintiffs' objection to the Service's assessment of current range is

9   puzzling, because the map at Figure 2 of the final rule depicts a current range consistent with that

10   identified by two of the Plaintiffs in the December 2018 listing petition. *Compare* AR_49

11   (Figure 2), *with* AR_2794 (Figure 3); *see also* AR_2796 (Figure 4); AR_22018 (Petition

12   Appendix A) (no "extant gray wolf population" in any of the States listed in Plaintiffs' brief).

13   The Service explained that it determined current range based on existing data of wolf groups or

14   packs and excluded individual dispersing wolves because they "do not have a defined territory or

15   consistently use any one area." AR_106; *see also* AR_113 ("the Northeastern United States does

16   not merit evaluation as a significant portion of the species' range because the best available

17   science indicates that this area is unoccupied"). The Service's focus on wolf packs, not the land

18   that they occupy, follows its SPR policy. 79 Fed. Reg. 37,593 ("The biologically based definition

19   [of significant] in our draft policy refers to the biological organisms, not the geographic area.");

20   AR_140, n.6 ("portion of its range" refers to the individual wolves within a particular area of the

21   species' current range, not the habitat itself). "This is because, while 'portion of the range' is part

22   of the species' range (i.e., a geographical area), when we evaluate a significant portion of its

23   _____

24   event, Plaintiffs misapprehend how the SPR inquiry is applied in practice. If a portion of a
     species' range is not significant, then the extinction risk in that area is irrelevant because a

25   portion must meet both prongs to warrant listing. *See* AR_140 (SPR inquiry asks whether there is
     "any portion of the species' range for which it is true that both (1) the portion is significant; and

26   (2) the species is in danger of extinction now or likely to become so in the foreseeable future in
     that portion"); *id.* ("Regardless of which question we address first, if we reach a negative answer

27   with respect to the first question that we address, we do not need to evaluate the other question

28   for that portion of the species' range.").

range, we consider the contribution of the individuals in that portion." *Id.* Plaintiffs may prefer a different definition of a species' range, but that is a policy preference and not a basis to overturn the Service's reasoned decision.

In short, Plaintiffs' challenges to the Service's SPR analysis are characterized by an unsupported legal principle—the need to set out quantitative standards amenable to bright-line inquiries—and factual attacks that disregard the Service's comprehensive analysis of wolf threats throughout all portions of its range in the lower 48 States. Plaintiffs prefer different methodologies and disagree with the Service's conclusions, but that does not mean the Service's approach and analyses are arbitrary or capricious. *See River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) ("The APA does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts.") (citation omitted).

### C.    The Service's five-factor inquiry considering threats to gray wolves is reasoned.

The Service followed the ESA and its implementing regulations in reaching its 2020 determination that no populations of gray wolves meet the definition of a threatened or an endangered species. *See* 16 U.S.C. § 1533(c)(2); 50 C.F.R. § 424.11(e)(2). The same factors considered in determining whether to list a species apply to delisting determinations. *Id.*; *see also* 16 U.S.C. § 1533(a)(1).[36] In evaluating these factors, the Service must rely on the "best scientific ... data available." *Id.* § 1533(b)(1)(A). "[T]he Service's evaluation of this data falls within its area of expertise and is entitled to deference by the court." *Defenders of Wildlife v. Zinke*, 849 F.3d 1077, 1089 (2017) (citation omitted).

The Service relied on the best scientific and commercial information available to it during the rulemaking to identify conditions that may negatively affect individual gray wolves ("threats"), as well as conditions that may ameliorate the threats. *See* AR_53. The delisting rule

---

[36] The factors are: "(A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." *Id.*

identifies threats to gray wolves, discusses the species' expected response to those threats, and analyzes the effects of the threats at the individual, population, and species level. *Id.* The Service identified several threats that could harm wolves within the lower 48 States: human-caused mortality, habitat and prey availability, disease and parasites, genetic diversity and inbreeding, and climate change. It evaluated each of these threats individually and cumulatively for each entity it analyzed, reasonably determining that the threats do not rise to such a level that gray wolves are currently in danger of extinction or likely to be so within the foreseeable future. *See* AR_142 (Minnesota); AR_145 (44-State entity); AR_149 (combined listed entity); AR_153 (lower 48 States entity).

### 1. The Service reasonably determined that gray wolves are not an endangered species or a threatened species because of human-caused mortality.

