KRISTEN L. BOYLES (CA No. 158450)
MICHAEL MAYER (WA No. 32135)
[*Admitted Pro Hac Vice*]
EARTHJUSTICE
810 Third Avenue, Suite 610
Seattle, WA 98104
(206) 343-7340
kboyles@earthjustice.org
mmayer@earthjustice.org

[*Additional counsel listed at end*]

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| DEFENDERS OF WILDLIFE *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. FISH AND WILDLIFE SERVICE *et al.*, <br><br> Defendants. | Case No. 4:21-cv-00344-JSW <br><br> Related Cases:  4:21-cv-00349-JSW <br> 4:21-cv-00561-JSW |
| WILDEARTH GUARDIANS *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DEBRA HAALAND, U.S. SECRETARY OF THE INTERIOR *et al.*, <br><br> Defendants. | **PLAINTIFFS' JOINT REPLY IN SUPPORT OF SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| NATURAL RESOURCES DEFENSE COUNCIL, INC., <br><br> Plaintiff, <br><br> v. <br><br> U.S. DEPARTMENT OF THE INTERIOR *et al.*, <br><br> Defendants. | Hearing Date: November 12, 2021 <br> Time: 9 a.m. <br> Courtroom 5 <br> Before Judge Jeffrey S. White |

**TABLE OF CONTENTS**

Table of Authorities ................................................................................................................ ii

Introduction ........................................................................................................................... 1

Argument ............................................................................................................................... 2

I.    FWS Did Not—and Could Not—Delist Gray Wolves Solely Based on a Novel Legal
     Interpretation That They Were No Longer Listable Species ....................................... 2

    A.  FWS did not rely on the definition of "species" as an independent basis for
       delisting gray wolves ........................................................................................... 2

    B.  Congress did not wipe out protections for gray wolves when it amended
       the ESA in 1978 .................................................................................................. 4

II.   FWS Fails to Justify Its Departure from the Mandate to Evaluate Species as Listed ............... 8

III.  FWS Violated the ESA by Inadequately Evaluating Wolf Populations
     in a Significant Portion of Their Range ...................................................................... 10

    A.  FWS's meaningless standard is arbitrary and capricious .................................. 10

    B.  FWS's use of the significant portion of range standard was irrational ............. 13

IV.  FWS Continues to Dodge the Science on and Threats to Pacific Coast Wolves .................... 15

V.   FWS's Threats Assessment Was Arbitrary and Not in Accordance with the ESA ................. 19

    A.  FWS failed to consider effects of lost historical range ..................................... 19

    B.  FWS relied on Great Lakes states' inadequate regulatory protections ............. 19

    C.  FWS relied on inadequate regulatory protections outside the Great Lakes ....... 23

VI.  FWS's Reliance on a "Lower 48 United States Entity" Was Not a
     Logical Outgrowth of the Proposed Rule .................................................................. 27

VII. FWS Used an Incorrect Standard to Deny the 2018 Wolf DPS Petition ................................ 28

VIII. FWS and its Supporters Fail to Justify Departure from the Default of Vacatur ...................... 29

Conclusion ............................................................................................................................ 32

# TABLE OF AUTHORITIES

## Cases

*Alaska v. USDA,*
    772 F.3d 899 (D.C. Cir. 2014) ........................................................................ 30

*All. for the Wild Rockies v. Salazar,*
    672 F.3d 1170 (9th Cir. 2012) ........................................................................ 7

*Ariz. Cattle Growers' Ass'n v. Salazar,*
    606 F.3d 1160 (9th Cir. 2010) ........................................................................ 29

*Bernstein v. Virgin Am., Inc.,*
    365 F. Supp. 3d 980 (N.D. Cal. 2019) ........................................................... 4

*California ex rel. Lockyer v. USDA,*
    459 F. Supp. 2d 874 (N.D. Cal. 2006) ........................................................... 30

*Cascadia Wildlands v. Woodruff,*
    151 F. Supp. 3d 1153 (W.D. Wash. 2015) ..................................................... 25

*Center for Biological Diversity v. Bernhardt,*
    No. 19-cv-05206-JST (N.D. Cal.) .................................................................. 8

*Pub. Citizen, Inc. v. Dep't of Health & Human Servs.,*
    332 F.3d 654 (D.C. Cir. 2003) ...................................................................... 10

*Coos Cnty. Bd. of Comm'rs v. Kempthorne,*
    531 F.3d 792 (9th Cir. 2008) ......................................................................... 8

*Crow Indian Tribe v. United States,*
    965 F.3d 662 (9th Cir. 2020) ..............................................6, 8, 18, 19, 20, 23-25

*Ctr. for Biological Diversity v. Haaland,*
    998 F.3d 1061 (9th Cir. 2021) ........................................................................ 15

*Ctr. for Biological Diversity v. Jewell,*
    2017 WL 8788052 (D. Ariz. Oct. 25, 2017) ................................................... 14

*Ctr. for Biological Diversity v. Jewell,*
    248 F. Supp. 3d 946 (D. Ariz. 2017) ............................................................. 14

*Ctr. for Biological Diversity v. Morgenweck,*
    351 F. Supp. 2d 1137 (D. Colo. 2004) ........................................................... 20

*Ctr. for Biological Diversity v. Zinke*,
   900 F.3d 1053 (9th Cir. 2018) ...................................................................... 3

*Defs. of Wildlife v. Norton*,
   258 F.3d 1136 (9th Cir. 2001) ............................................................... 10, 32

*Defs. of Wildlife v. Norton*,
   354 F. Supp. 2d 1156 (D. Or. 2005) ............................................................ 9

*Defs. of Wildlife v. Salazar*,
   776 F. Supp. 2d 1178 (D. Mont. 2011) ...................................................... 31

*Defs. of Wildlife v. Salazar*,
   729 F. Supp. 2d 1207 (D. Mont. 2010) ...................................................... 31

*Defs. of Wildlife v. Zinke*,
   849 F.3d 1077 (D.C. Cir. 2017) .................................................................. 21

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020) ................................................................................. 4

*Desert Survivors v. U.S. Dep't of the Interior*,
   336 F. Supp. 3d 1131 (N.D. Cal. 2018) ................................................. 10, 14

*Eberle v. City of Anaheim*,
   901 F.2d 814 (9th Cir. 1990) ....................................................................... 4

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) .................................................................................. 15

*Fed'n of Fly Fishers v. Daley*,
   131 F. Supp. 2d 1158 (N.D. Cal. 2000) ...................................................... 20

*Friends of Blackwater v. Salazar*,
   691 F.3d 428 (D.C. Cir. 2012) ................................................................... 21

*Greater Yellowstone Coal. v. Servheen*,
   665 F.3d 1015 (9th Cir. 2011) ............................................................... 22, 24

*Hosp. of Barstow, Inc. v. NLRB*,
   820 F.3d 440 (D.C. Cir. 2016) ................................................................... 10

*Humane Soc'y of the U.S. v. Kempthorne*,
   579 F. Supp. 2d 7 (D.D.C. 2008) ............................................................... 30

*Humane Soc'y of the U.S. v. Locke*,
    626 F.3d 1040 (9th Cir. 2010) ..................................................................... 3

*Humane Soc'y of the U.S. v. Zinke*,
    865 F.3d 585 (D.C. Cir. 2017) ..................................................................... 2

*Idaho Farm Bureau Fed'n v. Babbitt*,
    58 F.3d 1392 (9th Cir. 1995) ..................................................................... 27

*Image Tech. Serv., Inc. v. Eastman Kodak Co.*,
    903 F.2d 612 (9th Cir.1990) ....................................................................... 4

*INS v. Orlando Ventura*,
    537 U.S. 12 (2002) ............................................................................. 12, 32

*Klamath-Siskiyou Wildlands Ctr. v. NMFS*,
    109 F. Supp. 3d 1238 (N.D. Cal. 2015) .................................................... 30

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. U.S. Forest Serv.*,
    No. 10-cv-1397, 2012 WL 13042847 (D. Or. Dec. 10, 2012) ................... 30

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................................. 12, 25

*Nat'l Ass'n of Home Builders v. Norton*,
    340 F.3d 835 (9th Cir. 2003) ..................................................................... 14

*Nat'l Fam. Farm Coal. v. EPA*,
    960 F.3d 1120 (9th Cir. 2020) ................................................................... 29

*NRDC v. Rauch*,
    244 F. Supp. 3d 66 (D.D.C. 2017) ............................................................ 17

*Nw. Ecosystem All. v. FWS*,
    475 F.3d 1136 (9th Cir. 2007) ..................................................................... 6

*Oceana, Inc. v. Bryson*,
    940 F. Supp. 2d 1029, 1045–46 (N.D. Cal. 2013) .................................... 30

*Or. Nat. Res. Council v. Daley*,
    6 F. Supp. 2d 1139 (D. Or. 1998) ............................................................. 20

*Pasqua Yaqui Tribe v. EPA*,
    No. 20-cv-266, -- F. Supp. 3d --, 2021 WL 3855977 (D. Ariz. Aug. 30, 2021) .................. 30

*Pollinator Stewardship Council v. EPA,*
    806 F.3d 520 (9th Cir. 2015) ................................................................29-31

*SEC v. Chenery Corp.,*
    318 U.S. 80 (1943) .................................................................................. 4

*Sugar Cane Growers Coop. v. Veneman,*
    289 F.3d 89 (D.C. Cir. 2002) ................................................................ 19

*Trout Unlimited v. Lohn,*
    559 F.3d 946 (9th Cir. 2009) ................................................................ 18

*Vista Hill Found. v. Heckler,*
    767 F.2d 556 (9th Cir. 1985) .................................................................. 3

*W. Watersheds Project v. Norton,*
    No. 06-cv-127, 2007 WL 2827375 (D. Idaho 2007) ............................. 29

*Weyerhaeuser Co. v. FWS,*
    139 S. Ct. 361 (2018) ........................................................................... 11

*WildEarth Guardians v. Salazar,*
    No. 09-cv-574, 2010 WL 3895682 (D. Ariz. Sept. 30, 2010) ............... 31

**Statutes**

5 U.S.C. § 706(2) ......................................................................................... 29

16 U.S.C. § 1532(6) ...................................................................................... 10

16 U.S.C. § 1532(11) (1976) .......................................................................... 5

16 U.S.C. § 1532(16) ...................................................................................... 5

16 U.S.C. § 1532(20) .................................................................................... 10

16 U.S.C. § 1533(a)(1)(D) ............................................................................ 19

16 U.S.C. § 1533(b)(1)(A) ............................................................... 20, 22, 28

16 U.S.C. § 1533(c)(2)(A) ...................................................................... 7, 8, 32

Pub. L. No. 95-632, 92 Stat. 3751 (1978) ..................................................... 5

Wisc. Stat. § 29.185(1m) ............................................................................. 21

Wisc. Stat. § 29.185(5) ................................................................................ 21

Wisc. Stat. § 29.185(6) ................................................................................ 21

**Regulations & Rulemakings**

50 C.F.R. § 424.11 (2018) ............................................................................................... 8

