UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEFENDERS OF WILDLIFE, et al.,<br><br>       Plaintiffs,<br><br>    v.<br><br>U.S. FISH AND WILDLIFE SERVICE, et al.,<br><br>       Defendants. | Case No.  21-cv-00344-JSW<br>           21-cv-00349-JSW<br>           21-cv-00561-JSW<br><br>**ORDER RESOLVING CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 74, 107, 109, 111 |
| WILDEARTH GUARDIANS, et al.,<br><br>       Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,<br><br>       Defendants. | |
| NATURAL RESOURCES DEFENSE COUNCIL, INC.,<br><br>       Plaintiff,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,<br><br>       Defendants. | |

*United States District Court*
*Northern District of California*

Now before the Court for consideration are: (1) Plaintiffs' motion for summary judgment, filed by the plaintiffs in these related cases (collectively "Plaintiffs")[1] (Dkt. No. 74, "Plaintiffs' MSJ")[2]; (2) Defendants' cross-motion for summary judgment, filed by the United States Fish and Wildlife Service, et. al., (collectively "Federal Defendants") (Dkt. No. 107, "Federal Defendants' Cross-MSJ"); (3) Intervenor-Defendants' cross-motion for summary judgment filed by the State of Utah ("Utah") (Dkt. No. 109); and (4) Intervenor-Defendants' cross-motion for summary judgment filed by the National Rifle Association of America and Safari Club International (collectively, "NRA") (Dkt. No. 111).  The Court has considered the parties' papers, relevant legal authority, the record in this case, and had the benefit of oral argument.[3]  For the reasons below, the Court GRANTS, IN PART, and DENIES, IN PART, Plaintiffs' motion for summary judgment and therefore GRANTS, IN PART, and DENIES, IN PART, the Federal Defendants and Intervenor-Defendants' motions.

## BACKGROUND

These three related cases challenge the recent rule enacted by the Department of the Interior and the National Fish and Wildlife Service (the "Service"), which removes federal protections for the gray wolf population.  Plaintiffs challenge the rule as a violation of the

---

[1]     The plaintiffs in the three related cases are as follows:  In case number 4:21-cv-344-JSW, Defenders of Wildlife, Center for Biological Diversity, Sierra Club, National Parks Conservation Association, Oregon Wild, and Humane Society of the United States (collectively "*Defenders* plaintiffs"); in case number 4:21-cv-349-JSW, WildEarth Guardians, Western Watersheds Project, Cascadia Wildlands, Environmental Protection Information Center, Kettle Range Conservation Group, Klamath Forest Alliance, Klamath-Sisikyou Wildlands Center, The Lands Council, and Wildlands Network (collectively "*Guardians* plaintiffs"); in case number 4:21-cv-561-JSW, the National Resources Defense Council ("NRDC").

[2]     All citations to the docket are to the docket in case number 4:21-cv-344 unless otherwise noted.

[3]     The Court also received and considered three *amicus* briefs supporting Plaintiffs from, the people of the State of Michigan and the State of Oregon (Dkt. No. 83-2), several federally recognized Indian tribes with reservations in Minnesota, Wisconsin, and Michigan (Dkt. No. 87-1), and the Sault Ste. Marie Tribe of Chippewa Indians and several animal welfare and environmental organizations.  (Dkt. No. 116.)  The Court also received and considered four *amicus* briefs supporting Defendants from the Oregon Farm Bureau, Oregon Cattleman's Association, and Klamath County (Dkt. No. 113-2), the Gray Wolf Agricultural Coalition (Dkt. No. 117), the Sportsmen Conservation Coalition (Dkt. No. 118), and Hunter Nation Inc. (Dkt. No. 123.)

United States District Court
Northern District of California

1    Endangered Species Act of 1973 ("ESA"), 16 U.S.C. section 1531, *et seq*., and the Administrative

2    Procedure Act ("APA"), 5 U.S.C. section 551 *et seq*.

3          The gray wolf once occupied a large portion of the United States.  AR_52.  After the

4    arrival of Europeans, the range of the gray wolf began shrinking due to deliberate killings of

5    wolves by humans and human agricultural and industrial development.  *Id*.  As a result, the range

6    and population of gray wolves was substantially reduced by the 1970s.  *Id*.  Accordingly, regional

7    subspecies of the "gray wolf" were declared endangered by the federal government between 1966

8    and 1976.  *Id*.

9          In 1978, the Service reclassified the gray wolf throughout the lower 48 United States and

10   Mexico.  The reclassification subsumed the previous regional listings into a single species listing

11   divided into two entities: the gray wolf in Minnesota, which the Service determined was a

12   threatened population; and the gray wolf in the remaining lower 48 United States and Mexico,

13   which remained endangered.  *See* Reclassification of the Gray Wolf in the United States and

14   Mexico, with Determination of Critical Habitat in Michigan and Minnesota, 43 Fed. Reg. 9,607, 9,

15   608, 9612 (March 9, 1978).  As a result of the ESA's protections, gray wolf populations began to

16   rebound in several parts of their historic range.  *See* AR_48.

17         In 2003, the Service issued a rule that divided the gray wolf listing into three distinct

18   population segments ("DPS"): an Eastern segment, a Western segment, and a Southwestern

19   segment.  Final Rule to Reclassify and Remove the Gray Wolf From the List of Endangered and

20   Threatened Wildlife in portions of the Conterminous United States; Establishment of Two Special

21   Regulations for Threatened Gray Wolves, 68 Fed. Reg. 15,804, 15,818 (April 1, 2003) ("2003

22   Rule").  The 2003 Rule designated wolves in Eastern and Western segments as threatened, rather

23   than endangered.  Two district courts invalidated the 2003 Rule.  A district court in Oregon found

24   that the Service effectively ignored the species' status in its full range by downlisting the species

25   based solely on the viability of a small population within that segment.  *See Defs. of Wildlife v.*

26   *U.S. Dep't of the Interior*, 354 F. Supp. 2d 1156, 1170-72 (D. Or. 2005).  A district court in

27   Vermont invalidated the Service's attempt to designate and delist the Eastern segment of gray

28   wolves because it impermissibly "lumped" into the Eastern segment any gray wolves in the

1     Northeast region of the United States, without determining whether a gray wolf population existed

2     in the Northeast.  *See Nat'l Fed'n v. Norton*, 386 F. Supp. 2d 553, 564-65 (D. Vt. 2006)

3     ("*Norton*").

4          In 2007, the Service issued a new rule that created a "Western Great lakes gray wolf

5     distinct population segment" and simultaneously delisted that segment.  *See* Final Rule

6     Designating the Western Great Lakes Populations of Gray Wolves as a Distinct Population

7     Segment; Removing the Western Great Lakes Distinct Population Segment of the Gray Wolf

8     From the List of Endangered and Threatened Wildlife, 72 Fed. Reg. 6,052 (Feb. 8, 2007) ("2007

9     Rule").  A district court invalidated the 2007 Rule for "fail[ing] to acknowledge and address

10    crucial statutory ambiguities" concerning the creation of distinct population segments for the

11    purpose of delisting.  *Humane Soc'y of the U.S. v. Kempthorne*, 579 F. Supp. 2d 7 (D.D.C. 2008).