Unregulated human-caused mortality was the main factor responsible for the decline of gray wolves, and it remains the most significant factor affecting long-term conservation of the species. AR_54.[37] The main sources of human-caused mortality are harvest (hunting), lethal control, and illegal take. AR_55. The Service exhaustively analyzed this factor not only within the listed entities, but also within the delisted NRM population. AR_54-73.

In general, regulation "of human-caused mortality has significantly reduced the number of wolf mortalities caused by humans." AR_56. Further, despite "human-caused wolf mortality, wolf populations have continued to increase in both number and range since the mid-to-late 1970s." AR_72; *see also* AR_56 ("the high reproductive potential of wolves, and their innate behavior to disperse and locate social openings or vacant suitable habitats, allows wolf populations to withstand relatively high rates of human-caused mortality."); AR_404 (because of "adaptable and resilient" pack social structure, "breeding members can be quickly replaced from either within or outside the pack" and "wolf populations can rapidly overcome severe disruptions, such as pervasive human-caused mortality or disease"); *id.* ("Wolf populations have been shown to increase rapidly if the source of mortality is reduced after severe declines.");

---

[37] Because the States will regulate harvest and lethal control after delisting, this threat is linked to the evaluation of State regulatory mechanisms, which we elaborate on below.

AR_405 ("High levels of reproduction and immigration in wolf populations can compensate for anthropogenic mortality rates of 17% to 48%.").

In the Great Lakes area, the Service expects that legal harvest and lethal control will increase post-delisting, but after "an initial population decline" the population will stabilize, with "fluctuations around an equilibrium resulting from slight variations in birth and death rates." AR_72-73. Wolf population numbers in the Great Lakes region "are currently much higher than Federal recovery requirements." AR_73. The Service thus expects "some reduction in wolf populations in the Great Lakes area when they are delisted as States implement lethal depredation control and decide whether to institute wolf hunting seasons." *Id.* Even so, because the wolf population is so robust, the State plans will allow for "maintaining wolf populations well above Federal recovery targets" even with increased mortality levels. *Id.*

In the West Coast States, the Service assessed the prevailing data and conditions in 2020, finding that significant increases in human-caused mortality were unlikely because of existing State regulatory mechanisms, which "balance wolf management and wolf conservation." AR_72; *see also* AR_67 (rates of human-caused and total mortality in Oregon, which are estimated at 4 and 5 percent, respectively, "provide ample opportunity for continued positive population growth and recolonization of suitable habitat in the State"); AR_69 ("with continued positive population growth and relatively low levels of human-caused mortality, substantial opportunities remain for dispersing wolves to recolonize vacant suitable habitat in Washington"). Nor did the Service expect that increased levels of human-caused mortality would significantly affect "the recolonization and establishment of wolves in the central Rocky Mountain States due to the life-history characteristics of wolves and their ability to recolonize vacant suitable habitat." *Id.*[38]

The human-caused mortality analysis also captured the effects of lost historical range,

[38] Although wolves in the West Coast and central Rocky Mountains may be at greater risk from human-caused mortality because of small numbers, those wolves are not a significant portion of any of the entities evaluated in the final rule. As a result, the Service did not treat those wolves as a distinct entity in evaluating threats. *See, e.g.*, AR_145 (44-State entity); *id.* ("Because we did not identify any portions of the 44-State entity where threats may be concentrated and where the portion may be biologically meaningful in terms of the resiliency, redundancy, or representation of the 44-State entity, a more thorough analysis is not required.").

because that factor was the primary cause of range loss. *See* AR_54 ("An active eradication program is the sole reason that wolves were extirpated from much of their historical range in the United States."); *cf.* Pls. Br. at 28-30; ECF 86-1 at 19-20.[39] The Service evaluated the threat of human-caused mortality based on the species' current condition, which "reflects the effects of historical range loss." *See* AR_53; *see also* 79 Fed. Reg. 37,584 ("If the causes of the loss [of historical range] are still continuing, then that loss is also relevant as evidence of the effects of an ongoing threat."); *see also Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018) (deferring to Service's interpretation of "range" as current range and upholding agency's consideration of the species' historical range "in evaluating the factors that contributed to its negative listing decision"). The Service provided a rational basis for concluding that the threat of human-caused mortality had been ameliorated and that lost range was not "undermin[ing] the viability of the species as it exists today." 79 Fed. Reg. 37,584; *see also* AR_145-46 ("Although substantial contraction of gray wolf historical range occurred within the 44-State entity since European settlement, the range of the gray wolf has expanded significantly since its original listing in 1978, and the impacts of lost historical range are no longer manifesting in a way that threatens the viability of the species."); *id.* (causes of historical range contraction (targeted extermination efforts) and effects of contraction (reduced numbers and restricted gene flow) "have been ameliorated or reduced such that the 44-State entity no longer meets the Act's definitions of 'threatened species' or 'endangered species'").