43 Fed. Reg. 9607 (Mar. 9, 1978) ................................................................................... 4

61 Fed. Reg. 4722 (Feb. 7, 1996) ........................................................................... 5, 16-18

77 Fed. Reg. 61,375 (Oct. 9, 2012) ................................................................................ 16

79 Fed. Reg. 37,578 (July 1, 2014) ................................................................... 14, 16, 31

84 Fed. Reg. 9648 (Mar. 15, 2019) (Proposed Delisting Rule) ............................... *passim*

84 Fed. Reg. 52,598 (Oct. 2, 2019) ............................................................................... 18

85 Fed. Reg. 69,778 (Nov. 3, 2020) (Delisting Rule) ............................................. *passim*

85 Fed. Reg. 29,532 (May 15, 2020) ............................................................................. 28

86 Fed. Reg. 29,432 (June 1, 2021) .............................................................................. 28

**Other Sources**

Associated Press, *Montana governor signs bill allowing payment to wolf hunters*
        AP News (Apr. 23, 2021) ..................................................................................... 23

Ctr. for Biological Diversity & Humane Soc'y, *Emergency Petition to Relist Gray
        Wolves* (May 26, 2021) ....................................................................................... 28

Fed. Defs' Cross-Mot. for S.J., *Defs. of Wildlife v. Salazar*,
        729 F. Supp. 2d 1207 (D. Mont. 2009) (No. 09-cv-77), ECF No. 114 .................... 7

Joe Kelly, *Wisconsin Set Fall Wolf Hunt Quota at 300 After Uncontrolled Spring Hunt*
        Courthouse News Serv. (Aug. 11, 2021) ............................................................. 21

Keith Ridler, *Bill to kill up to 90% of Idaho wolves signed by governor*
        AP News (May 7, 2021) ....................................................................................... 23

S. Rep. No. 96-151 (1979), *reprinted in* Comm. on Env't & Public Works, 97th Cong., A
        Legislative History of the Endangered Species Act of 1973 (1982) ....................... 5

W. Watersheds Project et al., *A Petition to List the Western North American Population of
        Gray Wolves* 14–15 (July 29, 2021) ................................................................... 28

**INTRODUCTION**

Federal defendant Fish and Wildlife Service (FWS) has been trying to get out of the wolf-protection business for almost two decades. These efforts have been repeatedly rejected by courts, and yet FWS has continued to propose novel theories to support gray wolf delisting.

The challenged 2020 Delisting Rule marks a low point in this effort. Although this population of gray wolves has been protected under the Endangered Species Act (ESA) since 1978—notably before Congress added the "distinct population segment" language to the Act—FWS has suddenly concluded that the protected gray wolf populations "were not entities that Congress allowed the Service to protect," FWS Br. (ECF No. 107)[1] at 2, and that is the only issue the Court need address. To the contrary, this legal interpretation was not an independent basis for the Delisting Rule, and it is incorrect.

FWS fares no better once it reaches plaintiffs' claims. The ESA mandates that FWS protect and recover listed species—here, the wolf populations listed in 1978—and those duties must be fulfilled for the entire listed species. Instead, FWS parsed its duties under the ESA to avoid a complete review of the listed wolf species, focusing instead on wolves in the Great Lakes states in its status evaluation and discarding Pacific Coast and Central Rockies wolves as irrelevant. This truncated review violated the ESA. FWS also relied on an unmoored definition and irrational application of the ESA's "significant portion of range" standard to (again) limit review to the Great Lakes states, (again) in violation of the ESA and requirements of rational decision making. FWS's review of threats to Great Lakes wolves and wolves outside the Midwest faltered on basic facts: the states did not have laws and plans in place that could adequately protect wolves in the absence of ESA requirements, as Wisconsin's double-barreled wolf hunts illustrate. The agency included new analysis and information in the final Delisting Rule that the public had no opportunity to review, and it used an invalid standard to deny a 2018 Wolf Petition at an early stage of review. None of FWS's misdirection about competing petitions, numbers of wolves in Canada, or classification of Pacific Coast wolves as part of the Northern Rocky Mountains population (although listed as part of

---

[1] This brief provides citations to the docket in the *Defenders* case, No. 4:21-cv-00344-JSW.

the Great Lakes population) disguises these legal flaws, nor can reflexive calls for agency deference hide the lack of rational analysis or explanation.

Based on these fundamental errors, plaintiffs ask the Court to vacate the Delisting Rule and reinstate the prior ESA protections for wolves. Most immediately, such an order will halt the second wolf hunt in Wisconsin in 2021; it will also ensure wolf hunts and increased state-authorized killing do not return in other states and further hinder real, nationwide recovery of gray wolves.

# ARGUMENT

## I.      FWS Did Not—and Could Not—Delist Gray Wolves Solely Based on a Novel Legal Interpretation That They Were No Longer Listable Species

In its brief, FWS contends that gray wolves do not meet the statutory definition of species, precluding ESA protection of any kind, and that the agency based the Delisting Rule on that independent conclusion. FWS Br. at 2 (contending "delisting was warranted for that reason alone"). FWS's brief further suggests that the gray wolf populations became unlistable shortly after they were listed, 42 years ago, when Congress amended the ESA in late 1978. *See id.* at 18. The Court should dispose of this argument as a *post hoc* rationalization by the agency. Moreover, when examined on its merits, the argument does not withstand scrutiny. FWS cannot reasonably argue that Congress, in 1978, quietly meant to delist previously listed species when it amended the ESA's definitions, applying to iconic species like gray wolves, grizzly bears, American crocodiles, and bald eagles. No support exists for such a sweeping argument. Indeed, FWS's reasoning would allow it to do the very thing that the ESA prohibits: use a "backdoor route to the *de facto* delisting of already-listed species, in open defiance of the Endangered Species Act's specifically enumerated requirements for delisting." *Humane Soc'y of the U.S. v. Zinke*, 865 F.3d 585, 602 (D.C. Cir. 2017). The Court should reject this meritless contention.

### A.      FWS did not rely on the definition of "species" as an independent basis for delisting gray wolves

FWS argues that "gray wolves listed before 2020 did not meet the statutory definition of a 'species,' which precludes their protection as a 'threatened species' or 'endangered species' under the ESA." FWS Br. at 15. FWS then invites the Court to reject plaintiffs' legal claims on this

ground alone. *Id.* at 27. Yet FWS did not say in the Delisting Rule that it was delisting gray wolves based on its independent statutory interpretation that those wolves were not a "species." Instead, FWS stated that it needed to delist wolves because "if we determine that a species is no longer threatened or endangered throughout all or a significant portion of its range, we must remove the species" from the protected species list. AR_0000038. FWS continued to describe the basis for its action as the five factors the agency must consider in its listing analysis under the ESA. *Id.* The agency then purported to analyze the factors and the status of the species. AR_0000142, 0000145 (summarizing multiple decision reasons).

It is a foundation of administrative law that "[a]n agency's decision can be upheld only on a ground upon which it relied in reaching that decision." *Vista Hill Found. v. Heckler*, 767 F.2d 556, 559 (9th Cir. 1985). The Ninth Circuit consistently follows this doctrine to reject arguments of agencies or their lawyers when they differ from the original rationalizations for action. *See, e.g., Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1069 (9th Cir. 2018) (holding "FWS cannot rely on its briefing in this case to explain why" its listing decision relied on one study rather than another); *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1049 (9th Cir. 2010) ("We cannot gloss over the absence of a cogent explanation by the agency by relying on the post hoc rationalizations offered by defendants in their appellate briefs.").

To be sure, FWS mentioned the notion that it felt it could delist gray wolves based solely on a statutory definition, but it then rejected that path as an independent basis for delisting. FWS explained that under its interpretation, "the currently listed gray wolf entities *could* be removed from the List because they do not meet the statutory definition of a 'species,'" but the agency decided that "*instead of removing the listed entities solely because they do not meet the statutory definition of a 'species,'* in this rule, [it would] consider the status of gray wolves in several configurations." AR_0000044 (emphasis added). FWS further explained that because of the "unique listing history of the gray wolf, our many prior actions to designate and delist DPSs . . . and related court opinions, we have adopted a conservative approach to delisting in this rule. Rather than focus on gray wolf DPSs and taxonomic units, we focus on the currently listed entities." *Id.*; *see also* AR_0000104 ("clarify[ing] that, while the currently listed entities could be removed from the List

on that basis, we elected not to act solely on that basis"). Plaintiffs focus their legal challenge on this analysis and review—i.e., on what the agency claimed to conduct and rely on—and dispute the validity of that analysis below.

"Permitting agencies to invoke belated justifications . . . can upset 'the orderly functioning of the process of review,' forcing both litigants and courts to chase a moving target." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). FWS did not delist gray wolves solely because it felt it had no choice under the statute. It delisted gray wolves because it erroneously found them recovered in its inadequate review.[2] FWS's argument that gray wolves are not a species and must be delisted for that reason alone, without regard for the agency's reasoning in the Delisting Rule, its analysis of independent scientific peer reviews and public comments, and the thousands of pages of documents in the administrative record, is a *post hoc* rationalization that this Court should discard.

### B.   Congress did not wipe out protections for gray wolves when it amended the ESA in 1978

There was good reason that FWS did not delist gray wolves based solely on its new statutory interpretation: that interpretation is wrong. It is worth setting out the timeline here. FWS listed two gray wolf populations in 1978, 43 Fed. Reg. 9607, 9610 (Mar. 9, 1978), when the ESA defined

---

[2] Plaintiffs have not waived arguments about the definition of species or the use of the 2019 ESA Regulations. *See* FWS Br. at 16 n.14. First, because FWS did not rest on this reasoning in the Delisting Rule, there was no basis for plaintiffs to advance those arguments. Second, in the Ninth Circuit, while "the general rule is that appellants cannot raise a new issue for the first time in their reply briefs," the court "could consider the issue had appellees raised it in their brief," as FWS has here. *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990) (cleaned up). The important question is whether "a party has a full and fair opportunity to ventilate its views with respect to an issue at summary judgment." *Bernstein v. Virgin Am., Inc.*, 365 F. Supp. 3d 980, 985 (N.D. Cal. 2019) (quotation omitted).

This brief is both an opposition to FWS's Cross-Motion for Summary Judgment and Plaintiffs' Joint Reply. Waiver does not apply to an opposition brief precisely because there is an opportunity to respond, and notions of fairness and equity do not come into play. Here, FWS will have the final word in its cross-motion reply brief, and the issue will have been fully explored. *See Image Tech. Serv., Inc. v. Eastman Kodak Co.,* 903 F.2d 612, 615 n.1 (9th Cir.1990) (declining to consider argument plaintiffs failed to raise in opposition to defendant's motion for summary judgment below).

---

4

species to include "any subspecies of fish or wildlife or plants and any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed [when] mature," 16 U.S.C. § 1532(11) (1976). FWS does not contend that the listed gray wolf entities did not meet this definition of species when listed in 1978. Eight months after gray wolves were protected, Congress amended the definition of species in the Act to its present form, dropping the "common spatial arrangement" language and substituting language that defined a "species" to "include . . . any distinct population segment of any species . . . ." Pub. L. No. 95-632, § 2(5), 92 Stat. 3751, 3752 (1978) (codified at 16 U.S.C. § 1532(16)). As distinct population segment (DPS) is not a defined biological term, FWS eventually interpreted it through its DPS Policy in 1996, 61 Fed. Reg. 4722 (Feb. 7, 1996), setting out parameters for delineating these smaller segments of populations for ESA listing.