12         In 2009, the Service published a new final rule without notice and comment, which added

13    a section to the vacated 2007 Rule entitled "Issues on Remand."  Final Rule to Identify the

14    Western Great Lakes Populations of Gray Wolves as a Distinct Population Segment and to Revise

15    the List of Endangered and Threatened Wildlife, 74 Fed. Reg. 15,070 (Apr. 2, 2009) ("2009

16    Rule").  The 2009 Rule was challenged in court on several grounds.  Shortly after filing suit, the

17    parties entered into a stipulated settlement and the Service conceded that it erred by publishing the

18    2009 Rule without providing for notice and comment as required by the APA.  *Humane Soc'y of*

19    *the U.S. v. Salazar*, No. 09-1092 (D.D.C. July 2, 2009), Dkt. No. 27.  The 2009 Rule was therefore

20    vacated and remanded back to the Service and returned the wolves in the Western Great Lakes

21    DPS to the listing status they had prior to the 2009 Rule.

22         In 2009, the Service recognized and delisted the Northern Rocky Mountain population of

23    gray wolves ("NRM wolves").  Final Rule to Identify the Northern Rocky Mountain Gray Wolf

24    DPS and Revise the List of Endangered and Threatened Wildlife, 74 Fed. Reg. 15,123 (Apr. 2,

25    2009).  Although a district court invalidated the delisting, it was reinstated by Congress.  *See Defs.*

26    *of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1228 (D. Mont. Aug. 5, 2010); Section 1713, Pub. L.

27    112-10, 125 Stat. 38 (Apr. 15, 2011).  The Service's delisting of wolves in Wyoming was

28    challenged but was upheld by the D.C. Circuit Court of Appeals.  77 Fed. Reg. 55,530 (Sept. 10,

United States District Court
Northern District of California

4

1  2012); *Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1093 (D.C. Cir. 2017).

2       In 2011, the Service issued another rule seeking to divide and delist gray wolves in the

3  broader Western Great Lakes region.  Revising the Listing of the Gray Wolf (*Canis lupus*) in the

4  Western Great Lakes, 76 Fed. Reg. 81,666 (Dec. 28, 2011) ("2011 Rule").  The 2011 Rule

5  designated the wolves previously listed as "threatened" in Minnesota as part of a new Western

6  Great Lakes DPS that included Minnesota, Wisconsin, and Michigan, and portions of North

7  Dakota, South Dakota, Iowa, Illinois, Indiana, and Ohio, and it simultaneously delisted that

8  segment.  The 2011 Rule was vacated by a district court, and the D.C. Circuit Court of Appeals

9  affirmed the decision on the basis that the Service failed to adequately analyze and consider the

10  impacts of partial delisting and of historical range loss on the already-listed species.  *Humane*

11  *Soc'y v. Zinke*, 865 F.3d 585, 589 (D.C. Cir. 2017).

12       Following these delisting efforts, two gray wolf entities remained protected under the ESA:

13  the Minnesota gray wolf entity, listed as threatened; and the gray wolf entity in all or portions of

14  44 lower United States and Mexico, which excludes the NRM wolves, listed as endangered.

15  In March 2019, the Service proposed eliminating protections for the gray wolf throughout the

16  contiguous United States.  AR_20097; Endangered and Threatened Wildlife and Plants; Removing

17  the Gray Wolf (Canis lupus) from the List of Endangered and Threatened Wildlife, 84 Fed. Reg.

18  9648 (Mar. 15, 2019).  The Service provided 120 days of public comment on the proposed rule.

19  AR_40.  On November 3, 2020, the Service issued its final rule, which removed ESA protections

20  for the two previously listed entities—the Minnesota entity and 44-state entity.  AR_38;

21  Endangered and Threatened Wildlife and Plants; Removing the Gray Wolf (*Canis lupus*) From the

22  List of Endangered and Threatened Wildlife, 85 Fed. Reg. 69,778 (Nov. 3, 2020) ("Final Rule").

23       The Final Rule asserts that delisting is appropriate because neither the Minnesota entity nor

24  the 44-state entity qualify as a species, subspecies, or DPS under the ESA, and delisting is

25  warranted for that reason alone.  The Final Rule goes on to evaluate the conservation status of the

26  currently listed entities under three different configurations: the two currently listed entities

27  separately, the two currently listed entities combined into a single entity, and a single gray wolf

28  entity that includes all gray wolves in the lower 48 states and Mexico except for the Mexican wolf.

United States District Court
Northern District of California

5

AR_44.  The Final Rule concludes that wolves, under any of the three different configurations, no longer meet the ESA's requirements to be protected under the ESA.  The Final Rule bases its conclusion on the existence and purported recovery of two large metapopulations of gray wolves in the Northern Rocky Mountains and Great Lakes.  AR_150.  The Service concluded that while these metapopulations occupy a fraction of their historical range, they are capable of sustaining viable wolf populations in the lower 48 states over time.  As a result, the Final Rule removes the remaining ESA protections for the gray wolf throughout the contiguous United States.

The Court will address additional facts as necessary in the analysis.

## ANALYSIS

**A.     Standard of Review.**

Review of an agency's compliance with the ESA is governed by the APA.  *Greater Yellowstone Coalition, Inc. vv. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2017).  Under the APA, courts are required to hold unlawful and set aside only those agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

In evaluating agency actions under the "arbitrary and capricious" standard, courts "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Marsh v. Ore. Natural Res. Council*, 490 U.S. 360, 378 (1989) (citation and internal quotation marks omitted).  The scope of review under this standard is "narrow and a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency's decision can be set aside only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem,…offered an explanation that runs counter to the evidence before the agency[,] or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012) (emphasis removed) (citations and internal quotation marks omitted).

**B.** **Statutory Requirements Under the ESA.**

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hills*, 437 U.S. 153, 180 (1978).  Under the ESA, the Service must "identify and list species that are 'endangered' or 'threatened.'"  *Center for Biological Diversity v. Zinke*, 868 F.3d 1054, 1057 (9th Cir. 2017) (quoting 16 U.S.C. § 1533).  A threatened species "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," 16 U.S.C. § 1532(20), while an endangered species is "in danger of extinction throughout all or a significant portion of its range," *id*. § 1532(6).

The Service must make listing and delisting determinations according to a five-factor analysis of potential threats, considering:

(A) the present or threatened destruction, modification, or curtailment of [a species'] habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

16 U.S.C § 1533(a)(1).  The agency must make any determination "solely on the basis of the best scientific and commercial data available." *Id*. § 1533(b)(1)(A).  The Secretary of the Interior has delegated the authority to determine whether a species is endangered or threated to the Fish and Wildlife Service.  50 C.F.R. § 402.01(b).