Given the current stability of wolf populations and the adaptability of the species, the Service reasonably determined that regulated harvest and other sources of human-caused mortality were not a significant threat to the survival of gray wolves in the lower 48 States. *See Humane Society*, 865 F.3d at 608 (upholding the Service's conclusion that "human-caused mortality was not a significant threat to the wolf's survival, as shown by the resilient growth of

---

[39] The final rule and sources cited by the Service explain the "eradication program" that was responsible for extirpating wolves from much of their historical range. *See* AR_54; *see also* AR_32217-18; AR_32986; AR_33073; *cf.* Pls. Br. at 29 (wrongly arguing that the Service failed to define the program and relied on outdated sources) (citing AR_11142-43). The Service also considered and responded to other peer review comments questioning its range analysis. See AR_113; *cf.* Pls. Br. at 29.

the gray wolf population despite the human-caused deaths"); *see also id.* at 609 (the "record supports the Service's conclusion that disease- and human-caused mortality have not materially threatened the expansion of the gray wolf population in the Western Great Lakes region, and thus the Service reasonably concluded that those factors do not counsel against delisting").

> **2.** **The Service reasonably determined that gray wolves are not an endangered species or a threatened species because of the inadequacy of existing regulatory mechanisms.**

The final rule and its administrative record provide ample support for the Service's determination that State management would effectively protect gray wolves after delisting. *See* AR_85-98. Plaintiffs' criticism of the Service's conclusions ignores the applicable standard of review and misstates the agency's obligations in reviewing State management plans. *See* Pls. Br. at 31-40. The Court's role is to determine "whether the rulemaking record demonstrates the Service exercised its judgment in a reasonable way in concluding" that State management plans will adequately protect gray wolves after delisting. *See Defenders of Wildlife*, 849 F.3d at 1083. The Service's determination "is a quintessential judgment call that Congress left to the Secretary, and by delegation to the Service, which has years of experience in evaluating what is reasonably likely to be implemented and effective." *Id.* (citation omitted). Plaintiffs do not meet their burden to overcome the presumption that the Service exercised its judgment reasonably.

> **a.** **Plaintiffs misstate the Service's obligations in reviewing State regulatory mechanisms.**

The Court should reject Plaintiffs' criticisms of the Service's analysis of State management plans because they are based on a flawed premise: that the ESA requires the Service to ensure that every provision of each State management plan is based on the "best available science." *See* Pls. Br. at 35-37; *see also* ECF 87-1 at 7 (arguing that Wisconsin plan is based on outdated information). ESA Section 4 requires the Service to determine whether a species is endangered or threatened "solely on the basis of the best scientific and commercial data available ... after taking into account those efforts, if any, being made by any State ... to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction." 16 U.S.C. § 1533(b)(1)(A). The

statute does not require the Service to substitute its judgment for that of State regulators by examining their State management plans to make a threshold finding that the plans are based on the best available science.[40] Plaintiffs cite no case law supporting this argument.

The relevant inquiry for the Court is whether the Service "could rationally conclude that the regulatory framework described in the Rule is sufficient to sustain a recovered [wolf] population." *Greater Yellowstone Coal.*, 665 F.3d at 1032; *see also Defenders of Wildlife,* 849 F.3d at 1084 ("That appellees disagree with the Service does not undercut its reasoned determination that … [the State] has established an adequate regulatory framework."). Regulatory mechanisms are not "inadequate" just because they do not "protect a species from any conceivable impact"; "the ESA requires protection only 'against threats that would cause the species to be 'an endangered species or a threatened species.'" *Id.* at 1087. And State management measures need not equal the protections of the ESA. *See Greater Yellowstone Coal.*, 665 F.3d at 1032. The final rule provides a rational basis for the Service's determination that post-delisting management would sustain a recovered wolf population.