FWS now contends that this 1978 statutory change rendered the previously listed gray wolf population suddenly unlistable, and delisting is required for that reason alone, FWS Br. at 19, albeit a delisting that FWS neglected to pursue based on that reason for 42 years. Yet there is no hint in the plain language or the legislative history that Congress intended to delist already protected species when it amended the ESA's "species" definition. Species like grizzly bears, bald eagles, American crocodiles, and loggerhead sea turtles—all of which were listed as population segments prior to the 1978 amendment—remained protected, just like gray wolves.

If Congress intended to make such a sweeping change in 1978 and erase protections for already listed species, one would have expected it to say something. To the contrary, legislators rejecting a more restrictive definition of "species" the very next year suggested that Congress wanted the definition of "species" in the ESA to give FWS greater flexibility to *protect* species. *See* S. Rep. No. 96-151 (1979), *reprinted in* Comm. on Env't & Public Works, 97th Cong., A Legislative History of the Endangered Species Act of 1973, at 1397 (1982) ("the U.S. population of an animal should not necessarily be permitted to become extinct simply because the animal is more abundant elsewhere in the world"). The new DPS provision allowed the wildlife agencies to list populations that were not recognized in formal taxonomic terms. *See* 61 Fed. Reg. at 4722. And nothing in that provision or the subsequent DPS Policy requires FWS to apply it retroactively to

earlier listings. *See id.* at 4725 (allowing "case-by-case" reevaluations); *Nw. Ecosystem All. v. FWS*, 475 F.3d 1136, 1144–45 (9th Cir. 2007) (noting 1978 gray wolf listings preceded DPS policy). There is no support for FWS's argument that Congress intended to wipe away existing protections when passing the 1978 amendments.

FWS's additional claim that its hand was forced by administrative and legislative changes to the 1978 gray wolf listing over the past forty years is a red herring. FWS Br. at 19. The threatened-species listing of wolves in Minnesota has remained *unaltered* since 1978. *Id.* at 18–19. Nevertheless, FWS sweeps the Minnesota listing into its unlistable-entity argument. *See id.* at 18–20. Accordingly, the supposedly unlistable status of the affected wolf populations cannot arise from the administrative and legislative changes recounted by FWS, for those do not apply to the Minnesota listing. Instead, this supposedly unlistable status must arise from Congress's amendment of the "species" definition in 1978. Yet, as discussed, there is no indication that Congress intended such a result.

Moreover, any argument by FWS that it had effectively nullified the validity of the 1978 wolf listing through subsequent administrative changes would amount to an admission by the agency that it had exploited such changes to chart "a backdoor route to the *de facto* delisting of already-listed species," which both the Ninth Circuit and the D.C. Circuit have told FWS it cannot lawfully do. *Humane Soc'y*, 865 F.3d at 602; *accord Crow Indian Tribe v. United States*, 965 F.3d 662, 677–78 (9th Cir. 2020). FWS claims that the Delisting Rule is different because it does not create a new unlistable entity, but instead delists existing entities already rendered unlistable by prior regulatory changes. FWS Br. at 23–24. This is a distinction without a difference. The D.C. Circuit in *Humane Society* struck down FWS's attempt to carve a listed entity into a delisted DPS and an unlistable remnant precisely because it would lead to the impermissible "statutory dodge" that FWS attempts here. *Humane Soc'y*, 865 F.3d at 602–03.[3] FWS claims not to run afoul of

[3] Indeed, the *Humane Society* court noted with disapproval FWS's stated intention to delist the remnant entity on that basis—the very same action that FWS now attempts. *Compare* 865 F.3d at 602 ("Worse still, the Service has announced that, with the Western Great Lakes segment carved out, the remnant is no longer a protectable 'species' and has proposed its delisting for that reason alone."), *with* FWS Br. at 19 ("By 2020, ESA-listed wolves thus existed in two entities: Minnesota

*Humane Society* because it is executing the second step of an unlawful two-step maneuver rather than the first. This does not rescue the rule, and only serves to highlight that FWS's argument here is a direct attempt to end run the ESA's delisting standards.

FWS has managed and protected these gray wolves and other species for 42 years. In fact, in 2009, FWS argued that wolves within the 1978 listing, but outside of the Northern Rocky Mountain DPS—the very wolves now at issue—would remain protected: "FWS did not revise the listing status of wolves outside of the [Northern Rocky Mountains] DPS, and *those wolves are and will remain protected under the ESA*." Fed. Defs' Cross-Mot. for S.J. at 14–15, *Defs. of Wildlife v. Salazar*, 729 F. Supp. 2d 1207 (D. Mont. 2009) (No. 09-cv-77), ECF No. 114 (emphasis added).[4] Notably, FWS did not argue that Congress rendered already listed species unlistable when it amended the ESA in 1978; instead, FWS recognized that gray wolves remained a listed and protectable entity.

The plain language of the ESA further supports rejection of FWS's proposed analytical short cut. The ESA requires FWS to regularly undertake status reviews of listed species. 16 U.S.C. § 1533(c)(2)(A). After a status review, FWS must determine "whether *any such species*" (that is, the entity that was originally listed) "should—(i) be removed from such list; (ii) be changed in status from an endangered species to a threatened species; or (iii) be changed in status from a threatened species to an endangered species." *Id.* § 1533(c)(2)(B) (emphasis added). "Each decision made under those two statutory provisions *must* rely upon the five statutorily designated criteria for listing and the best available scientific and commercial data." *Humane Soc'y*, 865 F.3d at 596 (emphasis added). Put another way, every decision to delist a species, downlist a species, or uplist a species—as it was originally defined and protected—must be made using the statute's criteria and

_____

and the 44-State entity. In the 2020 Rule, the Service appropriately evaluated whether these remaining entities constitute protectable 'species' within the meaning of the ESA. The answer was no." (citation omitted)).

[4] When the Ninth Circuit later considered the congressional delisting of these wolves in an appropriations rider, the court found that the "meaning and intended effect of [the rider] are perfectly clear"—the rider created a "partial delisting." *All. for the Wild Rockies v. Salazar*, 672 F.3d 1170, 1175 (9th Cir. 2012). Congress did not intend to create unlistable lower-44 and Minnesota entities as a side-effect of delisting the Northern Rockies DPS.

the best science, without exception. *See Coos Cnty. Bd. of Comm'rs v. Kempthorne*, 531 F.3d 792, 806 (9th Cir. 2008) ("Indeed, if . . . review determinations were *not* made in accordance with those provisions, the ESA's purposes would be quite ill-served."). What FWS now contends it must do runs counter to the plain language of the statute, which requires application of the listing criteria to the particular "species" identified by FWS when first listed.

Neither do the current ESA regulations (or any ESA regulations) help FWS's argument. Because the 1978 wolf listings complied with the "species" definition at the time they were promulgated, and nothing indicates that Congress sought to change their protected status when it amended the Act in 1978, the 1978 listings "meet the statutory definition of a species" under 50 C.F.R. § 424.11(e)(3).[5]

Finally, this argument is new to the complex litigation history of gray wolf protection under the ESA. Since 2003, FWS has attempted to designate and delist gray wolf DPSs at least six times. Various courts have reversed those delisting decisions and restored the affected wolves' protected status under the 1978 listing. Yet now FWS is announcing that, unbeknownst to the courts and litigants in those cases, the controversies they addressed were beside the point because the gray wolf listing actually had been invalid for decades and a sweeping delisting of wolves was mandated by the ESA itself. The revisionist, and indeed nonsensical, nature of this contention offers still more reason for this Court to reject it.

## II.   FWS Fails to Justify Its Departure from the Mandate to Evaluate Species as Listed

FWS's arguments highlight the fact that it failed to evaluate the status of gray wolves where listed, in violation of the ESA's "require[ment of] a full, five-factor threats analysis . . . when making a decision to delist." *Crow Indian Tribe*, 965 F.3d at 678 (citing 16 U.S.C. § 1533(c)(2)(A),

---

[5] Until 2019, ESA regulations confirmed the statute's plain language that "a species may be delisted only if such data substantiate that it is neither endangered nor threatened" because it was extinct, recovered, or the original best scientific or commercial data in the listing was in error. 50 C.F.R. § 424.11(d)(1)–(3) (2018). FWS revised its ESA regulations in 2019, adding an additional path to delisting if a "listed entity does not meet the statutory definition of a species." 50 C.F.R. § 424.11(e)(3). The 2019 ESA Regulations have been challenged by numerous parties, including several of the plaintiffs here, in *Center for Biological Diversity v. Bernhardt*, No. 19-cv-05206-JST (N.D. Cal.).

1   (B)). The agency does not dispute that it relied on only one or two limited "core" populations for its

2   analysis. FWS Br. at 28. Indeed, FWS reiterates its conclusion that "wolves outside the Great Lakes

3   States are unnecessary for the recovered status of the entities that the Service evaluated." *Id.* at 48.

4   This error repeats the flaws of the agency's prior unlawful wolf delistings and should be rejected.

5   *See* Pls. Br. (ECF No. 74) at 11–13.

6          This is not a case about "policy preferences," FWS Br. at 2, but rather what the law requires.

7   FWS's attempts to distinguish its past, unlawful delisting attempts, FWS Br. at 22–23, cannot

8   explain how this delisting—again relying on the same two metapopulations without considering

9   threats to other wolves—is fundamentally different. *See, e.g.*, *Defs. of Wildlife v. Norton*, 354

10  F. Supp. 2d 1156, 1168 (D. Or. 2005) (faulting FWS's description of a "metapopulation of gray

11  wolves in the Northern Rocky Mountains" that "render[ed] all other areas" in the listing

12  "insignificant"). Those cases make clear that although gray wolf metapopulations may play a role in

13  the species recovery, they do not alone indicate that listed gray wolves are recovered or that FWS

14  can ignore all other wolf populations as insignificant. Yet FWS continues to rely on this flawed

15  reasoning in the Delisting Rule.

16         FWS's unlawful delisting is not saved by its suggestion that it can simply "consider in a

17  separate, later action . . . whether to list or protect other gray wolf 'species,' like any regional

18  DPSs."[6] FWS Br. at 21. Such an approach turns the ESA on its head by stripping animals of

19  protection before considering if those same animals merit protection. FWS was instead required to

20  evaluate gray wolves across the full geography of where they were listed. Pls. Br. at 10. That could

21  have included an evaluation of the discreteness, significance, and conservation status of possible

22  DPSs. But the agency neither analyzed the entire listings nor conducted such a DPS analysis.

23         FWS does not deny repeating its past failures to evaluate the entirety of the gray wolf

24  listings. Instead, the agency tries to recast plaintiffs' arguments or invent unsupported barriers to a

25

26

27  ---
    [6] FWS also describes limitations about what type of DPS analysis the agency could conduct. *See*
28  FWS Br. at 17–18. But the agency never actually analyzed DPSs, so decisions about what that
    analysis should include are not relevant here.

9

proper analysis. But the ESA requires the agency to evaluate the gray wolf listings before delisting them, and the agency failed to do so.