**C.** **The Service Cannot Rely on the Definition of "Species" As an Independent Basis for Delisting Gray Wolves.**

The Service first argues that the Minnesota entity and the 44-state entity do not meet the statutory definition of a "species," which bars their protection as "threatened" or "endangered" under the ESA.  The Service argues that the Court should uphold the Final Rule on this basis alone.

In 1978, the Service listed the gray wolf as two entities, which it defined geographically.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  AR_43. These entities were treated as distinct "species" under the statutory definition of the term

2  that was in effect at the time. *Id*. The ESA was later amended to introduce the concept of a DPS.

3  *Id*. Since the concept of a DPS was introduced, the Service has attempted to revise the listed gray

4  wolf entities by enacting rules that designated new population segments and simultaneously

5  delisted those segments. As discussed above, the Service was successful in designating and

6  delisting a DPS of NRM wolves, but its attempts to designate and delist a Western Great Lakes

7  DPS have been unsuccessful.

8      According to the Service, the currently listed gray wolf entities, which were defined in

9  1978 prior to the concept of the DPS, no longer qualify as species under the amended ESA. Under

10  the ESA, "[t]he term "species" includes any subspecies of fish or wildlife or plants, and any

11  distinct population segment of any species of vertebrate fish or wildlife which interbreeds when

12  mature." 16 U.S.C. § 1532(16). The Service argues that neither the Minnesota entity nor the 44-

13  state entity constitutes an entire taxonomic species or subspecies because gray wolves are widely

14  distributed across the globe. Moreover, neither entity constitutes a DPS because Minnesota

15  wolves are spatially, biologically, and genetically connected to wolves in Wisconsin, Michigan,

16  and the surrounding states and are thus not distinct from the 44-state entity. As a result, the

17  Service argues that because the ESA precludes the Service from recognizing something other than

18  a "species" as threatened and endangered and because neither the Minnesota entity nor the 44-state

19  entity meet that statutory requirement, the Court should uphold the delisting decision on this basis

20  alone.

21      The Court disagrees. As Plaintiffs note, there is nothing in the statute that suggests that

22  Congress intended the 1978 amendments to the ESA to remove protections for already-listed

23  entities.[4] Moreover, upholding the Final Rule solely on this basis would amount to an

24  impermissible "backdoor route to the *de facto* delisting of already-listed species." *Humane Soc'y*,

25

26  [4] If the 1978 statutory change rendered the gray wolf entities incompatible with the ESA's
   amended definition of species, it is not clear why the Service has not attempted to pursue delisting

27  based solely on this reason in the intervening four decades. Although the removal of the NRM
   wolves and Mexican subspecies have altered the originally listed 48-state entity, the Minnesota

28  entity has remained consistently defined since its 1978 listing. However, the Service has not
   attempted to delist the Minnesota entity based solely on this theory until now.

865 F.3d at 602.  In *Humane Society*, the Service proposed a rule that created a Western Great

Lakes DPS.  After carving out the DPS, the Service concluded that the remaining wolf population

was no longer a protectable "species" and sought to delist the remnant for that reason alone.[5] *Id.*

at 602.  The D.C. Circuit criticized the Service's approach proposal finding that:

> "The Service's power is to designate genuinely discrete population
> segments; it is not to delist an already-protected species by
> balkanization.  The Service cannot circumvent the Endangered
> Species Act's explicit delisting standards by riving an existing listing
> into a recovered sub-group and a leftover group that becomes an
> orphan to law."

*Id.* at 603.

The Service argues that here, unlike in *Humane Society*, it has not impermissibly created a

remnant entity that is no longer protectable; instead, it seeks to delist already existing entities that

no longer qualify for listing because of intervening statutory and regulatory changes.  The Court

finds the Service's efforts to distinguish *Humane Society* unpersuasive.  As the Ninth Circuit

explained in *Crow Indian Tribe v. United States*, the overarching concern in *Humane Society* was

the "practical outcome" of the rule, which "result[ed] in a 'backdoor route to the *de facto*

delisting' of the entirety of the species."  965 F.3d 662, 677 (9th Cir. 2020) (quoting *Humane*

*Soc'y*, 865. F.3d at 601-02).  The practical outcome of the Service's attempt to delist the gray wolf

based solely on the statutory definition of "species" is the same: the Service would effectively

remove federal protections for the listed gray wolf entities without addressing the ESA's

requirements for making such a determination.  This is the type of "statutory dodge" that

concerned the D.C. Circuit in *Humane Society*.  965 F.3d at 603.

Furthermore, the Final Rule itself contradicts the Service's position that the Court should

uphold the Final Rule on this basis alone.  Although the Service states that it believes it can delist

gray wolves based solely on the statutory definition of "species," it chose not to do so in the Final

Rule.  Instead, the Service went on to consider the status of the gray wolf in several configurations

---

[5] The central dispute in *Humane Society* was whether the ESA permits the Service to carve out of an already-listed species a "distinct population segment" for the purpose of delisting that segment and withdrawing it from the ESA's protection.  865 F.3d at 595.  The Court concluded that the ESA permits such a designation but only when the Service makes proper findings.

1    and apply the ESA's five factor analysis to those configurations.  AR_44.  But the Service's

2    argument asks the Court to disregard this analysis as unnecessary to its determination.  The Court

3    rejects this argument and declines to uphold the Final Rule on this basis.

4    **D.      The Service Failed to Evaluate the Full-Listed Gray Wolf Species.**

5            The Final Rule purports to evaluate three different configurations of gray wolves: (1) the

6    Minnesota entity and the 44-state entity separately; (2) the Minnesota entity and the 44-state entity

7    combined; and (3) a "lower 48 United States entity" that combines the combined listed entity with

8    the delisted NRM wolf population.  AR_44-45.  Plaintiffs challenge the Service's analysis of these

9    configurations.  According to Plaintiffs, the Service failed to analyze gray wolves across the entire

10   lower 48 states and based its delisting decision on the purported recovery of wolves in the Great

11   Lakes and Northern Rocky Mountains.

12           Plaintiffs contend that the Service's action here is no different than past attempts to delist

13   the gray wolf, which courts deemed unlawful.  In *Humane Society*, the D.C. Circuit rejected the

14   Service's attempt to designate and delist a Western Great Lakes DPS which left a remnant portion

15   of the species unprotected.  865 F.3d at 602 (rejecting attempt to "delist an already-protected

16   species by balkanization.").  Similarly, two district courts separately rejected the 2003 Rule, which

17   created three DPSs and downlisted the gray wolf from "endangered" to "threatened" in two of

18   those DPSs.  The Service relied on the recovery of wolves in two core areas—the Western Great

19   Lakes and Northern Rocky Mountains—to downlist wolves throughout the newly-created DPSs.

20   The courts rejected this approach because it failed to consider the threats to wolves outside of the

21   core areas.  *See Defs. of Wildlife*, 354 F. Supp. 2d at 1171-73 (finding approach unlawful because

22   it ignored that "the conservation status of populations within each DPS varie[d] dramatically,

23   ranging from recovered populations in parts of Montana, to precarious populations in Washington,

24   to extirpated populations in Nevada."); *Norton*, 386 F. Supp. 2d at 565 (rejecting attempt to "delist

25   an area that it previously determined warrants an endangered listing because it 'lumps together' a

26   core population with a low to non-existent population outside of the core area.").