> **b.    The Service reasonably determined that gray wolves are not endangered or threatened because of inadequate regulatory mechanisms in the Great Lakes.**

The Service reasonably concluded that Minnesota, Michigan, and Wisconsin "have adequate laws and regulations" to fulfill the commitments in their State management plans "and ensure that the wolf population in the Great Lakes area remains above recovery levels." AR_56. The number of wolves in the Great Lakes area far exceeds the level required to sustain the species. The recovery plan for the Eastern United States, which applies to the Great Lakes metapopulation, has two criteria: (1) assuring the survival of the gray wolf in Minnesota; and (2)

---

[40] The Service addressed this issue in the context of its 2009 rule identifying and delisting the Western Great Lakes DPS. 74 Fed. Reg. 15,070 (Apr. 2, 2009). Commenters recommended that specific changes be made to the State management plans for Michigan, Minnesota, and Wisconsin. In response, the Service explained that it reviews State plans "to determine if they will provide sufficient protection and reduce threats," and it is "primarily concerned with the outcome of the plan's implementation." *Id*. at 15,087; *see also id.* ("Once a species is delisted, the details of its management are a State or tribal responsibility; the Federal responsibility is to monitor the plan's implementation and the species' response for at least five years to ensure that the plan's outcome is as expected.").

at least one viable population within the historical range of the eastern timber wolf outside of Minnesota and Isle Royale, Michigan. AR_51. The plan identifies a population goal of 1,251-1,400 individual wolves for the Minnesota population. *Id.* The wolf population in Minnesota was estimated at over 2,000 at the time of delisting. AR_418. The recovery plan includes numerical goals for the second population based on how isolated it is from the Minnesota population. AR_51 (if located within 100 miles then a minimum of 100 wolves for at least 5 years; if more than 100 miles then a minimum of 200 wolves). Wolves in the Great Lakes area have exceeded both criteria for the past 20 years. *Id.*; *see also* AR_0417, 420, 421 (about 2,655 wolves (465 packs) live in Minnesota, 914 wolves (243 packs) in Wisconsin, and 695 wolves (43 packs) in Michigan). Although whether the species should be delisted does not hinge on whether the recovery criteria have been met, *see Friends of Blackwater v. Salazar*, 691 F.3d 428, 436 (D.C. Cir. 2012), the Service carefully considers the criteria in making listing determinations because they allow the Service to "evaluate progress toward recovery and assess the species' likely future condition." AR_50.[41]

Plaintiffs focus on the expected percentage decrease in wolf populations in the Great Lakes States, glossing over the magnitude by which current populations exceed the recovery criteria. Deliberate reductions in population size—which follow past practice and which the Service anticipated and factored into its analysis—are unlikely to bring the population below the recovery threshold. *Cf.* Pls. Br. at 31-35. Regardless of the methods used, wolves are not as sensitive to human-caused mortality as Plaintiffs assert. They can withstand high levels of mortality and rebound quickly, even after severe declines, if the source of mortality is reduced. *See supra* Section III.A.[42]

---

[41] Plaintiffs characterize the recovery criteria as "outdated," *see* Pls. Br. at 35-36, but do not directly challenge those plans or offer concrete evidence that the recovery criteria cannot achieve conservation. The Service did not have to update the recovery plans prior to delisting; the ESA does not require "that the criteria in a recovery plan be satisfied before a species may be delisted pursuant to the factors in the Act itself." *Friends of Blackwater*, 691 F.3d at 436.

[42] Plaintiffs argue that State mortality levels are "unsustainable," citing studies that they characterize as concluding that mortality rates "must be kept below 30%." Pls. Br. at 36. The Service considered the sources cited by Plaintiffs and reached a different conclusion. *See* AR_405; *see also* AR_55 ("Similarities in survival rates among wolf populations subject to

1    Regulated public harvest occurred in the Great Lakes area during periods when wolves

2    were delisted, and the population rebounded after the harvest ended. For example, population

3    data reflect that past hunts in Wisconsin when wolves were federally delisted did not result in

4    significant harm to the overall wolf population in the State. *Cf.* ECF 86-1 at 23 (alleging the

5    Service ignored a "pattern of state overhunting of wolves"). After delisting in 2012, the State

6    held a regulated hunting and trapping season in 2012-2013. There were 117 wolves harvested,

7    and the minimum wolf population fell from 815 (2011-2012) to 809 (2012-2013). AR_419, 428.