### III.   FWS Violated the ESA by Inadequately Evaluating Wolf Populations in a Significant Portion of Their Range

In the Delisting Rule, FWS determined that none of the populations outside of the Great Lakes occupy a "significant portion" of the gray wolf's range (SPR). Where a species is at risk "throughout . . . a significant portion of its range," the ESA requires protection of the entire species. 16 U.S.C. § 1532(6), (20). As detailed in plaintiffs' opening brief, FWS's approach to this determination was impermissibly vague in its conception, arbitrary in its execution, and lacking in consideration of relevant factors necessary for a rational decision, particularly for wolves found on the Pacific Coast and in the Central Rockies. Nothing in FWS's response alters the fact that its "significant portion of the range" findings violate the ESA.

#### A.   FWS's meaningless standard is arbitrary and capricious

FWS's insistence that it "adequately explained" the principles underlying how it determined the significance of gray wolf populations, FWS Br. at 34–35, is belied by the record. FWS's brief nowhere addresses the agency's concession that it has "not yet determined" how best to interpret "'significant' in light of the [court's] decision in *Desert Survivors*." AR_0020133 (referring to *Desert Survivors v. U.S. Dep't of the Interior*, 336 F. Supp. 3d 1131 (N.D. Cal. 2018)). The agency's deliberate failure "to wrestle with the relevant statutory provisions" by itself justifies remand. *Hosp. of Barstow, Inc. v. NLRB*, 820 F.3d 440, 445 (D.C. Cir. 2016); *see Defs. of Wildlife v. Norton*, 258 F.3d 1136, 1146 (9th Cir. 2001) (finding that FWS's "omission with respect to a significant legal issue raised by the factual circumstances would itself be a sufficient basis for remanding the case").

For the same reason, FWS errs in claiming that its statutory interpretation is entitled to "controlling weight" under Step Two of the *Chevron* doctrine. FWS Br. at 33; *see also* NRA Br. (ECF No. 111) at 16–17 (same). FWS cannot claim *Chevron* deference when it fails to provide a statutory interpretation. *Defs. of Wildlife*, 258 F.3d at 1145 n.11 (noting that a court "cannot defer to what [it] cannot perceive"). *Compare Pub. Citizen, Inc. v. Dep't of Health & Human Servs.*, 332

F.3d 654, 661 (D.C. Cir. 2003) (holding that *Chevron* deference "is simply inapplicable" where agency fails to "explain[] *why* it believes" its interpretation is reasonable), *with* AR_0000138 (stating only that the FWS's approach is "consistent with the Act, our implementing regulations, our policies, and case law").

FWS nevertheless insists that it did apply a "specific, defined standard," assessing significance based on "'whether portions of the range contribute meaningfully to the resiliency, redundancy, or representation of the gray wolf entity'" being evaluated without prescribing a specific threshold. FWS Br. at 35 (quoting AR_0000114); *see also* AR_ 0000138 (asking whether portions "may be biologically meaningful"). This articulation does not provide a rational metric for determining when a population is in fact "significant." It simply replaces "significant" with a synonym, "meaningful," to describe the metric. Yet it is impossible to determine whether any population's contribution to resiliency, redundancy, or representation is "meaningful" without having some measuring stick for where the point of meaningfulness lies.[7] This flaw is laid bare by FWS flatly and repeatedly stating in the Delisting Rule that it "evaluated whether any portions could be significant under any reasonable definition of 'significant.'" AR_0000138; *see also, e.g.,* AR_0000142 ("any reasonable definition"); AR_0000144 (same); AR_0000145 (three uses).[8] FWS's invocation of this "any-reasonable-definition" language only highlights the agency's refusal to articulate an actual definition of the "significant portion" language that this Court could review.

Nor may FWS find refuge in its own purportedly wide-ranging discretion. FWS Br. at 35 (drawing a comparison to the "flexible, discretionary, and 'open-ended'" DPS policy). In this circumstance, having repeatedly failed to articulate an interpretation of the "significant portion"

---

[7] A suitable measurement could involve defined factors, thresholds, or evidentiary indicators. Indeed, the cases FWS cites support this approach while rejecting what FWS argues for. *Compare Ctr. for Biological Diversity*, 868 F.3d at 1060 (upholding detailed factors in DPS policy), *with Weyerhaeuser Co. v. FWS*, 139 S. Ct. 361, 371–72 (2018) (rejecting FWS's claim of unlimited discretion where ESA defined required factors). Rational, objective guideposts such as these are, in no sense, capable of "eliminat[ing] the Service's discretion." FWS Br. at 35.

[8] FWS faults plaintiffs for supposedly never identifying the "object" of the SPR analysis. FWS Br. at 33 n.31. Not only does that point rely on FWS's flawed argument about unlistable species, *see supra* Part I, but FWS already identified the objects in the Delisting Rule.

---

11

language that survived judicial review, *see* Pls. Br. at 19–20, FWS lacks the capacious discretion that is implied by its standardless approach. FWS cannot, as multiple courts have found, define a "significant" population as one that is so instrumental that its extinction would imperil the entire species. *See id.* (describing rulings). Yet FWS offers no new interpretation here to assure this Court that is has not once again rendered the "significant portion" provision "superfluous." *Defs. of Wildlife*, 258 F.3d at 1142. To the contrary, the endlessly malleable nature of the standard that FWS purported to apply here facilitates that very type of unlawful administrative mischief.

To take one example, FWS conceded that Pacific Coast wolves "enhance[] the resiliency, redundancy, and representation of wolves in the gray wolf entities evaluated" in the Rule. AR_0000107; *see also* AR_0000143 ("[T]he viability of the [44-State entity] is further enhanced by wolves that occur outside of Wisconsin and Michigan."); *id.* (more wolves on the West Coast and Central Rockies "would add to resiliency, redundancy, and representation"); AR_0000126 ("[a]dditional populations of wolves in Colorado would add to the resiliency and redundancy of gray wolves in the lower 48 United States"). Yet FWS still concluded that they do not constitute a "significant portion." AR_0000145, 49. Consequently, "meaningful" apparently means something more than "enhance," but the public—and the Court—are left to guess what more may be required.[9]

Plaintiffs do not insist on "quantitative standards amenable to bright-line inquiries," as claimed by FWS. FWS Br. at 38. Plaintiffs instead ask for something more elemental: a cogent explanation of the agency's decision. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48–49 (1983). Without a discernable rationale underlying FWS's significance determinations, the final rule cannot satisfy this basic test. As a result, the Court should return the decision to the FWS so that it may provide one or, failing that, change its chosen course. *See, e.g., INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002) ("Generally speaking, a [court] should remand a case to an agency for decision of a matter that statutes place primarily in agency hands.").

---

[9] At the same time, FWS insists that the initial question is only whether portions of the range "may be" significant, presumably setting an even lower threshold for the first screen. FWS Br. at 33 (citing AR_0000138); *see* AR_0000144 (for the 44-State entity, concluding that "we did not find that any of these portions may be significant").

**B.      FWS's use of the significant portion of range standard was irrational**

FWS's unreasoned significance determinations illustrate the importance of holding FWS to a coherent significance standard. FWS failed to give full meaning to the statutory language, offered inconsistent and irrational justifications, and dismissed key factors that FWS elsewhere has recognized as potentially relevant.

First, FWS's treatment of wolf abundance presented the Pacific Coast and Central Rockies wolves with a no-win situation. The "significant portion of its range" determination, as articulated by FWS, considers whether there are areas where wolves both: (1) face greater threats and "could potentially be endangered or threatened"; and (2) "may be" biologically "significant." FWS Br. at 33. Related to the former, FWS found that Pacific Coast and Central Rockies wolves are "at greater risk from human-caused mortality or from factors related to small numbers[.]" *See, e.g.*, AR_0000145 (44-state entity). But FWS then disregarded that risk because the populations of wolves were not biologically "significant," in part because of the very reason they were at risk: wolves in those areas "occur in small numbers and include relatively few breeding pairs." *Id.* FWS's analysis has virtually ensured that populations such as the Pacific Coast and Central Rockies wolves cannot satisfy both significance prongs, given that a healthy population outside of a species' core habitat is not at risk while a small population will be considered insignificant. Pls. Br. at 26–27. FWS offers no substantive response to this Catch-22 for still-recovering populations, instead directing the Court's attention to an unrelated argument. FWS Br. at 36 n.35.[10]

FWS further does not deny that it ignored the potential harm of range contraction, the importance of healthy, varied habitat, and the benefit of the genetic divergence from the Great Lakes population when evaluating Pacific Coast and Central Rockies wolves in the SPR analysis of the Delisting Rule, despite FWS's having recognized those factors' relevance in similar contexts. Pls. Br. at 23–25. FWS discounts those concepts because they appear as part of the DPS policy.

---

[10] FWS further admits that it did not fully review the greater risk faced by Pacific Coast and Central Rocky Mountain wolves from human-caused mortality due to their small numbers. FWS Br. at 40 n.38. Consequently, its irrational assessment of "significant" led the FWS to cut the analysis short, resting on the belief that it does not matter to the species if all of the wolves outside the Great Lakes states are killed.

FWS Br. at 35–36. In so arguing, FWS inappropriately relies on its unlawful and vacated 2014 SPR interpretation. *See id.* at 33 & n.32 (citing *Desert Survivors* cases). That 2014 interpretation posits that "the threshold for significance must be higher than that in the DPS policy." 79 Fed. Reg. 37,578, 37,581 (July 1, 2014). Perhaps so, but that does not mean that the potential for range contraction and loss of wolves in ecologically valuable habitat are *irrelevant* to the "significant portion" determination. This treatment is especially unwarranted given that FWS has deemed such criteria important in evaluating resiliency, redundancy, and representation both in this rulemaking and in other contexts. Pls. Br. at 23–24 (citing previous FWS DPS findings referring to representation and resilience); AR_0000144-45 (considering the "ecological uniqueness" and "limited habitat suitability" around Michigan and Wisconsin); *see also Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 848–49 (9th Cir. 2003) (recognizing overlap between "significant portion" and DPS inquiries); *Ctr. for Biological Diversity v. Jewell*, No. 14-cv-2506, 2017 WL 8788052, at *2 (D. Ariz. Oct. 25, 2017) (same). And to the extent that FWS considered the issue of genetics in its SPR determinations, it did so entirely to undermine the protections for the gray wolf. Pls. Br. at 24–25. Far from "appropriately account[ing] for biological differences," FWS Br. at 36, FWS once again appears determined "to give as little substantive effect as possible to the SPR language of the ESA." *Ctr. for Biological Diversity v. Jewell*, 248 F. Supp. 3d 946, 958 (D. Ariz. 2017).