27           Here, the Final Rule relies on the recovery of core metapopulations of wolves in the Great

28   Lakes and Northern Rocky Mountains to conclude that wolves across the entire lower 48 states no

United States District Court
Northern District of California

1   longer qualify for federal protection.  However, similar to its previous rulemaking, the Service did

2   not adequately consider threats to wolves outside of these core populations.[6]  Instead, the Service

3   avoids analyzing these wolves by concluding, with little explanation or analysis, that wolves

4   outside of the core populations are not necessary to the recovery of the species.  *See, e.g.*, AR_143

5   (concluding that "the relatively few wolves that occur within the 44-state entity outside of

6   Wisconsin and Michigan, including those in the West Coast States and central Rocky Mountains,

7   as well as lone dispersers in other States, are not necessary for the recovered status of the 44-state

8   entity.").

9          In so concluding, the Service avoided assessing the impact of delisting on these wolves.

10  But in *Humane Society*, the D.C. Circuit was clear that the Service must consider "the impact that

11  extraction of the segment would have on the legal status of the remaining wolves in the already-

12  listed species."  *Humane Soc'y*, 865 F.3d at 600.  Although *Humane Society* dealt with the effect

13  that delisting a DPS had on the remaining wolf population, the Court finds its reasoning applies

14  here.  In this case, the Service attempts to avoid the issue of the remnant wolf population by

15  including, with little analysis or explanation, remnant wolves as part of the existing core

16  populations, or by dismissing, in cursory manner, remnant wolves outside of core populations as

17  lone dispersers that are not necessary to the viability of the species.  *See, e.g.*, AR_49 (assuming

18  that groups of wolves in Colorado are related to NRM wolves).  The Service has changed its tactic

19  since *Humane Society*, but the flaw is the same as—the failure to address the status of wolves

20  outside core populations under statutory listing criteria.

21         For these reasons, the Court concludes the Service failed to adequately consider the threats

22  to wolves outside of the core populations in the Great Lakes and Northern Rocky Mountains in

23  delisting the entire species and GRANTS Plaintiffs' motion on this basis.

24  _____

25  [6] In addition to groups of wolves in the West Coast states and central Rocky Mountains, the
    Service acknowledges that "wolves have been detected in all States within historical gray range
26  west of the Mississippi River except Oklahoma and Texas" and that "confirmed records of
    individual gray wolves have been reported from Vermont, Massachusetts, New York, Indiana,
    Illinois, Iowa, Missouri, North Dakota, South Dakota, Nebraska, Kansas, Colorado, Utah,
27  Arizona, and Nevada."  AR_49.  The Service characterizes these wolves as "lone dispersers" and
    did not include these areas in the definition of current range because they do not "substantively
28  contribute to the wolf's viability."  AR_46.

United States District Court
Northern District of California

11

**E.     The Service Failed to Consider the Status of West Coast Wolves.**

Plaintiffs also argue that the Final Rule violates the ESA because it arbitrarily and capriciously lumped wolves in western sections of Washington, Oregon, and California together with the already delisted NRM wolves for purposes of its analysis.[7]  Prior to the Final Rule, West Coast wolves were protected as endangered.  In the Final Rule, however, the Service determined that West Coast wolves were not discrete from the NRM wolves.  AR_145, 149.  As a result of this determination, Plaintiffs argue that the Service did not analyze whether threats to the West Coast wolves warranted their continued listing under the ESA.  Plaintiffs contend that the Service's decision to treat the West Coast wolves as part of the NRM is arbitrary and capricious because it contradicts an earlier agency finding without a reasoned explanation and ignores the best available science.

When changing a policy position, an agency must provide a reasoned explanation for disregarding the facts and circumstances that underlay the prior policy.  *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2016).  In its rule designating and delisting the NRM DPS, the Service concluded that NRM wolves were physically discrete from West Coast wolves.  *See* 73 Fed. Reg. 10, 514, 10,518-19 (Feb. 27, 2008); 74 Fed. Reg. 15, 123, 15-128-29 (Apr. 2, 2009).  The Final Rule, however, takes the position that West Coast wolves "represent the expanding edge of a recovered and stable source population (the NRM DPS)" and thus, are "not an independent population within the 44-State entity" and "are an extension of a large population of wolves in the NRM."  AR_145.

The Service does not dispute that the Final Rule's characterization of West Coast wolves departs from its prior policy.  However, the Service argues that it changed its position based on the development of new facts regarding the physical discreteness of West Coast wolves, specifically that the NRM wolf population expanded outward causing the distance between the NRM wolves and West Coast wolves to shrink.  Although the Final Rule does not detail the reasons for the

---

[7] Because the Final Rule refers to Washington, Oregon, and California as "West Coast States," the Court will use the term "West Coast wolves" to refer to wolves in those states.  Plaintiffs refer to these same wolves as "Pacific Coast" wolves.

1    change in position, the Service contends that it fully explained the underlying factual

2    developments that led to its change in position in a 2013 status review.  *See* 78 Fed. Reg. 35, 664

3    (June 13, 2013).  The Court agrees that the 2013 status review provides sufficient explanation for

4    the Service's change in position regarding the physical discreteness of West Coast wolves.  *See*

5    *Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1068 (9th Cir. 2021) ("[I]f a published

6    decision incorporates by reference a separate, fully reasoned document explaining why the agency

7    changed positions, that may suffice.").)

8         Plaintiffs also argue that the Service failed to consider the best available science with

9    regard to the genetic relationships between NRM wolves and West Coast wolves.  The Final Rule

10   states that genetic analysis of West Coast wolves shows that all gray wolves occupying Oregon

11   descend from NRM wolves while some wolves in Washington have mixed NRM and coastal

12   ancestry.  AR_44.  As a result, the Service concluded that "listed wolves in the West Coast States

13   are not genetically distinct from the NRM wolves."  *Id*.

14        The Court finds that the Service's conclusion fails to address the best available science on

15   this issue.  The primary studies relied on make clear wolves with coastal ancestry "should be

16   considered a priority for conservation given their unique evolutionary heritage and adaptations."