8    During the 2013-2014 hunting season, 257 wolves were harvested and the population count

9    declined to 660 wolves. AR_419. In response to this decline, State regulators reduced the wolf

10   quota for the 2014-2015 hunting season, from 275 to 156. *Id.* That year there were 154 wolves

11   harvested, and the population increased to 746. AR_428. After three years of public hunting and

12   trapping seasons aimed at reducing the number of wolves, the overall wolf population was

13   reduced by only 8.5 percent. AR_92.[43]

14        The hunts that occurred in Wisconsin when gray wolves were previously delisted reveal

15

16   different levels of human-caused and other forms of mortality" show "that moderate increases in
     human-caused mortality may not have a large effect on annual wolf survival.").

17   [43] Similar levels of harvest occurred after wolves were federally delisted in the NRM States and
     the harvest did not affect gray wolves at the population level, as seen in data showing that NRM

18   wolf populations have remained relatively stable since hunts were begun in those States. At the
     end of 2000, the NRM population contained more than 300 wolves distributed among Montana,

19   Idaho, and Wyoming. AR_412. At the end of 2015, there were more than 1,700 wolves in those
     three States. AR_425. The population expansion in the NRM occurred even with high levels of

20   harvest and other sources of human-caused mortality. *See* AR_70 (Table 3). Beginning in 2011,
     after wolves were federally delisted in Idaho and Montana, harvest levels expanded: 200 wolves

21   harvested in Idaho, compared to 46 in 2010; 121 in Montana, compared to 0 in 2010. *Id.* Harvest
     levels increased in 2012 and 2013, but overall wolf minimum counts did not vary widely in those

22   years. *Id.*

23   In Idaho, the wolf population peaked in 2009 at 870, declined slightly, and then stabilized
     between 2010 and 2015. *Id.* This stabilization occurred despite harvest levels of 200-356 wolves

24   per year between 2011 and 2015. *Id.* Even with harvest levels consistently remaining above 250
     wolves, the Idaho Department of Fish and Game estimated that there were about 1,000 wolves in

25   the State at the end of 2019. *Id.* In Montana, the minimum count of wolves peaked in 2011 at 653
     and stabilized at 500 to 650 wolves between 2012 and 2017. AR_70. In each of those years

26   except 2012, the harvest levels exceeded 200 wolves. *Id.* (175-255 per year). Using its updated
     methods for determining wolf numbers, Montana estimated at the time of delisting that its wolf

27   population remained above 800 individuals each year. *Id.*

28

that State managers are capable of monitoring the results of the harvest and can respond to reduce the quota for the next year if needed. *See* AR_56 ("Using an adaptive-management approach that adjusts harvest based on population estimates and trends, the initial objectives of States may be to reduce or stabilize wolf populations and then manage for sustainable populations, similar to how States manage all other hunted species."). They also show that States have the capability to manage wolves in a way that addresses human-wolf conflicts without causing major declines in wolf populations. *See id.* (during the three-year period that wolves were delisted, "verified wolf kills on cattle and the number of farms with verified depredations declined significantly..., indicating that active management with public harvests and targeted lethal depredation controls could reduce conflicts without causing significant declines in wolf numbers"). And if there is a decline due to harvest, the wolf population can recover quickly if the quota is reduced. AR_403-04; AR_46-47.

The February 2021 wolf hunt in Wisconsin does not show that the Service's November 2020 delisting rule was irrational. *Cf.* Pls. Br. at 32, n.19; ECF 86-1 at 13-14; ECF 87-1 at 21. The hunt post-dates the final rule and is not relevant to the question before the Court: is the delisting rule arbitrary or capricious based on the reasoning in the rule itself and the administrative record? *See supra* Section IV.B., n.25. But, even if the Court considers the February 2021 hunt, it does not undermine the rationality of the Service's finding regarding State regulatory mechanisms. The Service expected that Wisconsin and other States would hold hunting and trapping seasons consistent with their State management plans. *See* AR_92. The Service adequately considered existing State regulatory mechanisms and could not have reasonably predicted that a hunt would occur in February 2021—as a result of litigation and despite the objection of the Wisconsin Department of Natural Resources—and that the quota would be exceeded. *See* 87-1 at 9-15; *see also Defenders of Wildlife*, 849 F.3d at 1088 ("the ESA does not require a regulation to address every far-fetched 'what-if' scenario that opponents of delisting can imagine") (citation omitted).