Finally, FWS offers no meaningful response to plaintiffs' claim that the Delisting Rule's delineation of the gray wolf's range is incompatible with FWS's own policies. Pls. Br. at 27. For its SPR determinations, FWS defines "range" as "the general geographical area within which the species is currently found, including those areas used throughout all or part of the species' life cycle, *even if not used on a regular basis*." 79 Fed. Reg. at 37,583 (emphasis added). Yet, in the Delisting Rule, FWS discounted large geographic areas with well-documented wolf sightings. Pls. Br. at 27. FWS responds that it excluded those areas because the wolves there "do not have defined territory" and do not "consistently use any one area." FWS Br. at 37. But nowhere does FWS address how a requirement for "consistent[] use" can be squared with its policy that defines "range" to include areas "not used on a regular basis." Wolves in the disputed areas exhibit a trait crucial to

the gray wolf life cycle: dispersal from "their natal pack to locate social openings in existing packs or find a mate and form a new pack." AR_0000404; *see also* AR_0000151 (relying on dispersing wolves to ameliorate threats from loss of genetic diversity after delisting). Plaintiffs are, in no sense, ignoring the "biological organisms" here. FWS Br. at 37. Rather, they simply ask that FWS implement its own policy, one that recognizes the importance of a species' entire life cycle.

## IV.   FWS Continues to Dodge the Science on and Threats to Pacific Coast Wolves

FWS attempts to sidestep its failure to properly analyze Pacific Coast wolves by suggesting that plaintiffs are improperly asking for a "Pacific Coast DPS." FWS Br. at 24–25. However, the fundamental flaw in FWS's analysis is not that FWS failed to create a "Pacific Coast DPS," but rather that FWS grafted those wolves onto the congressionally delisted Northern Rockies DPS without analyzing discreteness and explaining the agency's change from its earlier findings. Pls. Br. at 13–14. FWS failed in this analysis despite evidence in the record that these wolves may be discrete from other wolves (the first step in the agency's DPS policy analysis), evidence that these wolves might be significant to the considered entities (the second step in the agency's DPS policy analysis), and evidence of identified threats to these small populations of wolves.

FWS's rationales for the unexplained inconsistencies between its earlier finding that Pacific Coast and Northern Rockies wolves were distinct and the Delisting Rule's contrary conclusion grafting Pacific Coast wolves onto a delisted DPS are too little, too late. FWS Br. at 29–30. Although the ranges of certain wolf populations have changed in the last decade, "an agency must provide its 'reasoned explanation' in a form that can adequately be examined on judicial review, not simply present arguments in its briefing how the decision might have been reached." *Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1068 (9th Cir. 2021). "The essential flaw in the [Delisting Rule] is its failure to offer more than a cursory explanation of why the findings underlying its [2008 Northern Rockies] Decision no longer apply. If, as is the case here, the agency's 'new policy rests upon factual findings that contradict those which underlay its prior policy,' a sufficiently detailed justification is required." *Id.* (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). FWS has failed to carry that burden. And because FWS previously found Pacific Coast wolves were discrete from the Northern Rockies DPS, the agency

cannot now combine them without giving a detailed explanation for the change.

In addition to attempting to sidestep the key flaw in its DPS analysis, FWS invents other roadblocks where none exist. Contrary to FWS's litigation position, there would be no statutory problem with FWS finding that Pacific Coast wolves merit protection as endangered and FWS accomplishing that protection through retaining the 44-state listing. FWS Br. at 24–25.[11] Indeed, FWS has relied on this approach for smaller protectable entities of wolves before. When FWS denied a petition to separately list Mexican wolves as either a DPS or subspecies as not warranted, it found the "current [1978] listing of all gray wolves in the lower 48 states and Mexico (save for those in the [then-delisted DPSs for the] western Great Lakes, and the northern Rocky Mountains) encompasses any gray wolf subspecies or DPS that may occur in those same states or Mexico." 77 Fed. Reg. 61,375, 61,377 (Oct. 9, 2012); *see also id.* (basing conclusion on fact that "all individuals that comprise the petitioned entity already receive the protections of the Act . . . consistent with the 1978 revised listing"). But FWS never reached that point in the decision-making process challenged here, because it failed to do a proper DPS analysis.

The best available science on Pacific Coast wolves, moreover, indicates that they might be discrete from other wolves under FWS's DPS policy. Pls. Br. at 13–18.[12] The DPS policy is a three-step process. 61 Fed. Reg. at 4725. First, FWS determines whether a population is discrete from the remainder of the species. Second, FWS determines whether that discrete population is significant. Third, FWS evaluates whether that DPS is endangered or threatened. *Id.* The second step—significance—involves a multifactor analysis of a non-exhaustive list of significance. *Id.* While FWS cites to two cases about the Sonoran Desert eagle to argue it need not evaluate the listed gray

---

[11] Alternatively, if FWS found that Pacific Coast wolves were endangered across a significant portion of the range of the listed gray wolves, that would *require* maintaining protections for the entire species. *See supra* at 10; 79 Fed. Reg. 37,578, 37,586 (July 1, 2014) (flowchart showing a finding that a species is endangered over a significant portion of its range should be listed as endangered). The threats to Pacific Coast wolves suggest that they are at risk of extinction. Pls. Br. at 14. Yet because FWS made these wolves invisible by combining them with delisted Northern Rockies wolves, the agency never considered this factor.

[12] Although FWS avers that it addressed peer reviewers' concerns, FWS Br. at 11, its brief does not respond to the specific flaws raised by peer reviewers and cited by plaintiffs. Pls. Br. at 16–18.

wolf entity, FWS Br. at 21–22, those cases are not relevant to plaintiffs' arguments about the possible discreteness of Pacific Coast wolves, Pls. Br. at 13–18, because the cases involved the second step of DPS analysis—significance—which FWS never reached here, AR_0000044 (agency "need not evaluate their significance"). Instead, FWS's failure to conduct the required review of the listed DPS Policy factors is what renders its conclusion that a population is not a DPS arbitrary. *NRDC v. Rauch*, 244 F. Supp. 3d 66, 97–100 (D.D.C. 2017) (rejecting FWS analysis that omitted a listed "significance" factor).

In defending the Delisting Rule's treatment of Pacific Coast wolves, FWS and Oregon agricultural *amici* confuse the first two steps of the DPS policy. *See* FWS Br. at 30–31; Or. Ag. Br. (ECF No. 113-2) at 8–13. First, plaintiffs' arguments—and FWS's failures—go to the first step, discreteness, and not significance. 61 Fed. Reg. at 4725. "The standard established for discreteness is simply an attempt to allow an entity given DPS status under the Act to be adequately defined and described. . . . [T]he standard adopted does not require absolute separation of a DPS from other members of its species, because this can rarely be demonstrated in nature for any population of organisms." *Id.* at 4724. The best available scientific information demonstrates precisely such a discrete group of Pacific Coast wolves.[13] One study before FWS concluded: "Wolf packs in [Washington] that have a dominant coastal ancestry should be a priority for conservation given their unique evolutionary heritage and adaptations." AR_0006223. Another, with the same lead author, found the "origins of *some* of the [Washington] and [Oregon] population are from geographically proximate [Northern Rockies] wolves . . . . However, it is unknown if immigration, territory establishment and subsequent breeding of coastal wolves in the [Pacific Northwest] has also occurred." AR_0005491–92 (emphasis added). Even where wolves have a mixed ancestry, these "individuals are likely ecological surrogates for the coastal wolves and provide similar community interactions and ecosystem functionality," and "healthy coastal habitats may enhance the proportion

---

[13] While it is unclear from FWS's citations which of the Hendricks studies was referenced at different points in the Delisting Rule, *see* FWS Br. at 30 n.27, it is irrelevant as they were both in the administrative record and before FWS. *Compare* AR_0000168 (*Conservation Genetics* study in 2019 and *Heredity* study in 2018); AR_0000436 (same), *with* AR_0000115 (using the opposite years for the studies).

of alleles unique to coastal wolves and decrease the fraction of genomic contribution from the"
Northern Rockies. AR_0005501. Therefore, the authors concluded, "[g]iven their unique
evolutionary heritage and adaptations, packs with a dominant coastal ancestry should be considered
a priority for conservation." *Id.* This is not an example of a "good faith disagreement" where FWS
relied on other scientific information to support its conclusion. *See Trout Unlimited v. Lohn*, 559
F.3d 946, 956 (9th Cir. 2009). Instead, FWS failed to grapple with the conclusions of these studies
and cherry picked findings in a way that "misinterprets the state of knowledge and/or does not
address the implications of these studies." AR_0011081 (Dr. Carroll peer review).

The best available science supports a conclusion that Pacific Coast wolves are "markedly
separated from other populations of the same taxon as a consequence of physical, physiological,
ecological, or behavioral factors," and, therefore, discrete at the first step of the DPS policy. 61 Fed.
Reg. at 4725. Whether this population of wolves is significant because it "differs markedly . . . in its
genetic characteristics," *id.*, which Oregon agricultural *amici* doubt, Or. Ag. Br. at 10, is a question
for the second step of DPS analysis—an analysis FWS never reached in the Delisting Rule,
AR_0000044. If FWS had reached that step, the fact that at least some Pacific Coast wolves are in
an "ecological setting unusual or unique for the taxon" and their "loss . . . would result in a
significant gap in the range of the taxon"—as well as other factors related to their "biological and
ecological importance" described in these studies—suggest they may indeed be significant and
therefore worthy of designation as a DPS. 61 Fed. Reg. at 4725.

FWS's incorrect analysis of genetic variation cannot save its conclusion that Pacific Coast
wolves were not discrete based on physical distance alone. FWS Br. at 30. The DPS policy requires
FWS to consider not only physical separation, but also "physiological, ecological, or behavioral
factors." 61 Fed. Reg. at 4725. Yet FWS did not consider all of these factors in the Delisting Rule.
Pls. Br. at 16–17; *cf.* 84 Fed. Reg. 52,598, 52,601–03 (Oct. 2, 2019) (factor-by-factor analysis of
discreteness for Southern Mountain caribou DPS).

FWS never addressed the best available science on and threats to Pacific Coast wolves.
FWS's reliance on two pages of one study, FWS Br. at 30 n.27, without addressing the conclusions
of that or other studies before FWS, Pls. Br. at 17–18, was inadequate. *See Crow Indian Tribe*, 965

1    F.3d at 678–79 (rejecting FWS reliance on citations to studies when, in fact, the studies reached

2    conclusions contrary to FWS). None of these arguments can cure the Delisting Rule's defects.

3    **V.    FWS's Threats Assessment Was Arbitrary and Not in Accordance with the ESA**

4        **A.    FWS failed to consider effects of lost historical range**

5        FWS failed to identify how it analyzed the impacts of lost historical range on the status of

6    wolves, and its failure to do so renders the Delisting Rule arbitrary and capricious. *Ctr. for*

7    *Biological Diversity*, 900 F.3d at 1067; *Humane Soc'y*, 865 F.3d at 606–07. Although FWS now

8    notes that a species that once had a large historical range may have healthy populations despite a

9    significant range loss, FWS Br. at 32 (quoting *Defs. of Wildlife*, 258 F.3d at 1143), FWS nowhere

10   reached such a conclusion about wolves in the Delisting Rule. FWS's broad pronouncements about

11   "species" generally provide no information about the effects of historical range loss on gray wolves

12   specifically, and repeat FWS's prior error of "nowhere analyz[ing] the impact of that loss on the

13   survival of gray wolves as a whole." *Humane Soc'y*, 865 F.3d at 606. Agricultural *amici* do little

14   more than uncritically recite FWS's claim in the Delisting Rule that it considered lost historical

15   range, Ag. Br. (ECF No. 117) at 13–14, without explaining how the FWS did more than simply

16   state it considered a factor, *see* Pls. Br. at 30. Merely "[r]eferencing a requirement is not the same as

17   complying with that requirement." *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 97

18   (D.C. Cir. 2002). The "undisputedly vast loss of historical range is a salient factor in determining

19   the endangered or threatened status" of wolves, yet once again FWS committed a "wholesale failure

20   to address that factor." *Humane Soc'y*, 865 F.3d at 607.