17   AR_ 20149; *see also* AR_23664.  The studies also discuss the unique implications and

18   contributions these wolves might have on the population of West Coast wolves.  Despite these

19   findings, the Service nowhere provided a sufficient reasoned explanation for the conclusion that

20   West Coast wolves were nevertheless not discrete from NRM wolves based on physiological,

21   behavioral, or ecological factors.[8]

22        With regard to the science on whether West Coast wolves are genetically distinct from

23   NRM wolves, the Service argues that the Court must defer to the Service's conclusion about the

24

_____

25   [8] The 2013 status review does not offer a rational explanation for this conclusion either.  In the
     status review, the Service acknowledged that information on the physiological, behavioral, or
26   ecological separation of wolves was "equivocal."  78 Fed. Reg. 35, 664.  Moreover, the studies
     cited in the Final Rule were published after the 2013 status review.  Thus, the Service was
27   required to provide a rational explanation for its conclusion regarding the genetic relationships
     between West Coast wolves and NRM wolves based on the best available science at the time of its
28   decisionmaking.

United States District Court
Northern District of California

West Coast wolves in the face of conflicting evidence. "Where scientific and technical expertise is necessarily involved in agency decision-making,…a reviewing court must be highly deferential to the judgment of the agency." *Trout Unlimited v. Lohn*, 559 F.3d 946, 958 (9th Cir. 2009) (internal citation and quotation marks omitted). "An agency's decision may be based on the best scientific evidence available even if the administrative record contains evidence for and against its decision. When not dictated by statute or regulation, the manner in which an agency resolves conflicting evidence is entitled to deference so long as it is not arbitrary and capricious." *Id.*

In *Trout*, the Service evaluated the extinction risk to a particular evolutionarily significant unit using criteria identified by experts and relying on an expert report and evaluations. 559 F.3d at 958-59. The record reflected that the Service approached the decision in a thoughtful manner, and that the downlisting occurred as a result of "substantial—though not dispositive—scientific data." *Id.* The court concluded the Service's resolution of the conflicting data was entitled to deference. *Id.*

Here, although the Service acknowledged the existence of West Coast wolves of mixed ancestry, it did not adequately address the science indicating that these wolves have distinct genetic traits that could distinguish them from NRM wolves or provide a rational explanation for its conclusion. Thus, unlike in *Trout*, the record does not reflect that the Service's conclusion about the genetic distinctiveness of West Coast wolves was the result of a thoughtful and comprehensive evaluation of the best available science about the genetic relationships between the wolf populations. For this reason, the Court finds the Service's decision to combine the West Coast wolves with the NRM wolves was arbitrary and capricious and GRANTS Plaintiffs' motion on this basis.

**F.      The Service's Interpretation of "Significant Portion of its Range" Was Arbitrary and Capricious.**

Plaintiffs challenge the Service's interpretation of the statutory phrase "significant portion of its range." 16 U.S.C. § 1532(6), (20). A species must be listed under the ESA if it is endangered or threatened throughout "all or a significant portion of its range." *Id.* The ESA does not define the phrase "significant portion of its range," and the Ninth Circuit has recognized it as

14

1    "inherently ambiguous." *Defs. of Wildlife v. Norton*, 258 F.3d 1136, 1141 (9th Cir. 2001).

2         In *Norton*, the Service interpreted the phrase to mean that a species is eligible for

3    protection under the ESA if it "faces threats in enough key portions of its range that the entire

4    species is in danger of extinction, or will be within the foreseeable future." *Id*. at 1141.  The Ninth

5    Circuit concluded that this interpretation rendered the statutory phrase "superfluous" because it

6    assumed that a species was in danger of extinction in "a significant portion of its range" only if it

7    was in danger of extinction everywhere. *Id*. at 1141-42.  The Ninth Circuit required the Service to

8    reconsider the phrase.

9         In 2014, following *Norton*, the Service issued a final policy interpreting the phrase

10   "significant portion of its range".  *See* Final Policy on Interpretation of the Phrase "Significant

11   Portion of Its Range" in the Endangered Species Act's Definitions of "Endangered Species" and

12   "Threatened Species," 79 Fed. Reg. 37, 578 (July 1, 2014) ("SPR Policy").  The SPR Policy stated

13   that a portion of a species' range is considered "'significant' if the species is not currently

14   endangered or threatened throughout all of its range, but the portion's contribution to the viability

15   of the species is so important that, without members in that portion, the species would be in danger

16   of extinction, or likely to become so in the foreseeable future, throughout all of its range. *Id*. at

17   37,579.  Two district courts held the interpretation of "significant portion of its range" in the SPR

18   Policy unlawful finding that the claimed difference between the new interpretation and the

19   interpretation rejected in *Norton* was illusory.  *See Desert Survivors v. U.S. Dep't of Interior*, 321

20   F. Supp. 3d 1011, 1072-73 (N.D. Cal. 2018); *Ctr. for Biological Diversity v. Jewell*, 248 F. Supp.

21   3d 946, 956 (D. Ariz. 2017).  The court in *Desert Survivors* issued a nationwide injunction

22   prohibiting the Service from applying that definition.  *See Desert Survivors*, 336 F. Supp. 3d 1131

23   (N.D. Cal. 2018) (clarifying that vacatur of "significant" definition applies nationwide).

24         In the Proposed Rule, the Service explained that it has "not yet determined the best way to

25   interpret 'significant' in light of the decision in *Desert Survivors*" but applies "'significant' in a

26   way that is consistent with [the opinion in *Desert Survivors*], and with other relevant case law."

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1    AR_20133.[9]  In the Final Rule, the Service stated that it "assessed 'significant' based on whether

2    portions of the range contribute meaningfully to resiliency, redundancy, or representation of the

3    gray wolf entity being evaluated without prescribing a specific 'threshold'."  AR_114.  To

4    determine whether any portions of the range may be significant, the Service "evaluated whether

5    any portions could be considered significant under any reasonable definition of 'significant'."

6    AR_138.

7         Plaintiffs contend that the Service's standard for "significant" amounts to a failure to

8    interpret the statutory provision, which alone justifies remand, and that the Service's purported

9    failure to interpret the phrase means that the standard is not entitled to "controlling weight" under

10   the *Chevron*.  The Service disagrees and argues that, because there was no generally applicable

11   interpretation, it interpreted the phrase through notice and comment procedures and thus, *Chevron*

12   deference applies.

13        The Court agrees with the Service that *Chevron* deference is applicable to its interpretation

14   of "significant portion of its range."  The Service provided its interpretation in the Proposed Rule,

15   and the interpretation was subject to public notice and comment.  While Plaintiffs may argue that

16   the Service's interpretation of the phrase is "meaningless," the Service did offer an interpretation

17   of the phrase.  Accordingly, *Chevron* deference applies.