Moreover, the outcome of a single hunt does not establish that regulatory mechanisms are inadequate. The Service's determination was based on the size of the current population and the

State's commitment to maintain a wolf population that exceeds the recovery goal. AR_92 ("WI DNR is committed to maintaining a wolf population of 350 wolves outside of Indian reservations, which translates to a State-wide population of 361 to 385 wolves in late winter. No harvest will be allowed if the wolf population falls below this goal."); *see also id.* (Wisconsin plan "calls for State relisting of the wolf as a threatened species if the population falls to fewer than 250 for 3 years"). Consistent with its post-delisting monitoring plan, the Service will assess the effects of the February 2021 hunt, and any other sources of human-caused mortality, based on population numbers and other data provided by the State. AR_154.[44]

The Service relied on the same State management plans in its 2011 rule designating and delisting a western Great Lakes DPS of wolves, finding that State "plans provided adequate monitoring of and protection for the wolf segment." *Humane Society*, 865 F.3d at 594. The D.C. Circuit upheld the Service's analysis of human-caused mortality, which relied in part on those State management plans. *Id.* at 609. Today, as in 2011, human-caused mortality has "not materially threatened the expansion of the gray wolf population in the Western Great Lakes region," and State "plans in Minnesota, Michigan, and Wisconsin" will provide "an important backstop should new threats emerge." *Id.*

> **c.** **The Service reasonably determined that gray wolves are not endangered or threatened because of inadequate regulatory mechanisms outside of the Great Lakes.**

The Service rationally concluded that Washington, Oregon, California, Colorado, and Utah are "committed to conserving wolves as demonstrated by the development of management plans and/or codification of laws and regulations that protect wolves." AR_56. The West Coast States have "adopted wolf-management plans intended to provide for the conservation and reestablishment of wolves in these States." AR_95. Their State plans "include population objectives, education and public outreach goals, damage-management strategies, and monitoring

---

[44] If the Court considers the post-decisional evidence about the 2021 Wisconsin hunt submitted by Plaintiffs and amici, the Service respectfully requests that the Court also consider the Service's March 2021 file memorandum discussing the hunt. *See* Exhibit 1 (Memo to File re: Wisconsin wolf season) (March 22, 2021) (explaining that the Service will assess the effects of the February 2021 harvest, along with any later harvests, based on State monitoring data).

1   and research plans." *Id.*; *see also* AR_95-96 (Oregon); AR_96-97 (Washington); AR_97

2   (California). The plans contain conservation objectives, such as four breeding pairs for three

3   consecutive years in each management zone (Oregon), 15 successful breeding pairs in 3

4   geographic regions or 3 consecutive years (Washington), and 4 breeding pairs for 2 consecutive

5   years State-wide (California). AR_96-97. The plans do not set population goals, *see* Pls. Br. at

6   39, instead allowing State managers to set appropriate goals in the future considering the

7   expansion of wolf populations and diverse stakeholder views. *See, e.g.*, AR_96 (Oregon plan

8   "does not include a minimum or maximum population level for wolves"; it "leaves room for

9   development of population thresholds in future planning efforts").[45]

10       The "deficiencies" that Plaintiffs identify, Pls. Br. at 37-41, reflect Plaintiffs' desire for

11   States outside the Great Lakes to take measures to support continued wolf expansion. But the

12   Service is the expert agency charged with determining whether any deficiencies rise to the level

13   of "inadequacies" and, if so, whether those inadequacies cause gray wolves to meet the definition

14   of a threatened or an endangered species. The Service's conclusion that they do not is

15   reasonable, especially because the wolves outside the Great Lakes States are unnecessary for the

16   recovered status of the entities that the Service evaluated. *See* AR_146 (although wolves in the

17   West Coast States and central Rocky Mountains, and lone dispersers in other States, "would add

18   to resiliency, redundancy, and representation, they are not necessary in order to conserve wolves

19   to the point that they no longer meet the definitions of endangered or threatened under the

20   Act.").[46] Thus, the alleged flaws in State and federal management identified by Plaintiffs are not

21

22   [45] Plaintiffs note that the Governor of Oregon stated that Oregon's wolf management plan "failed
     to meet her expectations." Pls. Br. at 39. The Oregon Department of Fish and Wildlife, however,
23   supported delisting, stating that it expected the number of established wolf packs would continue
     to expand after federal delisting. *See* AR_15874; *see also* ECF 83-2 (Oregon joining Michigan in
24   amicus brief, opposing delisting without criticizing its own ability to manage and protect gray
     wolves).
25   [46] For the same reasons, the argument advanced by the States of Michigan and Oregon also fails.
     ECF 83-2 at 7-8 (arguing that the Service should have considered certain aspects of Utah and
26   South Dakota State law). The Service addressed this argument in its response to comments,
27   clarifying that the threats analysis focuses on occupied range, and therefore the Service "did not
     assess the effects of threats to gray wolves in States that are not currently occupied by gray
28   wolves." AR_120.