21       **B.    FWS relied on Great Lakes states' inadequate regulatory protections**

22       FWS offers an unpersuasive response to plaintiffs' challenge that FWS violated the ESA by

23   uncritically relying on Great Lakes states wolf management plans and state laws in the Delisting

24   Rule. FWS does not dispute that it must consider the "inadequacy of existing regulatory

25   mechanisms," 16 U.S.C. § 1533(a)(1)(D), as one of the ESA's five delisting factors; it must use the

26   best available science to evaluate each factor, *id.* § 1533(b)(1)(A); and a threat from any one factor

27   mandates continued ESA protection. *See Crow Indian Tribe*, 965 F.3d at 679–80.

28

FWS's defense of its lack of analysis of the Great Lake states' wolf management plans rests on three shaky pillars. First, FWS insists that it need not evaluate the efficacy of state management plans and harm from planned state wolf hunts because it need not ensure that "*every* provision of each State management plan" is based on the best available science. FWS Br. at 42–43 (emphasis added). While FWS need not review each and every provision of each state management plan for its basis in the best available science, FWS still must decide on the adequacy of those existing state regulatory plans as a whole, based "solely" on the best available science. 16 U.S.C. § 1533(b)(1)(A); *see also Crow Indian Tribe*, 965 F.3d at 681.

In this vein, "[s]tate management plans may be considered adequate regulatory mechanisms, but only if they work." *Crow Indian Tribe*, 965 F.3d at 680 (finding no concrete, enforceable mechanisms in place that would ensure long-term genetic health of the Yellowstone grizzly bear population). Here, the various regulatory mechanisms embodied in state wolf plans are hortatory, routinely violated, and unenforceable. The lack of assurance in Minnesota's plan, for example, is striking; wolf hunts were held every year after the Great Lakes wolves' last delisting, AR_0000088, despite the plan's statement that no hunts would be held "sooner than 5 years after Federal delisting," AR_0040423.

Nor does a mere intention to manage a species in a certain way qualify as an existing regulatory mechanism. *Ctr. for Biological Diversity v. Morgenweck*, 351 F. Supp. 2d 1137, 1141 (D. Colo. 2004) (FWS improperly relied on actions described in conservation agreements with states where the agreements did "not legally bind the states to implement such actions"); *Or. Nat. Res. Council v. Daley*, 6 F. Supp. 2d 1139, 1155 (D. Or. 1998) (noting that a regulatory mechanism requires "some method of enforcing compliance"). Similarly, another court in this district found that reliance on prospective measures set forth in a steelhead conservation agreement was "inconsistent with the aggressive preventive posture of the ESA," because "[t]here are no assurances that the measures will be carried out, when they will be carried out, nor whether they will be effective in eliminating the threats to the species." *Fed'n of Fly Fishers v. Daley*, 131 F. Supp. 2d 1158, 1165 (N.D. Cal. 2000).

With respect to the devasting Wisconsin wolf hunt this past winter, FWS claims that it could not have "reasonably predicted that a hunt would occur in February 2021." FWS Br. at 46. Yet the Wisconsin hunt was not a "far-fetched, 'what-if' scenario." *Id.* For almost a decade, Wisconsin law has explicitly required an annual hunting season between November and February if wolves were delisted. Wisc. Stat. § 29.185(1m), (5) (prior to 2018, the required season opening was October 15). The Delisting Rule took effect in January 2021, during Wisconsin's mandatory hunting period. The Wisconsin hunting law authorizes hunting using dogs, an extremely effective method of killing wolves. Wisc. Stat. § 29.185(6)(a)(2); Tribal Amicus Br. (ECF No. 87-1) at 10–11. It also fails to require that annual hunts be suspended if wolf population numbers drop below a minimum threshold, and it requires state regulators to keep hunting zones open at least 24 hours after the state provides public notice that closure is required because a zone has met or will soon meet its kill quota. Tribal Amicus Br. at 13. Those quotas are not set by state agency scientists, but by a board of political appointees that can override biologically based recommendations.[14] *Id.* at 21. FWS chose to ignore all this information in the Delisting Rule—a decision that led directly to the mismanaged February 2021 wolf hunt.[15]

Second, FWS attempts to distract from the inadequacy of the recovery criteria it relied on by citing inapplicable case law about the relationship between federal recovery plans and recovery criteria. FWS Br. at 43–44. Whether recovery plan criteria are binding on FWS's delisting decisions is beside the point. *Id.* at 44 (citing *Friends of Blackwater v. Salazar,* 691 F.3d 428, 436 (D.C. Cir. 2012)). What matters is whether the recovery criteria used reflect the best available science. Pls. Br.

---

[14] As they recently did. "The 300-wolf quota entered by a 5-2 vote of the Natural Resources Board . . . more than doubles the quota of 130 proposed by the [state agency] in July." Joe Kelly, *Wisconsin Set Fall Wolf Hunt Quota at 300 After Uncontrolled Spring Hunt,* Courthouse News Serv. (Aug. 11, 2021), https://tinyurl.com/kaubfzeh.

[15] While regulatory mechanisms are not "inadequate" just because they do not "protect a species from any conceivable impact," FWS Br. at 43, mechanisms are inadequate if they fail to protect "against threats that would cause the species to be an endangered species or a threatened species," *Defs. of Wildlife v. Zinke,* 849 F.3d 1077, 1087 (D.C. Cir. 2017). In FWS's own words, "[t]he regulation of human-caused mortality has long been recognized as the most significant factor affecting the long-term conservation of wolves." AR_0000054. The Wisconsin wolf hunt, and future wolf hunts in Minnesota and Michigan, are not only conceivable impacts, they are entirely predictable and expected. *See* Pls. Br. at 31–35.

at 35–37. Because FWS relied on outdated recovery plan criteria that do not reflect the best available science, it does not matter whether plaintiffs challenged the federal recovery plan or not. Minnesota's plan has not been revised for 20 years, and its recovery goal was set in reference to the outdated recovery criteria. AR_0040422. Wisconsin's similarly lags by well over a decade, with its wolf population goal also selected by reference to the outdated federal plan. AR_0041805. FWS is obligated to use the best available science to evaluate the state plans, 16 U.S.C. § 1533(b)(1)(A), and it has not done so.

Third, FWS waves away concerns with state hunts by claiming that wolves can rebound "after an initial population decline." FWS Br. at 40. FWS notes that it will monitor wolves, and the ESA permits the agency to relist the species in an emergency. *Id.* at 43 n.40. Yet, the Ninth Circuit has "reject[ed] out of hand any suggestion that the future possibility of relisting a species can operate as a reasonable justification for delisting." *Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1029 (9th Cir. 2011) ("Whatever comfort may be taken in relisting as a safety net, it is no answer to conclude that a species is not threatened simply because it can be relisted if it is threatened").

In an attempt to minimize concerns about hunting, FWS points to Idaho and Montana, where the agency asserts that significant human-caused mortality of wolves through regulated hunting has not had the impacts plaintiffs fear. FWS Br. at 45 n.43. But FWS relied on incomplete data. Idaho stopped reporting wolf population numbers in 2015, and moved to other, untested methods to assess population trends. AR_0000060. As a result, population data since 2015 are nonexistent, or incomplete and questionable at best. AR_0000059 (explaining there are no wolf population estimates for Idaho in 2017 or 2018). FWS's assertion that wolf killing has had "minimal" effects on the wolf population in Idaho, AR_0000060, and has led to stable wolf populations there through 2015, FWS Br. at 45 n. 43, says nothing about populations since 2015. As FWS admits, Idaho has removed statewide wolf harvest limits, expanded hunting seasons, allowed wolf trapping, and increased bag limits of up to 30 wolves per person. AR_0000059–60. As a result of these liberalized killing policies, the number of wolf deaths in Idaho jumped to 583 individuals during the 2019-20

fiscal year—nearly sixty percent of the estimated wolf population.[16] *See* WildEarth Guardians Second Amd. Compl., Ex. 1 (ECF 58-1 in Case No. 21-cv-349) at 20.

### C.     FWS relied on inadequate regulatory protections outside the Great Lakes

FWS's defense of its determination that adequate regulatory mechanisms exist outside the Great Lakes states likewise fails. In *Crow Indian Tribe*, the Ninth Circuit explained that courts need not uncritically accept FWS's conclusions about regulatory mechanisms and that courts can review those mechanism's purported adequacy to see "if they work." 965 F.3d at 680. Yet no party attempts to explain how FWS met this standard, and FWS's other arguments defending its analysis do not pass muster.

First, the logic underlying FWS's analysis is fatally flawed. While claiming on the one hand that it thoroughly considered the adequacy of regulatory mechanisms outside of the Great Lakes states out of an abundance of caution, FWS Br. at 15, FWS on the other hand claims the wolves outside of the Great Lakes states are too insignificant to matter to the recovery of the species as a whole and therefore any flaws in management plans protecting them are "not material," *id.* at 48–49. The Service is wrong that wolves outside the Great Lakes states do not matter. Pls. Br. at 10–13. And because of this error, FWS failed to give due consideration to the actual adequacy of regulatory mechanisms in those states, including Colorado, Utah, Oregon, Washington, and elsewhere.

Second, FWS's generic arguments regarding Great Lakes wolves fare no better for wolves outside of the Great Lakes states. FWS's insistence that state management plans need not be based in the best available science cannot save its faulty analysis. *Supra* at 20 (describing standard in the context of Great Lakes states' regulatory mechanisms); *see also Crow Indian Tribe*, 965 F.3d at 678 (ruling section 4(c) "requires a full, five-factor threats analysis . . . when making a decision to delist"). And the fact that FWS can later relist Pacific Coast or Central Rockies wolves cannot be

---

[16] This spring, Idaho (which is part of the delisted Northern Rockies DPS) passed a law allowing hunters—including paid exterminators—to kill up to 90% of the state's wolves. *See* Keith Ridler, *Bill to kill up to 90% of Idaho wolves signed by governor*, AP News (May 7, 2021), https://tinyurl.com/2mb6x823. Montana passed a law allowing payments to wolf hunters that harkens back to the bounty system that played a major role in driving wolves to the brink of extinction. *See* Associated Press, *Montana governor signs bill allowing payment to wolf hunters*, AP News (Apr. 23, 2021), https://tinyurl.com/24tjx7jp.

1   used to justify its unlawful delisting of those wolves. *Supra* at 22; *Crow Indian Tribe*, 965 F.3d at

2   680 ("[W]e have expressly rejected 'any suggestion that the future possibility of relisting a species

3   can operate as a reasonable justification for delisting.'" (quoting *Greater Yellowstone Coal.*, 665

4   F.3d at 1029)).

5   Third, FWS continues to insist incorrectly that recovery objectives in state management

6   plans that do not set population goals or requirements for a post-delisting landscape are adequate.