18        Under the *Chevron* doctrine, when a court reviews an agency's construction of a statute

19   that is "silent or ambiguous with respect to [a] specific issue, the question for the court is whether

20   the agency's answer is based on a permissible construction of the statute."  *Chevron, U.S.A., Inc.*

21   *v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-843 (1984); *see also Pac. Nw. Generating Co-*

22   *op v. Dep't of Energy*, 580 F.3d 792, 806, 812 (9th Cir. 2009) ("When relevant statutes are silent

23   on the salient question, we assume that Congress has implicitly left a void for [the] agency to fill,

24   and, therefore, we defer to the agency's construction of its governing statutes, unless that

25   construction is unreasonable.").  Thus, the Service's interpretation of "significant portion of its

26   range" in the Final Rule must be given controlling effect so long as it is a reasonable construction

27   _____

28   [9] The Service limits the use of this standard for "significant" to this analysis and states that it does
     not intend it as precedent for any future determinations.  AR_20133.

of the ESA.  Consistent with previous case law, to be a reasonable construction, the Service's interpretation must give independent meaning to the phrase "significant portion of its range" and cannot render the phrase redundant or superfluous.

Plaintiffs contend that the Service's interpretation is unreasonable because it fails to provide a rational metric for determining when a population is "significant" and instead replaces "significant" with "meaningful" without providing a measuring stick for where meaningfulness lies.  The Service defends its standard arguing that the Final Rule explains how the Service applied resiliency, representation, and redundancy to the entities addressed in the Rule, and then determined that none of those portions was significant.  But the Service's argument does not address the fact that the significance standard provides no threshold for determining what makes any one of the factors of resiliency, representation, and redundancy "meaningful" such that the population could be considered "significant."

The Service argues that a standard need not impose a quantitative, bright-line test in order to be meaningful and legally appropriate.  However, the Service's authorities on this point are distinguishable as both involved standards that included defined factors, thresholds, or evidentiary considerations.  For example, in *Weyerhauser Co. v. FWS*, the provision at issue included the word "may" which afforded the Secretary a certain amount of discretion.  139 S. Ct. 361 (2018).  However, the provision also mandated a procedure to consider the economic and other impacts of designation, so the statute "was not drawn so that the court would have no meaningful standard against which to judge the exercise of discretion."  *Id*.  Here, in contrast, the Service's interpretation of "significant portion of its range" lacks objective guideposts or factors against which the Court can judge the exercise of discretion.  Additionally, even if the Service is not required to provide an objective standard, it must offer a sufficient explanation of its standard that permits the Court to assess the reasonableness of its current interpretation, which it fails to do here.

For example, the Final Rule states that wolves in the central Rocky Mountains and West Coast states could add to the resiliency, redundancy, and representation of gray wolves.  AR_146.  However, elsewhere in the Final Rule, the Service concludes that wolves in these portions of the

1   range are not significant, or meaningful to the redundancy or resiliency of the 44-state entity,

2   because they occur in small numbers and include relatively few breeding pairs.  AR_145.  Thus,

3   the Rule suggests that wolves that contribute to the resiliency, redundancy, and representation of

4   gray wolves still may not be considered meaningful and thus, do not satisfy the "significant

5   portion" standard.  But the Service has not sufficiently explained how it draws that line.  Because

6   the Service has not provided any threshold for meaningfulness, the Court cannot assess whether

7   the Service's interpretation gives independent meaning to the phrase or has again implemented an

8   interpretation that renders it redundant or superfluous.

9        Accordingly, the Court finds the Service's interpretation is not a reasonable construction of

10  the phrase "significant portion of its range" and GRANTS Plaintiffs' motion on this basis.

11  **G.**      **Whether the Service's Threats Assessment Was Arbitrary and Capricious.**

12       **1.**      **Failure to analyze threats across the entire listed species.**

13       Plaintiffs argue that the Final Rule unlawfully omitted a threats assessment for gray wolves

14  across much of the species' current and historical range.  Plaintiffs contend that because the

15  Service relied on the flawed conclusion that wolves outside of the Great Lakes do not matter to the

16  recovery of the species, the Service did not assess the ESA's threat factors for wolves outside the

17  Great Lakes region.  Specifically, Plaintiffs contend that the Service did not assess the ESA's

18  threat factors for West Coast wolves or wolves in the Central Rocky Mountains.  The Court's

19  conclusion that the Service failed to analyze wolves outside of the two core metapopulations

20  means that it failed to adequately conduct a threats assessment for these wolves.

21       **2.**      **Effects of lost historical range.**

22       Plaintiffs argue that the Service failed to evaluate the impact of lost historical range on the

23  status of gray wolves.  The SPR Policy interprets "range" as "current range."  *Ctr. for Biological*

24  *Diversity*, 900 F.3d at 1067 (upholding this interpretation as reasonable).  According to the SPR

25  Policy, a species may be "endangered or threatened throughout all or a significant portion of its

26  current range because [the] loss of historical range is so substantial that it undermines the viability

27  of the species as it exists today."  79 Fed. Reg. at 37,584.  Thus, although loss of historical range

28  is not an independent factor under Section 1533(a)(1), the SPR Policy "still requires that FWS

consider the historical range of a species in evaluating other aspects of the agency's listing decision..." *Ctr. for Biological Diversity*, 900 F.3d at 1067; *see also Humane Soc'y*, 865 F.3d at 606 ("[A]n adequate evaluation of the threats confronting the survival of a species within its current range requires looking at more than just the current moment in time.").

Prior to European settlement, the gray wolf's historical range covered most of North America. AR_406-407. Today the range of the gray wolf throughout the United States remains far below historical levels. AR_152; *see Humane Soc'y*, 865 F.3d at 606 (estimating that ninety-five percent of the gray wolf's historical range has disappeared). The Service contends that its analysis of the threat of human-caused mortality captures the effects of the lost historical range because that threat was the primary cause of the wolf's historical range loss. According to the Service, because wolves are no longer subject to an active eradication program and are protected by various state laws, the lost historical range does not threaten the species with extinction.

The Court does not find the Service's argument persuasive. The Service's assessment of the threat of human-caused mortality in the currently listed entities focuses on the areas defined by the Service as the wolf's "current range," which does not include much of the historic range. Thus, although the Service asserts that it considered the effect the lost historical range may have on the current and future viability of the species, the Final Rule fails to adequately grapple with the causes and effects of historical range loss. Accordingly, the Service again fails to adequately address the possible enduring consequences of significant loss of historical range.[10] The Court GRANTS Plaintiffs' motion on this basis.

### 3. Inadequacy of existing regulatory mechanisms.

Section 4(a) of the ESA requires the Secretary to consider "the inadequacy of existing regulatory mechanisms" in determining whether to delist a protected species. 16 U.S.C. § 1533(a)(1)(D). The Secretary is to make this determination "solely on the basis of the best

---

[10] The court in *Humane Society* found that the Service failed to analyze the impact of the loss of historical range on the survival of gray wolves. 865 F.3d at 607. The court noted that in undertaking the historical range analysis on remand, the Service would have to grapple with the physical boundaries of the relevant historical range and establish the timeframe for measuring a species' historical range. *Id.* That the Final Rule addresses these predicate issues does not mean that the Service adequately considered the effects of the lost historical range.