1    material to the Service's determination.[47]

2         The Court should uphold the final rule because "the record reflects that the Service

3    adequately wrestled with" the issues identified by Plaintiffs, and "grounded its decision in

4    substantial evidence." *Humane Society*, 865 F.3d at 607. Put simply, Plaintiffs have not met their

5    burden to show that the final rule is arbitrary and capricious.

6    **V.    CONCLUSION**

7         This case should turn on the proper interpretation and application of the ESA, not policy

8    preferences on who should manage wolves. Congress already answered that question: States and

9    Tribes manage their resident wildlife, unless a species, subspecies, or distinct population

10   segment is threatened or endangered. The Service here concluded that the listed gray wolf

11   entities in the lower 48 States were neither a separate protectable "species" nor, based on the

12   scientific evidence, threatened or endangered within the meaning of the ESA. Under these

13   circumstances, the ESA does not allow continued federal management of gray wolves in the

14   lower 48 United States. The Delisting Rule constitutes a reasoned application of the Service's

15   authority under the ESA and is supported by the administrative record. The Court therefore

16   should uphold the 2020 Rule and grant the Service's summary judgment motion.

17

18

19       DATED: August 20, 2021              TODD KIM, Assistant Attorney General

20                                           SETH M. BARSKY, Section Chief

21   _____
     [47] The Service also reasonably determined that gray wolves are not an endangered species or a

22   threatened species because of habitat and prey availability or other factors (disease and parasites,
     genetic diversity and inbreeding, climate change). The Service evaluated habitat suitability and

23   prey availability in the Great Lakes, the West Coast States, the Central Rocky Mountains, and
     the NRM, reasonably determining that there is sufficient suitable habitat and in the lower 48

24   States to support viable wolf populations into the future and that States will manage prey
     populations sustainably. *See* AR_78; *see also* AR_74-76 (Great Lakes); AR_76-77 (West Coast

25   States); AR_77-78 (central Rocky Mountains); AR_76 (NRM). Wolves "can successfully
     occupy a wide range of habitats" given adequate prey and control of human-caused mortality.

26   AR_405; *see also* AR_73 (gray "wolves are habitat generalists"). The Service also evaluated the
     other threats it identified, likewise concluding that they are unlikely to significantly affect wolf

27   populations. *See* AR_78-80 (disease and parasites); AR_80-81 (genetic diversity and
     inbreeding); AR_81 (climate change); *id.* (cumulative effects). Plaintiffs do not directly

28   challenge these conclusions.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEREDITH L. FLAX, Assistant Section Chief

*/s/ Michael R. Eitel*
MICHAEL R. EITEL, Senior Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, South Terrace 370
Denver, Colorado 80202
Phone: (303) 844-1479 / Fax: (303) 844-1375
Email: Michael.Eitel@usdoj.gov

OF COUNSEL:

KRISTEN BYRNES FLOOM
U.S. Department of the Interior
Office of the Solicitor

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEFENDERS OF WILDLIFE, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>U.S. FISH AND WILDLIFE SERVICE, et al.,<br><br>    Defendants. | Case No. 4:21-cv-00344-JSW<br><br>    4:21-cv-00349-JSW<br><br>    4:21-cv-00561-JSW |
| WILDEARTH GUARDIANS, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>DEBRA HAALAND, U.S. SECRETARY OF THE INTERIOR, et al.,<br><br>    Defendants. | **CERTIFICATE OF SERVICE** |
| NATURAL RESOURCES DEFENSE COUNCIL, INC.,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,<br><br>    Defendants. | Date:  November 12, 2021<br>Time: 9:00 AM<br>Courtroom: 5<br>Judge: Hon. Jeffrey S. White |

   I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to the attorneys of record.

                              _/s/ Michael R. Eitel_____
                              MICHAEL R. EITEL