7   FWS Br. at 48. It asserts that state wildlife managers need the discretion to figure out these goals or

8   requirements at some undetermined point in time during some undetermined planning process so

9   they can consider "diverse stakeholder views." *Id*. This is the exact definition of a regulatory

10  mechanism that is not "sufficiently certain and effective to alleviate a threat of endangerment . . .

11  after delisting." *Crow Indian Tribe*, 965 F.3d at 680 (alteration in original) (citation omitted). The

12  presence of population requirements is one of the factors that the D.C. Circuit relied on in

13  *Defenders of Wildlife* in concluding that adequate regulatory mechanisms existed in that case. 849

14  F.3d at 1083–84.

15  All that exists now, as FWS concedes, are recovery objectives that guide when wolves may

16  lose additional state-level protections as their populations continue to slowly recover. *See* FWS Br.

17  at 48 (citing AR_000096–97). That is not enough. To ensure that a wolf population is adequately

18  protected, a state must establish a minimum population that would trigger additional protections if

19  the population fell below that floor. FWS claims state managers will set these goals in the future. *Id*.

20  But there is no foundation for that assertion. Wolves in eastern Oregon and Washington were

21  congressionally delisted in 2011 as purportedly recovered, but those states' wildlife managers have

22  not developed minimum population metrics for wolves in those portions of those states. There is no

23  reason to think they will do so now, much less that any metrics that might be set will match the best

24  available science. Because FWS has entirely failed to analyze whether these wolf management

25

26

27

28

plans abide by the best available science, its conclusions regarding the adequacy of existing regulatory mechanisms are arbitrary, and contrary to the ESA.[17]

Fourth, FWS entirely fails to respond to plaintiffs' three concerns with the Washington wolf management regime. *See* Pls. Br. at 37–38. Instead, FWS simply asserts the state has a wolf management plan that includes some objectives and goals, and urges the Court to defer to its unexplained conclusion that Washington's plan is an adequate regulatory mechanism. *See* FWS Br. at 47–48. But as noted above, the ESA requires more. *See Crow Indian Tribe*, 965 F.3d at 680. The *Defenders of Wildlife* case that FWS and its allies rely on so heavily is not to the contrary. In that case, the D.C. Circuit explicitly relied on the agency's "respon[se] to concerns about the reliability of Wyoming's management plan" when concluding FWS had acted "reasonably and adequately" in evaluating the existence of adequate regulatory mechanisms. *Defs. of Wildlife*, 849 F.3d at 1083. Here, FWS is silent on the deficiencies in Washington's wolf plan, and therefore made an arbitrary and unsupported decision regarding its adequacy.[18]

Fifth, FWS's supporters (but not the agency itself) rely on *Defenders of Wildlife* to argue that state management plans do not need to be legally binding. NRA Br. at 24. This argument ignores the role the ESA's requisite post-delisting monitoring program played in the D.C. Circuit's decision. 849 F.3d at 1084 ("[FWS]'s decision to delist in the absence of legal certainty is compatible with the ESA's requirement for monitoring of the species after delisting 'for at least five years' . . . ."). FWS's post-delisting monitoring program does not include wolves outside of the

---

[17] Oregon-based amici's rosy characterization of Oregon's plan, Or. Ag. Br. at 15–19, is also unavailing and largely consists of post-hoc arguments never articulated by FWS. *State Farm*, 463 U.S. at 50 ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.").

[18] As described by one federal judge, Washington's wolf plan "is not mandatory[,] . . . is subject to changes and additions, allowing for room for discretionary acts," and "give[s] the public scant recourse" in terms of influencing "changes or additions" to the plan. *Cascadia Wildlands v. Woodruff*, 151 F. Supp. 3d 1153, 1161, 1167 (W.D. Wash. 2015).

Great Lakes states, AR_0000154, and as such, cannot serve as a backstop for the absence of a legally binding management plan.[19]

Sixth, only the NRA addresses whether federal public lands regulations provide adequate regulatory mechanisms.[20] NRA Br. at 27–28. But the NRA misunderstands plaintiffs' argument. Plaintiffs do not assert FWS entirely failed to analyze federal public lands regulations as adequate regulatory mechanisms, but rather challenge the flawed analysis the agency did undertake. *See* Pls. Br. at 40–41. No party has actually responded to plaintiffs' arguments regarding the arbitrary and legally irrelevant rationale FWS provided in the Delisting Rule related to the adequacy of federal public lands regulations.

Finally, FWS's reliance on the D.C. Circuit's *Humane Society* decision to justify its analysis of the threat of human-caused mortality is misplaced. *See, e.g.*, FWS Br. at 41–42. FWS overlooks altogether that the agency's prior analysis in that case—and the D.C. Circuit's review of it—only considered the threat to wolves in the Great Lakes states. *Humane Soc'y*, 865 F.3d at 608–09. FWS ignored—and continues to ignore—the severe impacts of human-caused mortality in suitable habitats outside the Great Lakes where few, or no, wolves exist. *See* FWS Br. at 48 (stating that wolves in such areas are unnecessary for recovered status). The agency cannot claim that its prior analysis of the threat of human-caused mortality on wolves in the Great Lakes states alone, and the D.C. Circuit's finding that such analysis was reasonable at that time, on that record, controls here. Additionally, the panel in *Humane Society* relied on the fact that the post-delisting monitoring would help counteract the effects of potentially excessive human-caused mortality. 865 F.3d at 611. But, as explained above, wolves outside of the Great Lakes states are not subject to FWS's post-

---

[19] FWS finalized the post-delisting monitoring plan for gray wolves in February 2008—more than 13 years ago—as part of a specific proposal to delist the Western Great Lakes gray wolf DPS. AR_0000154. At the time, California had no wolves, and wolves had just begun to return to Oregon. Oregon documented its first modern wolf reproduction in 2008, and Washington saw its first wolf return to the state that same year. AR_0021193 (history of wolves in Oregon); AR_0031123 (history of wolves in Washington). For those reasons, the recycled post-delisting monitoring plan did not discuss monitoring Pacific Coast wolves.

[20] By failing to respond to plaintiffs' argument, FWS has waived any claim that federal public lands management regulations constitute an adequate regulatory mechanism.

delisting monitoring, and therefore monitoring cannot serve as a backstop to excessive human-caused mortality of wolves in the Pacific Coast or Central Rockies states.

**VI.     FWS's Reliance on a "Lower 48 United States Entity" Was Not a Logical Outgrowth of the Proposed Rule**

As plaintiffs explain in their opening brief, FWS failed to provide adequate notice and an opportunity to comment on its new analysis of a "Lower 48 United States Entity" in the final rule. Pls. Br. at 41–43. FWS's attempts to explain away its reliance on this previously undisclosed rationale misunderstand the legal standard and misrepresent the record.

First, the APA's adequate notice requirements are not limited to the "precise regulatory action taken." FWS Br. at 26. They also apply to the *basis* for that action. *See, e.g.*, *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1402–04 (9th Cir. 1995) (FWS violated APA when it relied on new report to list a species as endangered, but report was not available when FWS proposed the listing and FWS did not provide the public an opportunity to comment on report). It is FWS's failure to provide adequate notice of its reliance on the analysis of a newly created lower-48 entity that violates the APA and ESA. Pls. Br. at 42–43.

Second, that some plaintiffs commented that FWS should limit its analysis to wolves within the then-listed entities—as FWS said it would do in the proposed rule, *see* Pls. Br. at 42—is beside the point. FWS Br. at 26. The question is whether FWS provided the public adequate notice that it would, contrary to its commitments in the proposed rule and plaintiffs' comments, analyze and rely on a new entity that also included the delisted Northern Rockies wolves. FWS did not.[21] *See* Pls. Br. at 42–43.

---

[21] FWS's citations to the proposed rule do not show adequate notice. *See* FWS Br. at 26 n.24. The proposed rule referenced Northern Rockies wolves solely "to provide context" for its analysis of listed wolves. AR_0020103; *see also* AR_0000044 (repeating "provide context" language for other entities). These contextual references did not provide adequate notice of FWS's decision, in the final rule, to consider the status of Northern Rockies wolves when combined with the listed wolves for the delisting analysis, particularly given FWS's explicit statement in the proposed rule that it would not do so because Northern Rockies wolves were "not currently listed under the Act." AR_0020103.

1   Finally, FWS's failures are not "harmless error." *See* FWS Br. at 26–27. The so-called

2   "independent basis" FWS now asserts justified delisting, *id.* at 26, is neither an "independent"

3   rationale in the Delisting Rule, *see supra* Part I.A, nor a legally sufficient basis to delist the gray

4   wolf, *see supra* Part I.B. It therefore cannot excuse FWS's violation of the APA and ESA.

5   **VII.   FWS Used an Incorrect Standard to Deny the 2018 Wolf DPS Petition**

6   FWS barely mentions its Wolf DPS Petition denial at all, other than to assert in general that

7   various petitions submitted by wolf advocates amount to "implicitly conceding" that the listed wolf

8   populations are not protectable. FWS Br. at 25. Plaintiffs make no such concession. Instead, a

9   subset of plaintiffs have long recognized FWS's continued reluctance to protect wolves nationwide

10  and have presented FWS with numerous ways to scientifically define separate wolf populations as

11  DPSs.[22] The 2018 DPS Petition (the only petition at issue in this litigation) in particular analyzed

12  and suggested several options for FWS to consider that would address (1) the current patchwork of

13  wolf listings across the nation, (2) the congressional delisting of Northern Rocky Mountain wolves,

14  and (3) wolf recovery in Pacific Coast states and the Central Rockies. *See* AR_0021766–814.

15  FWS punts on any real defense of its petition denial, simply repeating that it can rely on its

16  expertise. *See* FWS Br. at 25 n.23. Even where an agency with "technical expertise" acts "within its

---

17

18  [22] FWS's suggestion that plaintiffs' arguments in this case are inconsistent with the recent emergency listing petitions, *see* FWS Br. at 24 n.22, is disingenuous at best. One petition presented

19  two alternative DPS configurations for FWS to consider, one of which included a Pacific Coast DPS. *See* Ctr. for Biological Diversity & Humane Soc'y, *Emergency Petition to Relist Gray Wolves*

20  2 (cover letter), 7, 13–14 (May 26, 2021), https://ecos.fws.gov/docs/tess/petition/992.pdf. The other simply presented a larger option, noting these wolves were discrete from Great Lakes wolves. *See*

21  W. Watersheds Project et al., *A Petition to List the Western North American Population of Gray Wolves* 14–15 (July 29, 2021), https://ecos.fws.gov/docs/tess/petition/3352.pdf. Plaintiffs in this

22  litigation do not advance a definitive set of DPSs for FWS to consider, but instead ask that the agency comply with its duties and policies when making a delisting decision. There is, moreover,

23  nothing unusual about FWS considering multiple DPS alternatives in a threats analysis. *See, e.g.*, 86 Fed. Reg. 29,432, 29,439 (June 1, 2021) (identifying two DPSs of lesser prairie-chicken for listing

24  after considering petition that presented several alternatives); 85 Fed. Reg. 29,532, 29,533–36 (May 15, 2020) (describing alternative DPS configurations and analysis for listing Southern Sierra

25  Nevada fisher DPS). FWS must determine in the first instance whether or what DPSs of wolves to list in response to petitions submitted outside the context of this litigation, and only after further

26  analysis and notice-and-comment rulemaking. *See* 16 U.S.C. § 1533(b)(3). But FWS cannot point to petitions to restore protections scrapped by the unlawful Delisting Rule to suggest that the rule was

27  in fact lawful in the first place.