United States District Court
Northern District of California

scientific and commercial data available to him…after taking into account those efforts, if any, being made by any State…to protect such species…" *Id.* § 1533(b)(1)(A).

### a. Adequacy of regulatory mechanisms in Great Lakes states

Plaintiffs argue that the Service improperly relied on inadequate and outdated state plans for gray wolf management in deciding to remove federal protections for wolves in Wisconsin, Minnesota, and Michigan.  Plaintiffs contend that the wolf management plans in the Great Lakes states are not sufficiently protective, increase harm to the species, include outdated, arbitrary population goals and unsustainable mortality levels, and fail to address recent studies that cast doubt on the assumptions underlying the plans.

In determining the adequacy of existing regulatory mechanisms, the Court must determine whether the Service's analysis could lead to the rational conclusion that the state's regulatory mechanisms are adequate to sustain a recovered wolf population.  *See Greater Yellowstone Coal., Inc., v. Servheen*, 665 F.3d 1015, 1032 (9th Cir. 2011) ("It is reasonable to conceive of "adequate" regulatory mechanisms as offering a recovered species something less than the stalwart protections of the ESA, but considerably more than no special protection at all.").  Here, the Court concludes that the Final Rule provides adequate support for the Service's determination that the Great Lakes' state management plans would provide adequate protection for gray wolves after delisting.

Plaintiffs argue that the post-delisting regulatory regimes in Wisconsin and Minnesota expand the number of wolves humans can kill and will result in a massive wolf population reduction.[11]  Plaintiffs also assert that the Service did not analyze how Wisconsin would ensure that the wolf kill limits were not exceeded in the contemplated post-delisting wolf hunts.  Plaintiffs also emphasize that the plans contemplate deliberate reductions in wolf populations of up to sixty percent.

However, contrary to Plaintiffs' argument, the Final Rule shows that the Service did analyze these issues and reached a different conclusion than Plaintiffs regarding the adequacy of the state plans.  *See, e.g.*, AR_133-134.  For example, the Service acknowledged that hunting

---

[11] Unlike Wisconsin and Minnesota, the Michigan plan does not provide for the opening of a hunting season to reduce the state's wolf population following removal of federal protections.

United States District Court
Northern District of California

seasons would likely lead to an initial reduction in wolf population; however, the Service concluded that deliberate reductions in population size through harvest would be unlikely to bring the population below the recovery thresholds.  In reaching this conclusion, the Service considered evidence showing that wolf populations in the Great Lakes has continued to increase despite human-caused mortality.  The Service also reviewed data from previous public harvests in the Great Lakes during periods when wolves were delisted showing that the wolf population recovered after the end of the harvest.  *See* AR_92; AR_419.  Additionally, the Service cited evidence of state regulators monitoring and adjusting harvest quotas in the past as evidence that the state was capable of monitoring and reducing quotas if wolf populations fall below threshold levels.  *Id*.  Accordingly, the Service's conclusion about the adequacy of regulatory mechanisms was rational.  Plaintiffs' disagreement with the Service's conclusions on these points does not render the Service's conclusion arbitrary and capricious.  *Kandra v. United States*, 145 F. Supp. 2d. 1192, 1210 (D. Or. 2001).[12]  For these reasons, the Service's conclusion that state management plans in the Great Lakes states would adequately protect gray wolves after delisting was not arbitrary and capricious.  The Court DENIES Plaintiffs' motion on this basis.

> **b.    Adequacy of regulatory mechanisms in states outside of the Great Lakes**

Plaintiffs also argue that the Service violated the ESA in determining that wolves outside the Great Lakes could be delisted despite inadequate existing state regulatory protections.

Plaintiffs first criticize the Service's review of the wolf management plans in Washington, Oregon, and California.  According to Plaintiffs, the Service failed to explain how the Washington plan would provide adequate protection to the gray wolves given that the plan is not binding.  With regard to Oregon's plan, Plaintiffs contend that the Service failed to consider the threat to wolves caused by the removal of ESA protections given that Oregon has not met its population

---

[12] Plaintiffs and several *amici* argue that the outcome of Wisconsin's February 2021 wolf hunt is evidence that the Service's determination of the adequacy of state management plans was unreasonable.  However, the February 2021 wolf hunt occurred after the Final Rule went into effect and information related to it is not part of the administrative record.  Accordingly, the Court does not consider arguments related to Wisconsin's February 2021 wolf hunt in determining if the Service acted arbitrarily and capriciously in determining the adequacy of the existing regulatory protections.

United States District Court
Northern District of California

objectives and the state's decision to remove state protections was blocked from judicial review. Plaintiffs also criticize all three plans because they do not include population management goals. As a result, Plaintiffs argue that the Service's conclusion that these recovery objectives would ensure the maintenance of wolf populations in these states after delisting was arbitrary and capricious.

While state regulatory mechanisms need not necessarily be legally binding, courts must review the mechanisms' purported adequacy to see "if they work." *Crow Indian Tribe*, 965 F.3d at 680. Here, the Court concludes that the Service's review of the regulatory mechanisms in Washington, Oregon, and California meet this bar. The Service considered the plans for wolf management in California, Oregon, and Washington and articulated a reasonable basis for the conclusion that sufficient protections existed to guide management of wolves in these states following delisting. The Final Rule addressed the plans in each state and determined that the regulatory mechanisms were not so inadequate that they represented a threat to the species. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 402 F. Supp. 2d 1198, 1209 (D. Or. 2005) ("There can be a large gap between the best regulatory mechanisms and a situation in which the regulatory mechanisms contribute to the threat and endangerment of a species."); *see also Defs. of Wildlife*, 849 F.3d at 1083 ("That determination…is a quintessential judgment call that Congress left to the Secretary, and by delegation to the Service, which has years of experience in evaluating what is reasonably likely to be implemented and effective.").[13]

Plaintiffs also contend that the Service entirely failed to examine regulatory mechanisms in Colorado and Utah in violation of the ESA. However, the record shows that the Service did assess the adequacy of the regulatory mechanisms in both states. *See* AR_97-98. The Court concludes that the Service's determination that the existing regulatory mechanisms in Colorado and Utah provide adequate protection for the gray wolf was not arbitrary and capricious. The Court

---

[13] Federal Defendants argue that any flaws in the analysis of these states' plans are not material to the Service's determination to delist gray wolves because the Service concluded that wolves outside the Great Lakes are unnecessary for the recovery of the entities that the Service evaluated. However, as discussed above, the Court has found that determination by the Service to be arbitrary and capricious. (*See* Section G, *supra*.) As a result, the Court finds this argument unpersuasive.