28

---

area of competence," a reviewing court "need not defer to the agency when the agency's decision is without substantial basis in fact, and there must be a rational connection between the facts found and the determinations made." *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1163 (9th Cir. 2010). And FWS fails entirely to address its use of an incorrect, higher standard than required for its 90-day review decision. A 90-day review is merely a cursory review to determine whether a reasonable person would conclude that the petitioned action may be warranted. Pls. Br. at 43–44 (collecting cases).

As discussed in plaintiffs' opening brief, and not rebutted by FWS, the agency found that the petition presented two viable listed species arrangements and that the petition presented substantial information on the threats of overutilization, disease, and genetic diversity/isolation/small populations for those two species arrangements. *See* Pls. Br. 45 (citing AR_0000341–46). Those findings mandated a positive 90-day finding and commencement of a further, in-depth, public review. *See W. Watersheds Project v. Norton*, No. 06-cv-127, 2007 WL 2827375, *6 (D. Idaho 2007) (FWS erred by demanding a higher standard than required at 90-day stage).

The Wolf DPS Petition presented the agency with legitimate paths to ground gray wolf listing, protection, and recovery decisions in the best available science. FWS erred when it rejected those alternatives at the 90-day stage, an action which stopped the agency from assessing how gray wolves could have continued protection under the ESA. Vacatur of the petition denial and remand to FWS to further consider these options would give FWS the opportunity to accurately evaluate the status of gray wolves across the nation.

## VIII.   FWS and its Supporters Fail to Justify Departure from the Default of Vacatur

Vacatur is the default remedy for unlawful agency action, 5 U.S.C. § 706(2), and one that courts depart from "only in limited circumstances," *Nat'l Fam. Farm Coal. v. EPA*, 960 F.3d 1120, 1144 (9th Cir. 2020) (quoting *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015)). When determining whether those circumstances are present, courts "weigh the seriousness of the agency's errors against 'the disruptive consequences of an interim change that may itself be changed.'" *Id.* (quoting *Pollinator Stewardship Council*, 806 F.3d at 532).

In the mere two sentences FWS devotes to the issue of remedy, it ignores this Circuit's precedent altogether. *See* FWS Br. at 27. Nor does FWS provide any support for its suggestion that the Delisting Rule should remain on the books during remand simply because there are gray wolf listing petitions before the agency.[23] If the Court concludes the Delisting Rule is unlawful, it may not decline vacatur absent disruptive consequences "that significantly outweigh the magnitude of the agency's error." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, No. 10-cv-1397, 2012 WL 13042847, at *2 (D. Or. Dec. 10, 2012). This is particularly so in ESA cases like this, where "courts will tip the scales in favor of the endangered species under the 'institutionalized caution' mandate." *Klamath-Siskiyou Wildlands Ctr. v. NMFS*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015) (citation omitted); *see also Humane Soc'y of the U.S. v. Kempthorne*, 579 F. Supp. 2d 7, 21 (D.D.C. 2008) (the "ESA's preference for protecting endangered species counsels strongly in favor of vacating the Rule while FWS revisits" its decision).

The NRA's arguments fare no better. *See* NRA Br. at 28–31. Even assuming the "consequences" the NRA identifies would in fact follow vacatur of the Delisting Rule, they are not "disruptive," but rather a continuation of the status quo that existed for many decades prior to the Delisting Rule. *See Humane Soc'y*, 579 F. Supp. 2d at 21; *see also Pasqua Yaqui Tribe v. EPA*, No. 20-cv-266, -- F. Supp. 3d --, 2021 WL 3855977, at *5 (D. Ariz. Aug. 30, 2021) (finding vacatur appropriate when it would reinstate prior regulatory regime that was "familiar to the Agencies and industry alike"). Reinstating federal protections for wolves during remand would not undermine the ESA's purposes or threaten the environment. *See* Pls. Br. 48. The NRA's arguments otherwise are

---

[23] FWS's claim that vacatur of the Delisting Rule might open the door to litigation over the longstanding gray wolf listings, FWS Br. at 27, is both speculative and beside the point. Litigants did not rush to the courthouse to challenge those decades-old listings when courts vacated prior, unlawful delisting decisions. Nor do the cases FWS cites—*Alaska v. USDA*, 772 F.3d 899, 900 (D.C. Cir. 2014); *Oceana, Inc. v. Bryson*, 940 F. Supp. 2d 1029, 1045–46 (N.D. Cal. 2013)— compel the conclusion that the statute of limitations for the original listing that expired almost 40 years ago would be restarted by vacatur in this case. In any event, the possibility of future litigation cannot justify leaving in place the unlawful Delisting Rule. *See California ex rel. Lockyer v. USDA*, 459 F. Supp. 2d 874, 917–18 (N.D. Cal. 2006) (concluding the court "cannot base its decision" whether to vacate and reinstate a prior regulation "on speculation as to what another court might do in response to any new litigation").

based on mere speculation. There is no evidence that FWS will give less attention to the Mexican wolf (or any other species) during remand if the Delisting Rule is vacated. NRA Br. at 29. Nor is there evidence that wolves will do *better* without federal protection on remand, because the public may tolerate wolves more if delisted. *Id.* at 30. Indeed, the actions of Wisconsin (among other states, *see supra* note 16) since the Delisting Rule undercut that self-serving theory. After a winter hunt that exceeded the state-licensed 119-wolf quota by almost 100 wolves, *see* Pls. Br. at 32 n.19, the Wisconsin Natural Resources Board recently approved a hunt for this November with a total quota of 300 wolves—170 wolves more than the state's natural resource agency had recommended, *see supra* note 14. If hunters merely *meet* this second quota, they will have killed more than half of all wolves in Wisconsin in less than one year since FWS issued the Delisting Rule. *See* AR_0000420 (estimating 914 wolves in Wisconsin in 2019). This could not happen without the Delisting Rule. Because leaving the Delisting Rule in place "risks more potential environmental harm than vacating it," vacatur remains the appropriate remedy. *Pollinator Stewardship Council*, 806 F.3d at 532; *see also Defs. of Wildlife v. Salazar*, 776 F. Supp. 2d 1178, 1188 (D. Mont. 2011) ("To craft a remedy that would expose the endangered species . . . to taking while the agency revisits the [entity's] listing status would permit a substantial violation of the ESA's substantive provision[s] . . . .").

Finally, the NRA and Sportsmen Alliance's assertion that rather than vacate the Delisting Rule, the Court could—on its own—relist only some subset of wolves in certain states, *see* NRA Br. at 31–32; Sportsmen Br. (ECF No. 118) at 1–2, 4, misstates the law and the Court's role in enforcing it. The ESA does not allow FWS to list only *part* of a species' range as endangered. Several courts have rejected that exact theory. *See Defs. of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1217–22 (D. Mont. 2010); *WildEarth Guardians v. Salazar*, No. 09-cv-574, 2010 WL 3895682, at *4–6 (D. Ariz. Sept. 30, 2010).[24] So has FWS. *See* 79 Fed. Reg. at 37,580, 37,589–92. But even if the ESA allowed *FWS* to list only parts of the gray wolf range as endangered, it is not

---

[24] *Defenders of Wildlife v. Salazar* thoroughly discusses and rebuts the NRA and Sportsmen Alliance's arguments in their briefs. *See, e.g.*, *Defs. of Wildlife*, 729 F. Supp. 2d at 1218–19 & n.2 (distinguishing *Defenders of Wildlife v. Norton*, 258 F.3d 1136 (9th Cir. 2001)); *id.* at 1220–21 (explaining that 16 U.S.C. § 1533(c)(1) does not allow listing of only part of a species' range).

1    *the Court's* role to make that type of determination in the first instance. *See Orlando Ventura*, 537

2    U.S. at 16. Partial vacatur—where the Court effectively relists wolves in some parts of the United

3    States but not others—is therefore contrary to the ESA and not available here.

## CONCLUSION

5        For the reasons discussed above, and those presented in plaintiffs' opening brief, the Court

6    should vacate the Delisting Rule and Wolf DPS Petition denial.

7        DATED this 15th day of September, 2021.

8                                        Respectfully submitted,

9

10                                       /s/ *Kristen L. Boyles*
                                         KRISTEN L. BOYLES (CA No. 158450)
11                                       MICHAEL MAYER (WA No. 32135)
                                         *Appearing Pro Hac Vice*
12                                       Earthjustice
                                         810 Third Avenue, Suite 610
13                                       Seattle, WA 98104
                                         (206) 343-7340
14                                       kboyles@earthjustice.org
                                         mmayer@earthjustice.org
15

16                                       TIMOTHY J. PRESO (MT No. 5255)
17                                       *Appearing Pro Hac Vice*
                                         Earthjustice
18                                       313 East Main Street
                                         Bozeman, MT 59715
19                                       (406) 586-9695
20                                       tpreso@earthjustice.org

21                                       GREGORY C. LOARIE (CA No. 215859)
22                                       Earthjustice
                                         50 California Street, Suite 500
23                                       San Francisco, CA 94111
                                         (415) 217-2000
24                                       gloarie@earthjustice.org

25
                                         *Attorneys for Plaintiffs Defenders of Wildlife et al.*
26

27                                       JASON FLANDERS (CA No. 238007)
                                         Aqua Terra Aeris Law Group
28                                       4030 Martin Luther King Jr. Way
                                         Oakland, CA 94609

(916) 202-3018
jrf@atalawgroup.com

/s/ Kelly E. Nokes
KELLY E. NOKES (CO No. 51877)
*Appearing Pro Hac Vice*
Western Environmental Law Center
P.O. Box 218
Buena Vista, Colorado 81211
(575) 613-8051
nokes@westernlaw.org

JOHN R. MELLGREN (OR No. 114620)
*Appearing Pro Hac Vice*
Western Environmental Law Center
120 Shelton McMurphey Blvd., Ste. 340
Eugene, OR 97401
(541) 359-0090
mellgren@westernlaw.org

*Counsel for Plaintiffs WildEarth Guardians et al.*

/s/ Francis W. Sturges, Jr.
FRANCIS W. STURGES, JR. (IL No. 6336824)
*Appearing Pro Hac Vice*
Natural Resources Defense Council
20 N. Wacker Drive, Suite 1600
Chicago, IL 60606
Telephone: (312) 847-6807
Fax: (415) 795-4799
fsturges@nrdc.org

JARED E. KNICLEY (DC No. 1027257)
*Appearing Pro Hac Vice*
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
Telephone: (202) 513-6242
Fax: (415) 795-4799
jknicley@nrdc.org

KATHERINE DESORMEAU (CA No. 266463)
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
Telephone: (415) 875-6100

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Fax: (415) 795-4799
kdesormeau@nrdc.org

*Counsel for Plaintiff Natural Resources Defense
Council*

Plaintiffs' Joint Summary Judgment Opposition/Reply; Lead Case No. 4:21-cv-00344-JSW