1   DENIES Plaintiffs' motion on this basis.

2              **c.      Federal public lands**

3       Plaintiffs also argue that because wolves in the western United States reside largely on

4   federal public lands, the Service was obligated to consider the adequacy of federal public land

5   management regimes in ensuring a sustainable wolf population post-delisting.  The Federal

6   Defendants' primary response to this argument is that any alleged flaws in its analysis of federal

7   public land management regimes in the western United States are not material because the wolves

8   in these areas are not necessary for the continued viability of the species.  However, as discussed

9   above, the Court has found that the Service's decision to exclude these wolf populations arbitrary

10  and capricious.  Accordingly, the Service's reliance on this argument to defend its analysis of

11  federal public land management regimes fails.

12      Defendant-Intervenor NRA argues that the Service evaluated the protections offered by the

13  U.S. Forest Service and Bureau of Land Management and found they would not increase human-

14  caused mortality to a level that threatens the species.  The Court disagrees.  The record shows that

15  wolves in the western States, including the Central Rocky Mountains, reside largely on federal

16  public lands; however, the U.S. Forest Service land management plans in the West Coast states

17  "do not contain standards and guidelines specific to wolf management."  AR_102.  Although the

18  Final Rule refers to certain existing mechanisms, such as the sensitive species listings for both

19  agencies, and it does not explain how these mechanisms will ensure a sustainable wolf population

20  post-delisting.  For this reason, the Court concludes that the Service's decision that post-delisting

21  federal public land management regimes provide adequate regulatory mechanisms was arbitrary

22  and capricious and GRANTS Plaintiffs' motion on this basis.

23  **H.    The Service Applied the Relevant Standard in Reviewing the 2018 Petition.**

24      In 2018, Center for Biological Diversity and Humane Society of the United States

25  submitted a petition to the Service that presented scientific studies and evidence to support ways to

26  define and protect gray wolves in the United States.  AR_21766-814 (2018 Petition).  The

27  *Defenders* plaintiffs argue that the Service violated the ESA in denying the 2018 Petition.

28  AR_138-39; *see also* AR_322-54.  The 2018 Petition requested one of three alternative DPS

United States District Court
Northern District of California

1   designations: (1) a DPS for the entire lower 48 States; (2) "Western" and "Eastern" DPSs; or (3)

2   regional DPSs for the West Coast, Southern Rocky Mountains, Northern Rocky Mountains,

3   Northeast, and Midwest.  AR_139; *see also* AR_21767.  Plaintiffs contend that the Service's

4   denial was improper because it relied on an elevated standard in reviewing the 2018 Petition.  The

5   Service argues that it applied the appropriate standard.

6        The parties agree that the relevant standard the Service should apply in evaluating a 90-day

7   petition is "whether the petition presents substantial scientific or commercial information

8   indicating that the petitioned action may be warranted."  16 U.S.C. § 1533(b)(3)(A).  "Substantial

9   information" is "that amount of information that would lead a reasonable person to believe that the

10  measure proposed in the petition may be warranted."  50 C.F.R. § 424.14(h)(1).  If the 90-day

11  determination is positive, the Service will then conduct a formal review of the petition and the

12  species concerned, including a public comment period, to determine whether listing the species is

13  warranted.  At the 90-day stage, "[i]t would be wrong to discount the information submitted in a

14  petition solely because other data might contradict it…unless the Service has demonstrated the

15  unreliability of the information that supports the petition."  *Ctr. for Biological Diversity v.*

16  *Kempthorne*, No. C 06-04186 WHA, 2007 WL 163244, at *4 (N.D. Cal. Jan. 19, 2007).

17       Here, the Service found that the 2018 Petition presented two viable listed species

18  arrangements and that the petition presented substantial information on the threats of

19  overutilization, disease, and genetic diversity.  However, the Service concluded that the Petition

20  did not provide substantial information that the threats may negatively affect wolves at the

21  population level.  *See* AR_330 ("mere identification of any threat(s) does not necessarily mean

22  that the species may meet the statutory definition of an "endangered species" or a "threatened

23  species.").  The Service reviewed the Petition and the sources cited therein.  In concluding that the

24  Petition lacked substantial information that the identified threats would negatively affect the gray

25  wolf population, the Service explained that it had previously considered many of the sources in the

26  Petition in prior reviews of the gray wolf listing and thus, they did not present substantial new

27  information.  *See* 50 C.F.R. § 424.14(h)(1)(iii) ("The 'substantial scientific or commercial

28  information' standard must be applied in light of any prior reviews or findings the Services have

United States District Court
Northern District of California

made on the listings status of the species that is the subject of the petition.").  Thus, the Service

relied on its experience and records in concluding that the Petition did not contain information

warranting a more in-depth review.  *See, Ctr. for Biological Diversity v. Morgenweck*, 351 F.

Supp. 2d 1137, 1142 (D. Colo. 2004) (noting that the Service need not "blindly accept statements

in petitions that constitute unscientific data or conclusions, information FWS knows to be obsolete

or unsupported conclusions of petitioners").  For these reasons, the Court finds that the Service

applied the relevant standard in reviewing the 2018 Petition and DENIES the *Defenders* Plaintiffs'

motion on this basis.

## I.        The Court Remands with Vacatur.

In the Ninth Circuit, remand without vacatur is the exception rather than the rule.  *See*

*California Cmty. Against Toxics v. U.S. EPA*, 688 F.3d 989, 984 (9th Cir. 2012) ("we have only

ordered remand without vacatur in limited circumstances.");  *Humane Soc'y v. Locke*, 626 F.3d

1040, 1053 n.7 (9th Cir. 2010) ("In rare circumstances, when we deem it advisable that the agency

action remain in force until the action can be reconsidered or replaced, we will remand without

vacating the agency's action.").  When determining whether to leave an agency action in place on

remand, the Ninth Circuit weighs the seriousness of the agency's errors against "the disruptive

consequences of an interim change that may itself be changed."  *Cal. Cmties. Against Toxics*, 688

F.3d at 992 (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-

51 (D.C. Cir. 1993).

Here, the Service's analysis relied on two core wolf populations to delist wolves nationally

and failed to provide a reasonable interpretation of the "significant portion of its range" standard.

These deficiencies in the Final Rule are serious and weigh in favor of vacatur.  For these reasons,

the Court does not find the NRA's argument for partial vacatur persuasive.  Additionally, while

there will be some disruption if the Final Rule is vacated, the Court does not find that the

disruption warrants departing from the Ninth Circuit's default.  Remand with vacatur is

appropriate here.

//

//

**CONCLUSION**

For the foregoing reasons, the Court GRANTS judgment in favor of Plaintiffs and against Defendants.  The "Endangered and Threatened Wildlife and Plants; Removing the Gray Wolf (*Canis lupus*) From the List of Endangered and Threatened Wildlife," 85 Fed. Reg. 69,778 (Nov. 3, 2020), is vacated and remanded.  A separate judgment shall issue, and the Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: February 10, 2022

_____
JEFFREY S. WHITE
United States District Judge